LOVELL, LOVELL, ISERN & FARABOUGH, L.L.P.
John H. Lovell, SBN 12609300
Barbara A. Bauernfeind, SBN 08190500
Matthew S. Merriott, SBN 24100846
112 Southwest 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Telephone:  806/373-1515
Facsimile:  806/379-7176
*Attorneys for Lone Star State Bank of West Texas*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Chapter 11 |
| WAGGONER CATTLE, LLC, ET AL, | § | |
| | § | CASE NO. 18-20126-rlj-11 |
| | § | Joint Administration |
| *Debtors.* | § | |

| | | |
|---|---|---|
| LONE STAR STATE BANK OF | § | |
| WEST TEXAS, | § | |
| | § | ADVERSARY PROCEEDING NO. |
| *Plaintiff,* | § | _____-rlj-11 |
| | § | |
| v. | § | |
| | § | |
| RABO AGRIFINANCE, LLC, | § | |
| f/k/a RABO AGRIFINANCE, INC.; | § | |
| WAGGONER CATTLE, LLC; | § | |
| CLIFF HANGER CATTLE, LLC; and | § | |
| CIRCLE W OF DIMMITT, INC., | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ........................................................................ 1

II.     BACKGROUND ............................................................................................ 3

    A.   LOANS BY LONE STAR TO WAGGONER-RELATED ENTITIES ................................... 3

    B.   LONE STAR FORBEARANCE AGREEMENT ................................................................ 7

    C.   WAGGONER BUSINESS EXPANSION ......................................................................... 8

    D.   2014 LOAN BY RABO TO CLIFF HANGER AND INTERCREDITOR
        AGREEMENT ........................................................................................................ 10

    E.   CONTRARY TO THE INTERCREDITOR AGREEMENT, WAGGONER
        CATTLE WERE TRANSFERRED TO CLIFF HANGER WITHOUT FULL
        PAYMENT ............................................................................................................. 12

    F.   CIRCLE W OF DIMMITT, INC. AND WAGGONER CATTLE, LLC
        FRAUDULENT TRANSFERS ................................................................................... 15

    G.   OBLIGATIONS OF RABO ........................................................................................ 16

    H.   TRANSFERS SHOW SIGNS OF FRAUD ..................................................................... 17

III.    PREFACE AS TO CAUSE OF ACTION NOS. 1-6 ....................................... 18

IV.     CAUSES OF ACTION ................................................................................... 20

    A.   FIRST CAUSE OF ACTION – AVOIDANCE OF FRAUDULENT
        TRANSFERS .......................................................................................................... 20

    B.   SECOND CAUSE OF ACTION – AVOIDANCE OF CONSTRUCTIVE
        FRAUDULENT TRANSFERS ................................................................................... 22

    C.   THIRD CAUSE OF ACTION – AVOIDANCE AND RECOVERY OF
        FRAUDULENT TRANSFERS ................................................................................... 24

    D.   FOURTH CAUSE OF ACTION – EQUITABLE SUBORDINATION ................................. 25

    E.   FIFTH CAUSE OF ACTION – DISALLOWANCE OF CLAIM UNDER 11
        U.S.C. §502(D) .................................................................................................... 25

    F.   SIXTH CAUSE OF ACTION – TEXAS UNIFORM FRAUDULENT
        TRANSFER ACT .................................................................................................... 26

    G.   SEVENTH CAUSE OF ACTION – DECLARATORY JUDGMENT .................................. 28

H.    EIGHTH CAUSE OF ACTION – BREACH OF INTERCREDITOR
AGREEMENT ................................................................................... 31

I.    NINTH CAUSE OF ACTION – CONVERSION ............................................ 33

J.    TENTH CAUSE OF ACTION – FRAUDULENT INDUCEMENT ...................... 34

K.    ELEVENTH CAUSE OF ACTION – MONEY HAD AND RECEIVED BY
RABO AND CONSTRUCTIVE TRUST ......................................................... 36

L.    TWELFTH CAUSE OF ACTION – SUIT TO AVOID FRAUDULENT
TRANSFERS TO TRANSFEREE RABO ......................................................... 37

M.    THIRTEENTH CAUSE OF ACTION – CIVIL CONSPIRACY ......................... 37

N.    FOURTEENTH CAUSE OF ACTION – ACCOUNTING .................................. 38

O.    FIFTEENTH CAUSE OF ACTION – WRONGFUL OFFSET ........................... 39

P.    SIXTEENTH CAUSE OF ACTION – ATTORNEY'S FEES AND COSTS ......... 40

V.    CONDITIONS PRECEDENT ............................................................................. 41

VI.   PRE-JUDGMENT INTEREST .......................................................................... 41

VII.  POST-JUDGMENT INTEREST ........................................................................ 41

VIII. RESERVATION OF RIGHT TO AMEND .......................................................... 41

IX.   REQUEST FOR RELIEF .................................................................................. 41

LONE STAR STATE BANK OF WEST TEXAS ("Lone Star" or "Plaintiff") hereby files this Original Complaint (the "Complaint") against RABO AGRIFINANCE, LLC, f/k/a Rabo Agrifinance, Inc. ("Rabo"), Waggoner Cattle, LLC, Cliff Hanger Cattle, LLC, and Circle W of Dimmitt, Inc.  Plaintiff respectfully states as follows:

## I.   JURISDICTION AND VENUE

1.     On April 9, 2018 (the "Petition Date"), Waggoner Cattle LLC ("Waggoner Cattle"), Cliff Hanger Cattle, LLC ("Cliff Hanger"), and Circle W of Dimmitt, Inc. ("Circle W") each filed a voluntary petition in the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division, pursuant to Chapter 11 and Section 301 of Title 11 of the United States Code (the "Bankruptcy Code") thus initiating the voluntary cases [Waggoner Cattle Case No. 18-20126-rlj-11; Cliff Hanger Case No. 18-20129-rlj-11; Circle W Case No. 18-20127-rlj-11].[1]

2.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a) and (b) and 1334.  This is a core proceeding as defined in 28 U.S.C. § 157(b).  If any part of this adversary proceeding is found to be "non-core," under Bankruptcy Rule 7008, the Plaintiff consents to the entry of final orders and judgments by this Court.

3.     Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

4.     Lone Star is a Texas financial institution with its principal place of business in Lubbock County, Texas at 6220 Milwaukee Avenue, Lubbock, Texas 79424.  Lone Star is a citizen of Texas.

5.     Rabo is a Delaware corporation with its principal place of business at 12443 Olive Boulevard, Suite 50, St. Louis, Missouri  63141.  Rabo is registered to do business in Texas and

---

[1] All references to the "Bankruptcy Code" are made to 11 U.S.C. §§ 101 *et seq*. Unless otherwise indicated, all section references are references to the Bankruptcy Code.

does business in the Northern District of Texas, with an office in Potter County, Texas at 5307 W. Interstate 40 W, Amarillo, Texas 79106.  Rabo is a citizen of Delaware.  Its registered agent for service of process in Texas is, and it may be served with process by service of process upon, C T Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

6.      Waggoner Cattle, LLC is a Texas limited liability company, whose president is Michael Quint Waggoner. Waggoner Cattle, LLC may be served through its agent for service of process, Johnny Kent Merritt, 3144 Bee Caves Road, Austin, Travis County, Texas 78746, or at 1001 S. Harrison Street, Suite 200A, Amarillo, Potter County, Texas 79101.

7.      Cliff Hanger Cattle, LLC is a Texas limited liability company, whose President is Michael Quint Waggoner, and which may be served through its agent for service of process, Johnny Kent Merritt, 3144 Bee Caves Road, Austin, Travis County, Texas 78746, or at 1001 S. Harrison Street, Suite 200A, Amarillo, Potter County, Texas 79101.

8.      Circle W of Dimmitt, Inc. is a Texas corporation with its principal place of business in Castro County, Texas. Circle W of Dimmitt, Inc. may be served by service upon its president, Michael Quint Waggoner, or by service upon its registered agent for service of process, Johnny Kent Merritt, 3144 Bee Caves Road, Austin, Travis County, Texas 78746, or at 1001 S. Harrison Street, Suite 200A, Amarillo, Potter County, Texas 79101.

9.      In the subject transactions, Rabo conducted business in Texas with Debtors Cliff Hanger, LLC, Waggoner Cattle, LLC, Circle W of Dimmitt, Inc., Bugtussle Cattle, LLC, and Michael Quint Waggoner ("Quint") who are residents of Castro County, Texas, and with Lone Star which is a resident of Lubbock County, Texas.  Both Castro County, Texas and Lubbock County, Texas are counties within the Northern District of Texas.  The bankruptcy cases of Waggoner Cattle, LLC, Cliff Hanger, LLC, Circle W of Dimmitt, and Bugtussle Cattle, LLC

(Case No. 18-20128-rlj-11) ("Bugtussle") are jointly administered in Case No. 18-20126-rlj-11, by order dated April 20, 2018, and are all pending in the Amarillo Division of the Northern District of Texas. The bankruptcy case of Michael Quint Waggoner is also pending in this Court in Case No. 18-20125-rlj-11, but is not jointly administered with the Waggoner Cattle, Cliff Hanger, Circle W and Bugtussle bankruptcy cases.

10.    This Complaint is brought in accordance with Federal Rules of Bankruptcy Procedure 7001, *et seq.*, and seeks relief under sections 105, 502(d), 510(c), 547(b), 548 and 550 of the Bankruptcy Code, declaratory judgment under 28 U.S.C. § 2201, as well as Sections 24.005, and/or 24.006 of the Texas Business and Commerce Code.

11.    This Complaint further seeks relief under Texas law for breach of contract, fraudulent transfer (TEX. BUS. & COMM. CODE §24.001 et seq.), attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE §38.001, et seq., and TEX. BUS. & COMM. CODE §24.013, declaratory judgment and attorney's fees under TEX. CIV. PRAC. & REM. CODE §37.001 et seq., conversion, fraud, fraudulent inducement, and fraud as to borrowing bases.

## II.    BACKGROUND

### A.    LOANS BY LONE STAR TO WAGGONER-RELATED ENTITIES

12.    Prior to Defendant Rabo beginning to loan money to Debtor Cliff Hanger, Lone Star had entered into certain loan documents, promissory notes, security agreements, and financial agreements as listed below with Debtors Waggoner Cattle, Cliff Hanger, as well as with Debtors, Bugtussle Cattle, LLC, Circle W of Dimmitt, Inc., and/or Waggoner Trust:

| Note No. | Date | Amount | Borrower |
|----------|------|--------|----------|
| 7100155659 | 07/18/11 | $1,300,000.00 | Bugtussle Cattle, LLC |
| 7100168381 | 04/30/12 | $ 505,000.00 | Bugtussle Cattle, LLC |
| 7100167463 | 10/05/12 | $1,304,000.00 | Bugtussle Cattle, LLC; Waggoner Cattle, LLC; Circle W of Dimmitt, Inc. |
| 7100155644 | 10/31/13 | $7,000,000.00 | Waggoner Cattle, LLC; Circle W of Dimmitt, Inc.; Bugtussle Cattle, LLC |

| Note No. | Date | Amount | Borrower |
|----------|------|--------|----------|
| 7100187471 | 03/07/14 | $8,000,000.00 | Waggoner Cattle, LLC; Cliff Hanger Cattle, LLC; Circle W of Dimmitt, Inc.; Bugtussle Cattle, LLC |
| 7100216049 | 03/09/16 | $    92,000.00 | Bugtussle Cattle, LLC |

13.     Pursuant to its loan documents, promissory notes, and security agreements, Lone Star  obtained a first lien security interest in,  and encumbrance on,  the following property and rights of Waggoner Cattle, Cliff Hanger and Circle W:

    a.   cattle and livestock;

    b.   receivables;

    c.   present and future accounts;

    d.   general intangibles;

    e.   all products and proceeds;

    f.   present and future inventory;

    g.   present and future farm products;

    h.   hedge accounts;

    i.   equipment; and

    j.   contract rights and monies and proceeds payable thereunder.

14.     These liens were granted in the respective security agreements and deeds of trust, and were thereafter perfected.

15.     Pursuant to its loan documents, promissory notes, security agreements and deeds of trust, Lone Star obtained a first lien security interest in, and encumbrance upon the following property and rights of Waggoner Cattle, Cliff Hanger, Circle W and Bugtussle:

    a.     Bugtussle:  July 18, 2011 Deed of Trust as to real property in Castro County, Texas, recorded on August 3, 2011 in Castro County in Vol. 335, Pg. 803 of the public records;

      b.      Bugtussle:  February 29, 2016 Modification of Deed of Trust recorded in Castro County, Texas in Vol. 376, Pg. 20 of the public records;

      c.      Waggoner Cattle:  R. J. O'Brien & Associates, LLC Security Agreement and Assignment of Accounts to Lone Star dated August 15, 2011;

      d.      Bugtussle:  April 30, 2012 Deed of Trust as to real property in Castro and Lamb Counties, Texas recorded on May 1, 2012 in Castro County, Texas in Vol. 342, Pg. 145 of the public records, and recorded on May 2, 2012 in Lamb County, Texas in Vol. 686, Pg. 185 of the public records;

      e.      Bugtussle:  October 5, 2012 Agricultural Security Agreement;

      f.      Waggoner Cattle:  October 5, 2012 Agricultural Security Agreement;

      g.      Circle W:  October 5, 2012 Agricultural Security Agreement;

      h.      Bugtussle:  October 5, 2012 Deed of Trust as to real property in Castro County, Texas, recorded on November 9, 2012 in Castro County, Texas in Vol. 346, Pg. 549 of the public records;

      i.      Waggoner Cattle:  October 5, 2012 Agricultural Security Agreement;

      j.      Bugtussle:  October 5, 2012 Agricultural Security Agreement;

      k.      Circle W:  October 5, 2012 Agricultural Security Agreement;

      l.      Waggoner Cattle:  Match 7, 2014 Agricultural Security Agreement;

      m.      Cliff Hanger:  March 7, 2014 Agricultural Security Agreement;

      n.      Bugtussle:  March 7, 2014 Agricultural Security Agreement;

      o.      Circle W:  March 7, 2014 Agricultural Security Agreement;

      p.      Bugtussle:  March 7, 2014 Deed of Trust as to real property in Castro and Lamb Counties, Texas, recorded on April 15, 2014 in Lamb County, Texas in Vol. 357, Pg. 684 of the public records, and recorded on April 3, 2014 in Castro County, Texas in Vol. 357, Pg. 691 of the public records; and

      q.      Bugtussle:  March 9, 2016 Agricultural Security Agreement.

Security interests were granted in the respective security agreements and deeds of trust and were

perfected shortly thereafter.

16.    One of the conditions of the Lone Star loans to Waggoner Entities was that the financial statements of these entities be regularly audited by certified public accountants. Pursuant to Lone Star's requirement, the Waggoner Entities hired Moseley & Riddle to perform these required audits.

17.    Quint Waggoner caused periodic borrowing base reports on his business entities to be prepared and delivered to Lone Star, and to Rabo. Lone Star relied on all these borrowing base reports to loan, and continue to loan, to Quint's entities.

18.    Because of the expansion of Quint Waggoner's businesses, these Waggoner Entities needed to borrow additional funds. An arrangement was made whereby Rabo would loan money to Cliff Hanger to finance the Cliff Hanger cattle being fed in third party commercial feed yards, such as Barrett & Crofoot, Bar-G, Great Plains, and Dean Cluck Feedyard. It was contemplated that while Rabo was in the process of replacing Lone Star as the lender to the Waggoner Entities for their cattle, in the interim, Lone Star would continue to loan money to Waggoner Cattle, Circle W and Bugtussle to finance the operations of those businesses.

19.    Lone Star received and relied upon the borrowing base reports delivered to it by Quint Waggoner, and later, Lone Star also received and relied upon the borrowing base reports which Quint Waggoner and Cliff Hanger delivered to Rabo, copies of which were routinely delivered to Lone Star. Further, Lone Star relied upon the audits, compilations and reviews prepared and delivered by Moseley & Riddle in continuing the loans to Waggoner Cattle, Bugtussle and Circle W. Lone Star reasonably relied upon these documents in believing that the accounting records of Cliff Hanger, LLC, Waggoner Cattle, LLC, Bugtussle Cattle, LLC and Circle W of Dimmitt, Inc. accurately represented and presented the assets and liabilities of those

entities, accurately stated the collateral and collateral values by which the bank loans were secured, and accurately recorded the transactions of the Waggoner Entities.

20.     Lone Star was not notified of any particular problem with the Waggoner Entities' financial matters until December 29, 2016. The Lone Star borrowing base for year end 2016 inexplicably had millions of dollars of receivables "disappear," and reflected huge reductions in total cattle inventory.  In December of 2016, Lone Star's borrowing base value inexplicably went from $12,410,661.45 to $2,227,506.00.  In that same period, the value of the receivables on Lone Star's borrowing base went from $7,461,045.00 to $265,000.00.   Moseley & Riddle were questioned by Lone Star about "what happened?".  They were unable or unwilling to explain beyond stating that adjusting entries were made.   Quint Waggoner also blamed errors by his accountants as the cause of the problem, particularly in regard to the stated receivables from his sons, Tucker Waggoner and Tyler Waggoner. Quint Waggoner blamed Moseley & Riddle for not previously noting and bringing to his attention the errors and misstatements in the Waggoner Entities' financial statements, accounting records, and borrowing base certificates.

21.     It is now very obvious that a great deal of the information and representations in the borrowing base reports, the audit reports, the compilations, and in the accounting records of the Waggoner Entities, all of which was reasonably relied upon by Lone Star, was grossly incorrect.  Accordingly, all statutes of limitations in this case should be tolled so as to not to begin to accrue until Lone Star actually discovered the underlying claims and causes of action.

B.     LONE STAR FORBEARANCE AGREEMENT

22.     Waggoner Cattle's loans to Lone Star became past due and in default.  Lone Star and Waggoner Cattle entered into a Forbearance Agreement, effective June 1, 2017.  Under the terms of the Forbearance Agreement, Lone Star ratified its perfected security interests in:

        a.   cattle and farm products;

     b.  equipment;

     c.  receivables;

     d.  inventory;

     e.  accounts;

     f.  hedge accounts;

     g.  real estate;

     h.  life insurance;

     i.  general intangibles;

     j.  an aircraft;

     k.  all Waggoner Cattle's claims, causes of action, and all choses in action, including all claims which Waggoner Cattle has against Rabo and Cliff Hanger; and

     l.  proceeds.

## C.   WAGGONER BUSINESS EXPANSION

23.    Fed Holstein cattle require long periods of time on feed in order to finish properly. The long period of time for which fed Holstein cattle remain on a high carbohydrate diet can lead to digestive problems and liver abscesses.  Quint Waggoner determined that if he could own the feed yard in which his Holstein feeder cattle were fed, and control the diet of these fed Holsteins to a diet more suited toward their long periods of time on feed, he could reduce the incidence of liver abscesses and condemned carcasses in his fed Holstein cattle.  Quint Waggoner then decided to seek to buy a feed yard to feed the cattle belonging to his Waggoner Entities.

24.    Quint Waggoner was seeking to greatly increase the number of cattle in his grow yard, as well as increasing the number of cattle on feed, including the number of cattle on feed in the feed yard he attempted to purchase. Quint Waggoner spent at least $5 million in improving

8

and expanding his grow yard facility near Dimmitt. Quint Waggoner's credit needs exceeded
Lone Star's capacity to loan such large sums to one borrower. Lone Star told Quint Waggoner he
needed to find another lender.

25.    As part of his business expansion plans, Quint Waggoner entered into a contract
to purchase Great Plains Feedyard near Hereford, Texas, and made a $500,000 down payment.
The Seller of the Great Plains feed yard agreed with Quint that, if Quint would close on the
purchase of the feed yard, Quint could also receive, as part of the purchase of the feed yard, all
the feed markup attributable to the Cliff Hanger cattle on feed in the Great Plains Feedyard.
Because of the Seller's promise to allow Quint Waggoner to recover the feed markup on the Cliff
Hanger cattle in the Great Plains Feedyard upon closing of the purchase of that feed yard, Cliff
Hanger then began buying large numbers of cattle and placing them in the Great Plains
Feedyard, even though, at the time, market conditions were such that such Holstein cattle would
not be expected to make a profit unless the feed markup was rebated by Great Plains Feedyard
upon closing of the purchase.  Quint Waggoner did not then inform Lone Star that the cattle then
being placed on feed would lose money.

26.    Rabo expressed an interest in financing Quint Waggoner's operations. The
interim plan of Quint Waggoner, Rabo Agrifinance and Lone Star was for Lone Star to finance
Waggoner Cattle's cattle at the calf ranch, Rabo to finance the Cliff Hanger cattle in third party
feed yards, and Lone Star to finance the real estate and equipment of Bugtussle.  When Rabo was
to take over all the cattle lending for the Waggoner Entities, it was discussed that Lone Star
would consider financing the purchase of the Great Plains Feedyard.  The plan among Quint
Waggoner and the Banks was that, after Rabo had its loan to Cliff Hanger in place, Quint
Waggoner and the Banks would then work together to have Rabo take over the lending on all the

cattle of Cliff Hanger and Waggoner Cattle.  As late as early November of 2016, Rabo was
stating its intent to take over all the cattle lending to the Waggoner Entities.

**D.     2014 LOAN BY RABO TO CLIFF HANGER AND INTERCREDITOR AGREEMENT**

27.     Cliff Hanger wanted to borrow money from Rabo to buy the cattle to fill the Great
Plains Feedyard and finance the Cliff Hanger cattle and feed.  It was contemplated that, if Rabo
took over the financing of all of Quint Waggoner's cattle, Lone Star might finance the feed yard
purchase, and Rabo would finance the cattle.  It was contemplated that Rabo would eventually
take out Lone Star and become the sole lender for Quint Waggoner and his entities.  Lone Star
had a prior first lien on all the Waggoner Entities' collateral.

28.     Rabo and Cliff Hanger entered into a loan agreement, dated October 27, 2014.
Then, on December 2, 2014, they entered into an amended and restated loan agreement.  A copy
of the amended and restated loan agreement is attached as Exhibit A.  This loan agreement
provided that: 1) Rabo would only advance funds for 75% of the value of unhedged cattle, 2) the
transfer price for Waggoner Cattle transferred to Cliff Hanger would be based upon the most
recent Overland Auction price, and 3) Rabo would receive monthly borrowing base reports from
Quint, annual CPA audits, and quarterly CPA compilations of Cliff Hanger financial statements.
Lone Star was never a party to this contract, and was never bound by its terms.  As is typical
with cattle lending, Cliff Hanger was to have and maintain a 25% equity margin in the Cliff
Hanger cattle.  Quint Waggoner caused the monthly borrowing base reports of Cliff Hanger to
also be delivered to Lone Star.  Lone Star reviewed and relied upon the Cliff Hanger borrowing
base reports delivered to Lone Star.

29.     Because Lone Star had a perfected prior lien and security interest in cattle and
other collateral of Waggoner Cattle and Cliff Hanger, Rabo contacted Lone Star about an
Intercreditor Agreement.

30.    Lone Star was unwilling to subordinate its prior secured status and lien as to any property or rights of Waggoner Cattle or Cliff Hanger without express assurance, and a contractual obligation, that the cattle of Waggoner Cattle would not be transferred to Cliff Hanger, and Lone Star's first lien on Waggoner Cattle's cattle and their proceeds would not be released or subordinated, without Waggoner Cattle being paid in full for the cattle Waggoner Cattle transferred to Cliff Hanger.

31.    Because Rabo wanted a lien upon, and a security interest in, cattle sold by Waggoner Cattle to Cliff Hanger (the cattle on feed in third party feed yards), and Lone Star wanted to preserve its prior liens and security interests in the Waggoner Cattle cattle and their proceeds until Waggoner Cattle was paid in full for the cattle, Lone Star and Rabo entered into a November 26, 2014 Intercreditor Agreement.  (*See*, *esp.* ¶2(a)).  A true and correct copy of the Lone Star-Rabo Intercreditor Agreement is attached hereto as Exhibit B.

32.    Under ¶2(a) of the Intercreditor Agreement, Rabo did not obtain a lien or security interest in the cattle transferred from Waggoner Cattle to Cliff Hanger, until and unless Waggoner Cattle was paid in full for the transferred cattle.  And, if Waggoner Cattle was not paid in full for the transferred cattle, Lone Star's prior first lien and security interest as to those Waggoner Cattle cattle, and upon the proceeds of the Waggoner Cattle cattle, remained and had priority over any lien or security interest claim of Rabo as to the cattle at Cliff Hanger, LLC, which in the absence of full payment to Waggoner Cattle and Rabo lien would, in any event, be junior to Lone Star's perfected first lien.

33.    Noteworthy as to the Intercreditor Agreement, on page 7 of the Agreement, Cliff Hanger and Waggoner Cattle also signed the Agreement, acknowledged awareness of its terms,

consented to the Intercreditor Agreement, and agreed to be bound by the terms of the Intercreditor Agreement.

**E.    CONTRARY TO THE INTERCREDITOR AGREEMENT, WAGGONER CATTLE WERE TRANSFERRED TO CLIFF HANGER WITHOUT FULL PAYMENT**

34.    Beginning on or about November 25, 2014 and through 2017, Cliff Hanger obtained possession of cattle of Waggoner Cattle without paying the full price of the cattle to Waggoner Cattle. Approximately $9 million of Waggoner Cattle cattle were transferred to Cliff Hanger with no payment at all, more Waggoner Cattle cattle were transferred to Cliff Hanger for less than their market value, and approximately $6 million of Waggoner Cattle cattle were transferred to Cliff Hanger via offsets involving Tucker Waggoner and Tyler Waggoner receivables.

35.    Accordingly, many millions of dollars' worth of Waggoner Cattle cattle were transferred to Cliff Hanger without Waggoner Cattle receiving: 1) full payment, 2) market value, 3) the amount owed, or 4) a reasonably equivalent value, in exchange for the transfers.  These transfers occurred when Waggoner Cattle was about to engage in transactions for which the remaining assets were relatively small in relation to the transactions and contemplated business, and at a time when Waggoner Cattle intended to incur, or believed, or reasonably should have believed that Waggoner Cattle would incur debts beyond Waggoner Cattle's ability to pay those debts as they became due.

36.    Pursuant to the express terms of the Intercreditor Agreement, Rabo knew that Cliff Hanger had to pay Waggoner Cattle in full for the cattle sold to Cliff Hanger by Waggoner Cattle, or else Lone Star's perfected lien on those cattle and proceeds would not be released or subordinated, and the cattle and their proceeds would not become collateral pledged by Cliff Hanger to Rabo.  When Cliff Hanger did not pay for the cattle, or did not pay full value for the

Waggoner Cattle cattle, Rabo's security interest in the transferred cattle never attached and, at all times pertinent, Lone Star's prior perfected first lien status and lien as to the transferred cattle and their proceeds remained.  In the alternative, when Cliff Hanger did not pay, or did not pay in full for the Waggoner Cattle cattle, Rabo's lien remained junior to Lone Star's perfected first lien against the transferred cattle and their proceeds.  When Cliff Hanger did not pay Waggoner Cattle for the cattle, or did not pay full value for the transferred cattle, and then transferred proceeds from the re-sale of the same cattle to Rabo when the cattle finished, Lone Star's perfected first lien as to those cattle and their proceeds remained.  The cattle were transferred to Cliff Hanger in breach of the Intercreditor Agreement, and both Cliff Hanger and Rabo are transferees of the cattle and proceeds of the cattle that were fraudulently transferred.

37.    At the time the cattle of Waggoner Cattle were transferred to Cliff Hanger for less than full price, or for no payment whatsoever, Lone Star had a prior perfected security interest in those cattle and proceeds pursuant to its Agricultural Security Agreements with Waggoner Cattle and Cliff Hanger.  Lone Star's prior security interest was totally disregarded in the Fraudulent Transfers, all to the detriment of Lone Star and original Debtor Waggoner Cattle, which first owned and possessed the cattle and had granted to Lone Star security interests in such collateral.

38.    As set out in its October 27, 2014 Credit Agreement with Cliff Hanger, Rabo directed that the amount of the Rabo loan advances to Cliff Hanger, which Cliff Hanger used to pay Waggoner Cattle for the transferred cattle would be only 75% of the average price of such calves at the Overland Auction.  (*See* Paragraph 6.11 of the October 27, 2014 Credit Agreement, Exhibit A.)  Rabo had actual awareness that as Cliff Hanger was transferring money to Waggoner Cattle to pay for the transferred Waggoner Cattle calves, Cliff Hanger was not paying the full transfer price, as was required in the Intercreditor Agreement, and it knew that Cliff

Hanger was not paying Waggoner Cattle the market price, or a reasonable equivalent price.  So when Rabo contemporaneously signed the Intercreditor Agreement with Lone Star, Rabo **knew** Cliff Hanger would **not** be paying full price for the calves obtained from Waggoner Cattle.  Rabo only permitted Cliff Hanger to pay Waggoner Cattle approximately 75% of the actual value of the Waggoner Cattle being transferred to Cliff Hanger.

39.     The perfected security interests and agricultural liens of Lone Star in the transferred cattle and their proceeds remain even though Cliff Hanger received and later sold the cattle, and remitted the sales proceeds to Rabo.  When Rabo accepted and retained the proceeds from the sale of those cattle from Cliff Hanger, Rabo breached the Intercreditor Agreement, it wrongfully asserted a lien upon the Waggoner Cattle cattle which had been shipped to Cliff Hanger for no value or insufficient value, and the proceeds of such cattle, and it disregarded Lone Star's prior and existing perfected security interest and lien as to such cattle and their proceeds, thereby 1) converting the proceeds of Lone Star's collateral, 2) breaching the Intercreditor Agreement, and 3) being the knowing and willing transferee of fraudulent transfers.

40.     To the extent Rabo may claim it has, or had, a lien or could claim as collateral, cattle or proceeds of cattle that Cliff Hanger obtained from Waggoner Cattle but for which Cliff Hanger did not pay, or did not pay full value, Lone Star objects to the Rabo lien under 11 U.S.C. § 506.  Pursuant to the November 26, 2014 Intercreditor Agreement, Rabo did not obtain a lien or secured status as to cattle in the possession of Cliff Hanger for which Cliff Hanger did not pay Waggoner Cattle full value, and Lone Star's prior security interest and lien remained as to all such cattle and in the proceeds of the sale of those cattle.  In the alternative, any lien which Rabo had on the Cliff Hanger cattle was junior and subordinated to Lone Star's perfected first lien.

F.   **CIRCLE W OF DIMMITT, INC. AND WAGGONER CATTLE, LLC FRAUDULENT TRANSFERS**

41.   As of June 30, 2016, Tucker Waggoner's feed and care payable obligation to Circle W, and Circle W's receivable from Tucker Waggoner totaled $2,201,187.38.   As of June 30, 2016, Tyler Waggoner's feed and care payable obligation to Circle W, and Circle W's receivable from Tyler Waggoner totaled $1,451,408.77.   Lone Star was Circle W's secured lender. These $3,652,596.15 in receivables were assets of Circle W, and therefore collateral of Lone Star.   Effective June 30, 2016, journal entries were made transferring these $3,652,695.15 in receivables to Cliff Hanger. These transfers were for no consideration, and were made in order to hinder, delay or defraud Circle W's secured lender, Lone Star.

42.   Prior to June 30, 2016, Tucker Waggoner had accumulated a large feed and care payable to Waggoner Cattle. Waggoner Cattle paid itself with cash, credit or offsets $487,521.14 of this payable for Tucker Waggoner, for no consideration. These payments were made in order to hinder, delay or defraud Waggoner Cattle, of which Lone Star was its secured creditor. These payments or credits were also made in order to hinder, delay or defraud a secured creditor of Waggoner Cattle, Lone Star.

43.   Prior to June 30, 2016, Tyler Waggoner had accumulated a large feed and care payable to Waggoner Cattle. Waggoner Cattle paid itself with cash, credits or offsets $361,000.00 of this payable for Tucker Waggoner, for no consideration. These payments or credits were made in order to hinder, delay or defraud Waggoner Cattle, of which Lone Star was its secured creditor. These payments or credits were also made in order to hinder, delay or defraud a secured creditor of Waggoner Cattle, Lone Star.

G.     OBLIGATIONS OF RABO

44.     Under the Intercreditor Agreement, Rabo and Debtors Waggoner Cattle and Cliff Hanger knew Rabo would not obtain a security interest or lien in the cattle or in the proceeds of the cattle transferred from Waggoner Cattle to Cliff Hanger, unless and until Waggoner Cattle was paid in full for the cattle.

45.     The Intercreditor Agreement obligated Rabo to assure that Waggoner Cattle was paid in full before Rabo claimed a security interest or lien as to the transferred cattle and their proceeds, and before Rabo accepted any proceeds from the sale of cattle transferred from Waggoner Cattle to Cliff Hanger.

46.     Contrary to its contractual obligations to Lone Star, and in order to perpetuate a fraud or constructive fraud upon Lone Star, Rabo directed the Debtors to transfer the Waggoner Cattle cattle to Cliff Hanger without paying full price to Waggoner Cattle, and then Rabo received all the proceeds of those same cattle when they were later sold by Cliff Hanger, even though Rabo had no security interest or lien, or, alternatively, only held a junior or subordinated security interest or lien, on such cattle and their proceeds.

47.     The transfers of Waggoner Cattle cattle, in which Lone Star had a prior perfected security interest and lien, to Cliff Hanger were done by Waggoner Cattle and Cliff Hanger, with the proceeds of those transferred cattle paid to Rabo, with actual intent to hinder, delay or defraud Lone Star, to whom Waggoner Cattle and Cliff Hanger were indebted on secured debts.

48.     As a result of the actions of Waggoner Cattle, Cliff Hanger, and Rabo, Lone Star did not receive the proceeds from the transfer and sale of Lone Star's collateral.

49.     Because Rabo knew Cliff Hanger was required to pay Waggoner Cattle full value for the Waggoner Cattle cattle and instructed Cliff Hanger not to do so, Lone Star's prior perfected security interest in the cattle remained, and Rabo (with no security interest, or,

16

alternatively, only a junior or subordinated security interest and lien, in partially-paid for cattle,

or in Waggoner Cattle's cattle for which nothing had been paid by Cliff Hanger), is a transferee

of fraudulent transfers when Rabo accepted proceeds of the re-sold cattle with unreleased liens

attached.  Further, Rabo failed to act in good faith.  It knew full price had not been paid for the

Waggoner Cattle cattle, and, therefore, knew that it had no lien, or alternatively, only a junior or

subordinated lien, on the cattle and their proceeds.  Rabo nevertheless fraudulently accepted and

retained all the proceeds of the sale of such cattle.  Rabo knew it had not advanced sufficient

funds of Cliff Hanger to Waggoner Cattle for Cliff Hanger to pay the full price for the Waggoner

Cattle cattle.

## H.    TRANSFERS SHOW SIGNS OF FRAUD

50.    The transfers from Waggoner Cattle to Cliff Hanger, and then the transfer of

resale proceeds to Rabo, show signs of fraud, including each and all the following badges of

fraud:

    a.    Lack or inadequacy of consideration;

    b.    Close relationship between the participants in the fraud;

    c.    Retention of possession, benefit or use of the property in question;

    d.    The financial condition of Waggoner Cattle and Cliff Hanger before and after the transactions shows both were insolvent;

    e.    The existence or cumulative effect of a pattern or series of transactions, or course of conduct, after incurring the debt to Lone Star, and then using the series of fraudulent cattle sales and Intercompany and related party transactions and journal entires to the detriment of Waggoner Cattle and Lone Star;

    f.    The questionable transfers, transactions and journal entries were not in the usual course of business and were for less than full value of the cattle in each transfer; and

    g.    The secrecy, haste or unusualness of the series of transactions, and the numerous irregularities in the accounting records and borrowing base

reports of Cliff Hanger and Waggoner Cattle were all to the benefit of Cliff Hanger and Rabo, and to the detriment of Waggoner Cattle and Lone Star, and were also to the detriment of other creditors of Waggoner Cattle.

51.     Rabo received the proceeds of the resale of the cattle even though Waggoner Cattle had not been paid in full by Cliff Hanger for the cattle.  Rabo never acquired a security interest in the cattle due to the non-payment of full value to Waggoner Cattle, or, alternatively, Rabo only had a junior or subordinated lien.  And the prior perfected lien of Lone Star as to the cattle was never satisfied, all in breach of the Intercreditor Agreement, in violation of 11 U.S.C. Section 548 (Fraudulent Transfers to defraud creditors), and in violation of TEX. BUS. & COM. CODE §24.001 et seq and 11 U.S.C. § 544.

### III.     PREFACE AS TO CAUSE OF ACTION NOS. 1-6

52.     Lone Star, as a secured creditor of Waggoner Cattle, Cliff Hanger, Bugtussle, and Circle W, Debtors, files this suit to set aside Fraudulent Transfers from Waggoner Cattle to Cliff Hanger and, in turn, from Cliff Hanger to Rabo.  Lone Star also seeks to set aside the Fraudulent Transfers of the Circle W receivables from Tucker Waggoner and Tyler Waggoner to Cliff Hanger.  Lone Star also files this suit to set aside Fraudulent Transfers from Waggoner Cattle to Circle W and, in turn, from Circle W to Cliff Hanger, with those proceeds in turn being paid to Rabo.

53.     In its prior security agreements, as well as in the 2017 Security Agreement, as part of the Forbearance Agreement, Lone Star acquired a perfected security interest in all Waggoner Cattle's claims and causes of action.

54.     No trustee or examiner has been appointed in any of the Waggoner Entities' bankruptcy proceedings.

55.     Given the time limits to set aside the transfers, an adversary proceeding needed to be filed immediately.

56.     The transfers include inter-Debtor transfers, and/or insider and/or affiliate transfers. The Debtors have a conflict of interest in pursuing the Fraudulent Transfers.  The managing member of Waggoner Cattle, Circle W and Cliff Hanger was Michael Quint Waggoner.

57.     Further, given the fact that debtor-in-possession Waggoner Cattle transferred cattle on which Lone Star had a lien, to debtor-in-possession Cliff Hanger, without Cliff Hanger paying in full for some of the Waggoner Cattle cattle, and without paying at all for others of the Waggoner Cattle cattle, and given the additional fact that Waggoner Cattle also participated with Cliff Hanger creditor Rabo in continuing to so act and deliver the proceeds of the fraudulently transferred cattle only to Rabo, in violation of Lone Star's lien and in violation of the Intercreditor Agreement, Lone Star is the party in the position to avoid the Fraudulent Transfers to Cliff Hanger and to Rabo, and to restore the transfers and cattle proceeds to the Debtor Waggoner Cattle's Estate (hereinafter "Estate") to be appropriately distributed to the creditors of the Waggoner Cattle Estate.

58.     Further, Lone Star has a perfected first lien upon all the herein described claims and causes of action of Waggoner Cattle and Circle W against Cliff Hanger and Rabo.

59.     This adversary proceeding will benefit the Waggoner Cattle and Circle W Estates, and return funds and proceeds of cattle which were fraudulently transferred to Cliff Hanger, and then transferred on to Rabo.

60.     Insofar as this adversary proceeding seeks to avoid Fraudulent Transfers under 11 U.S.C. § 548, and TEX. BUS. & COMM. CODE §24.001 et. seq. and 11 U.S.C. § 544 to Cliff Hanger and to Rabo, Lone Star seeks leave of court to pursue said claims on behalf of the Waggoner Cattle and Circle W Estates, as a derivative claimant, as well as in its own right, for

its own damages as a secured creditor having a perfected first lien upon such claims and proceeds. This authority is sought pursuant to 11 U.S.C. § 548 and 11 U.S.C. § 1109(b), and in the interest of justice.

61.    Accompanying the filing of this adversary proceeding, Lone Star will also file its Motion for Derivative Standing to Pursue Fraudulent Transfers.

62.    Lone Star, as a secured party and party in interest, also pleads its rights under 11 U.S.C. § 1109(b) to raise and be heard on any issue in this bankruptcy proceeding, including to preserve and present claims to set aside Fraudulent Transfers and to recover to the Estate sums paid by Cliff Hanger and sums transferred to Rabo by Debtors Cliff Hanger, Circle W and/or Waggoner Cattle.

63.    Lone Star claims derivative standing under 11 U.S.C. §§ 1103(c)(5), 1109(b), and 1123(b)(3)(B), to sue to recover to the Estates the Fraudulent Transfers to Cliff Hanger and to Rabo, and those from Circle W to Cliff Hanger, and then on to Rabo.

## IV.    CAUSES OF ACTION

### A.    FIRST CAUSE OF ACTION – AVOIDANCE OF FRAUDULENT TRANSFERS

64.    Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

65.    In these Chapter 11 proceedings, no trustee has been appointed, and Quint Waggoner and the Debtors all have a conflict of interest in pursuing the avoidance actions.

66.    Lone Star seeks leave of court to pursue these causes of action on behalf of Debtors. The sums received from these avoidance claims will benefit the Waggoner Cattle and Circle W Estates, and the sums in excess of the secured debt to Lone Star will be available for court-ordered distribution to the other creditors of Waggoner Cattle and Circle W.

67.    The transfers to Cliff Hanger and to Rabo by Debtors should be avoided as fraudulent (collectively, the "Fraudulent Transfers") under § 548 of the Bankruptcy Code, and also under the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE §24.001 et seq. and 11 U.S.C. § 544.

68.    Lone Star is a secured creditor of Debtors and asserts its rights pursuant to 11 U.S.C. § 1109 as an interested party.  Section 544(b) of the Bankruptcy Code permits the assertion of claims and causes of action that any such creditor could assert under applicable state law.

69.    At all times relevant herein, Lone Star was and is a secured creditor of Debtors.

70.    The Fraudulent Transfers occurred within four (4) years of the date this complaint is filed.

71.    Lone Star seeks to recover the value of transfers by Debtor Waggoner Cattle to Debtor Cliff Hanger, for transfers from Waggoner Cattle to Circle W, and from Circle W on to Rabo, and payments by Cliff Hanger to Rabo as intentional Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(A), and also pursuant to the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE § 24.001 et seq.  Lone Star alleges that $31,699,573.44 of the payments were made during the two-year look-back period prior to Waggoner Cattle and Cliff Hanger filing their bankruptcy petitions, and are, accordingly, avoidable as alleged intentional Fraudulent Transfers under 11 U.S.C. § 548.  Pursuant to 11 U.S.C. § 548(a)(1)(B) and TEX. BUS. & COMM. CODE § 24.005(a) and § 24.006, the payments were made without receipt of reasonably equivalent value at a time when Waggoner Cattle and Cliff Hanger were insolvent, or at a time when Waggoner Cattle and Cliff Hanger became insolvent as a result of such transfers. In the alternative, the transfers were made when said Debtors were engaged in a business or

transactions, or were about to engage in a business or transactions, for which the property remaining with each respective Debtor was an unreasonably small capital.  In the alternative, the transfers occurred when each Debtor had incurred debts beyond its respective ability to pay.

72.    The Fraudulent Transfers were made with the actual intent to hinder, delay, or defraud then and future creditors of Debtors.

73.    Debtors Waggoner Cattle and Circle W received less than reasonably equivalent value in exchange for the Fraudulent Transfers.

74.    Debtors were insolvent at the time of the Fraudulent Transfers.

75.    The fraudulently-transferred collateral and proceeds, in good conscience belongs or should be paid to Lone Star, which had a perfected first lien on such fraudulently-transferred assets and proceeds, when Debtors were engaged or were about to engage in a business or a transactions for which their remaining assets were unreasonably small in relation to the business or transactions.

76.    At the time the Fraudulent Transfers occurred, Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their respective abilities to pay as they became due.

77.    The Fraudulent Transfers are, therefore, avoidable as such under Sections 548(a)(1)(A) and (a)(1)(B) of the Bankruptcy Code and also under TEX. BUS. & COM. CODE §§ 24.005 and/or 24.006 and 11 U.S.C. § 544.

**B.    SECOND CAUSE OF ACTION – AVOIDANCE OF CONSTRUCTIVE FRAUDULENT TRANSFERS**

78.    Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

79.    Lone Star alternatively seeks to recover the value of cattle transferred by Debtor Waggoner Cattle to Debtor Cliff Hanger, and the further transfer of proceeds by Debtor Cliff Hanger to Rabo as constructive Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(B), and also pursuant to The Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE §§ 24.005(a) and 24.006 and 11 U.S.C. § 544.  Lone Star also alternatively seeks to recover the value of receivables transferred by Debtor Circle W to Debtor Cliff Hanger, with the ultimate transfer by Cliff Hanger to Rabo as constructive Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and also pursuant to The Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE §§ 24.005(a) and 24.006, and 11 U.S.C. § 544.

80.    Pursuant to 11 U.S.C. § 548(a)(1)(B), Lone Star asserts that many of the payments were made without receipt by Waggoner Cattle of reasonably equivalent value within two years of Waggoner Cattle, Cliff Hanger and Circle W filing their bankruptcy petitions, and all were made within four years of Waggoner Cattle, Cliff Hanger and Circle W filing their bankruptcy petitions, and all were received at a time when Waggoner Cattle and Circle W were insolvent, or at a time when Waggoner Cattle, Circle W, and/or Cliff Hanger became insolvent as a result of such transfers.  In the alternative, the transfers were made when the respective Debtors were engaged in a business or transactions, or were about to engage in business or transactions, for which the property remaining with the respective Debtors was unreasonably small capital, and/or when the respective Debtors were incurring debts beyond their respective abilities to pay.

81.    The payments should be recovered for the Estates of Waggoner Cattle and Circle W, and then distributed in accordance with the Bankruptcy Code and the lien status of secured creditors.

**C.**     **THIRD CAUSE OF ACTION – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS**

82.     Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

83.     Debtor Waggoner Cattle transferred property (cattle) to Cliff Hanger without being paid in full and/or reasonably equivalent value from Debtor Cliff Hanger.

84.     Then, on the resale of the cattle, Debtor Cliff Hanger and/or Debtors paid or caused to be paid to Rabo the cattle proceeds.

85.     Lone Star was and is a secured creditor of each Debtor.  Lone Star had a first and unreleased lien on all the cattle and receivables of Waggoner Cattle, and upon all the receivables of Circle W.

86.     Each transfer was made at various times within four years of the Petition Date.

87.     These transfers were made with the actual intent to hinder, delay, or defraud then and/or future creditors of Debtors.

88.     In exchange for the transfers, the respective Debtors Waggoner Cattle and Circle W did not receive reasonably equivalent value.

89.     When each transfer was made, Debtors were engaged or about to engage in a business or transactions for which their remaining assets were unreasonably small in relation to the business or transactions.

90.     Debtors were each insolvent when each subject transfer was made.

91.     Each transfer was made with knowledge that Debtors intended to hinder, delay, or defraud their then and/or future creditors.

92.     The transfers are, therefore, avoidable under § 548(a)(1)(A) and (a)(1)(B) of the Bankruptcy Code, and also under TEX. BUS. & COM. CODE §§ 24.005 and/or 24.006, and 11 U.S.C. § 544.

Case 18-02007-rlj    Doc 1    Filed 06/29/18    Entered 06/29/18 10:57:38    Desc Main
Document      Page 28 of 69

93.     To the extent the transfers are avoided under §§ 544 and 548 of the Bankruptcy Code, under § 550 of the Bankruptcy Code, the Estate may recover the value of the transfers from the transferees of the transfers -- Cliff Hanger and Rabo -- for the benefit of the Waggoner Cattle and Circle W Estates, and their secured creditors.

94.     Because Rabo failed to act in good faith and, instead, conspired to perpetuate the fraud and then kept the cattle proceeds, Rabo as transferee is liable under § 548 and TEX. BUS. & COM. CODE § 24.008 and 11 U.S.C. § 544.

**D.      FOURTH CAUSE OF ACTION – EQUITABLE SUBORDINATION**

95.     Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

96.     Rabo has engaged in inequitable conduct, including conduct described in this Complaint, which has resulted in injury to the Estates of Waggoner Cattle and Circle W, as well as Estate creditors. The result of such inequitable conduct has been the conferring of an unfair advantage to Rabo.  This inequitable conduct has resulted in harm to the Estates of Waggoner Cattle and Circle W and their entire creditor bodies.  Accordingly, pursuant to §§ 510(c)(1) and 105(a) of the Bankruptcy Code, all claims asserted by, on behalf of, or for the benefit of Rabo against Debtors should be equitably subordinated to the allowed claims of legitimate creditors for distribution purposes because the claims of Rabo arise from improper conduct in the form of Fraudulent Transfers, and receipt and conversion of cattle proceeds on which Rabo held no lien or security interest, or, alternatively held only a junior or subordinated lien, and done in violation of an Intercreditor Agreement.

**E.      FIFTH CAUSE OF ACTION – DISALLOWANCE OF CLAIM UNDER 11 U.S.C. § 502(d)**

97.     Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

98.     By reason of the facts alleged in this Complaint, pursuant to § 502(d) of the Bankruptcy Code, all claims to be asserted by Rabo must be disallowed unless it has turned over to the Estate the property transferred or converted, or unless Rabo has paid to the Estate the value of such property for which it is liable to the Estate under § 550 of the Bankruptcy Code.

99.     To the extent the transfers are avoided under §§ 544 or 548 of the Bankruptcy Code, or under § 550 of the Bankruptcy Code, the Waggoner Cattle and Circle W Estates may recover the value of the transfers from the transferees of the transfers for the benefit of the Estate.

**F.     SIXTH CAUSE OF ACTION – TEXAS UNIFORM FRAUDULENT TRANSFER ACT**

100.    Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

101.    Pursuant to TEX. BUS. & COM. CODE § 24.005(a) and 11 U.S.C. § 544, a fraudulent transfer was made to transferee Rabo each time it received proceeds from the sale of cattle by Cliff Hanger, after Cliff Hanger acquired the cattle from Waggoner Cattle for less than full value in violation of the Intercreditor Agreement dated November 26, 2014 between Lone Star and Rabo.

102.    Pursuant to TEX. BUS. & COM. CODE § 24.005(a) and 11 U.S.C. § 544, a fraudulent transfer was made to Cliff Hanger each time it received a transfer of a Circle W receivable for no consideration, or for inadequate consideration.

103.    Each said transfer was made with actual intent to hinder, delay, or defraud Lone Star, a creditor of Debtors Waggoner Cattle, Circle W and Cliff Hanger, or was made without Debtors Waggoner Cattle or Circle W receiving a reasonably equivalent value in exchange for the transfer.

104.    Each transfer was made when the respective Debtors were either engaged or were about to be engaged in a business or transactions for which the remaining assets of the respective Debtors were unreasonably small in relation to the business or transactions, or when the respective Debtors intended to incur, or believed or reasonably should have believed that the respective Debtors would incur debts beyond the respective Debtors' ability to pay as they became due.

105.    The transfers between Waggoner Cattle and Cliff Hanger and then to transferee Rabo, were of substantial amounts of the Debtors' total assets.

106.    The transfers were made as Rabo and the Debtors removed assets of Waggoner Cattle and Circle W, assets acquired with funds loaned by Lone Star, and transferred those assets to Cliff Hanger for no value or at less than market value, at less than the Overland Auction market price, and at less than reasonably equivalent value.

107.    Each of the respective Debtors were insolvent at the time of the transfers, or became insolvent shortly after the transfers were made and then proceeds were paid to Rabo.

108.    The transfers were made and proceeds paid to Rabo, even though Rabo had no lien on the transferred Waggoner Cattle cattle, or in the alternative Rabo only held a junior or subordinated lien on the Waggoner Cattle cattle and their proceeds, because, as it knew, Cliff Hanger did not pay Waggoner Cattle full value for the cattle, as was required for Rabo to have a lien as to the transferred cattle or their proceeds.  In many instances, Cliff Hanger paid nothing whatsoever for the Waggoner Cattle cattle which Waggoner Cattle transferred to Cliff Hanger.

109.    Further, the transfer of the Waggoner Cattle cattle to Cliff Hanger for less than full value, and with the proceeds of their later resale going to Rabo, also violated TEX. BUS. & COM. CODE § 24.006 and 11 U.S.C. § 544 because they were transfers made by a Debtor and

fraudulent as to creditor Lone Star, whose claim and lien arose before the transfers were made. Debtors Waggoner Cattle and Circle W did not receive reasonably equivalent value in exchange for the transfers, and Debtors Waggoner Cattle and Circle W were insolvent at that time, or Debtors Waggoner Cattle and Circle W became insolvent as a result of the transfers.

110.    Lone Star sues transferee Rabo pursuant to TEX. BUS. & COM. CODE §§ 24.008 and 24.009 and 11 U.S.C. § 544.  Lone Star seeks avoidance of the transfers to Cliff Hanger and Rabo to the extent necessary to satisfy Lone Star's claim, attachment of the cattle sales proceeds transferred to Rabo by Cliff Hanger, and a judgment against Rabo in the amount of the Fraudulent Transfers from Cliff Hanger to Rabo, or in the amount necessary to satisfy Lone Star's claim, whichever is less.  TEX. BUS. & COM. CODE § 24.009(b) and 11 U.S.C. § 544.

111.    At the time of the transfers, Rabo knew of but wholly disregarded, Lone Star's prior perfected first lien as to the cattle and proceeds, and knew that Rabo had no lien, or, alternatively, only held a junior or subordinated lien, because its Debtor, Cliff Hanger, had not paid Waggoner Cattle full value of the transferred cattle.

112.    Pursuant to 11 U.S.C. § 544, Lone Star seeks any other relief against Rabo under the Texas Uniform Fraudulent Transfer Act to which Lone Star is justly entitled.

113.    Further, pursuant to TEX. BUS. & COM. CODE § 24.008(b) and 11 U.S.C. § 544, Lone Star seeks in addition to a judgment, a writ of execution against Rabo.

114.    Pursuant to TEX. BUS. & COM. CODE § 24.013 and 11 U.S.C. § 544, Lone Star also seeks to recover from Rabo, Cliff Hanger and Waggoner Cattle, Lone Star's costs and reasonable attorney's fees as are equitable and just.

**G.    SEVENTH CAUSE OF ACTION – DECLARATORY JUDGMENT**

115.    Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

116.    On November 26, 2014, Lone Star and Rabo agreed and executed the Intercreditor Agreement.

117.    The Intercreditor Agreement is related to the subject matter of this bankruptcy case because Lone Star is a secured creditor of Debtors Waggoner Cattle, Circle W and Cliff Hanger, and Rabo is a creditor of Cliff Hanger, and the Intercreditor Agreement pertains to lien priority as to cattle transfers and cattle sale proceeds, as well as certain receivables.

118.    Pursuant to the Intercreditor Agreement, paragraph 2, Rabo agreed that "upon delivery of the collateral to the Cliff Hanger Feedyards **and receipt of payment in full by Waggoner** [Cattle] (emphasis added), thereafter all Collateral located in the Cliff Hanger Feedyards shall be owned by and in possession of Cliff Hanger and shall be Cliff Hanger Collateral." The parties thereby agreed that a condition precedent for Rabo's lien to attach to the transferred cattle was for Waggoner Cattle to be paid in full for the full value of the transferred Waggoner Cattle cattle.

119.    Rabo further contracted therein that "Any [Rabo] security interest in, or lien or encumbrance on, or claim to Waggoner Collateral including proceeds thereof or rights relating thereto shall be junior in priority to the security interest in, lien, encumbrance on, claims or rights of Lone Star to the Waggoner Collateral."

120.    When some of the cattle were transferred from Waggoner Cattle to Cliff Hanger, Cliff Hanger did not fully pay Waggoner Cattle, for other transferred cattle Cliff Hanger did not pay Waggoner Cattle at all, and in regard to most of the cattle, Waggoner Cattle did not receive "payment in full".

121.    Therefore, pursuant to the terms of the Intercreditor Agreement, the cattle transferred from Waggoner Cattle to Cliff Hanger never became "Cliff Hanger Collateral." In

29

any event, any Rabo lien upon the Waggoner Cattle cattle transferred to Cliff Hanger for no consideration, or for inadequate consideration, and as to the proceeds of such cattle, was junior and subordinate to Lone Star's lien.

122.    Rabo agreed that Lone Star's prior security interest in, and lien upon Waggoner Collateral (the cattle) would remain in place as to cattle transferred for which Waggoner Cattle did not receive payment in full.  Further, Rabo agreed that Lone Star's lien has priority and Rabo's lien shall be junior in priority to Lone Star's security interest in, lien, encumbrance on, and claims and rights to said collateral.

123.    Therefore, Lone Star seeks declaratory judgment as follows:

   a.   As to the cattle transferred by Waggoner Cattle to Cliff Hanger for which Waggoner Cattle was not paid in full, or for which Waggoner Cattle was not paid at all, the cattle never became Cliff Hanger Collateral.

   b.   As to the cattle transferred by Waggoner Cattle to Cliff Hanger, which never became Cliff Hanger Collateral, the Lone Star security interest in, lien, encumbrance on, and claims and rights to said cattle, and all proceeds thereof, takes priority over any claim, lien or security interest of Rabo in the cattle and/or cattle proceeds in the possession of Rabo and/or paid to it by Cliff Hanger, Waggoner Cattle, or by any buyer of the cattle.

124.    As set out in ¶¶ 34-37 above, and ¶¶ 174-177 below, Cliff Hanger transferred $9,771,891.72 to Waggoner Cattle, with both Cliff Hanger and Waggoner Cattle posting these transfers in their "due to/due from" accounts as loans from Cliff Hanger to Waggoner Cattle.  In his May 31, 2018 § 341 testimony, Quint Waggoner testified that all of these transfers were intended to be payments by Cliff Hanger to Waggoner Cattle for Waggoner Cattle cattle transferred to Cliff Hanger. In regard to the transfer of the $9,771,891.22 of Cliff Hanger money to Waggoner Cattle, Lone Star prays for a declaratory judgment of this court, declaring and determining whether these transfers of money from Cliff Hanger to Waggoner Cattle were payments for Waggoner Cattle's cattle, as Quint Waggoner testified on May 31, 2018, or

whether they were loans, as was reflected on the general ledger and borrowing base certificates of both Cliff Hanger and Waggoner Cattle.

125.     As set out in ¶¶ 34-35 and 41-43 above, and ¶¶ 174-177 below, effective June 30, 2016, Cliff Hanger offset Tucker and Tyler Waggoner's $3,585,078.20 payable (as of 12-31-15) to Waggoner Cattle for delivered cattle by $3,004,041.21, by crediting the posted $2,084,827.91 receivable of Cliff Hanger from Tucker and Tyler Waggoner by offsetting the posted $7.4 million receivable from Waggoner Cattle[2] in the same amount.  In regard to this offset, Lone Star seeks a declaratory judgment of this Court declaring and determining 1) whether there was a Cliff Hanger receivable from Waggoner Cattle to offset, and, if not, 2) the status of the actual accounts between Cliff Hanger and Waggoner Cattle after the attempted offset.

### H.     EIGHTH CAUSE OF ACTION – BREACH OF INTERCREDITOR AGREEMENT

126.     Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

127.     On November 26, 2014, Lone Star and Rabo entered into the Intercreditor Agreement ("Agreement").

128.     Pursuant to Recital A of the Agreement, Rabo knew that Lone Star had loan documents, promissory notes, security agreements or other financial agreements dated March 7, 2014 with Waggoner Cattle, Cliff Hanger, Bugtussle Cattle, LLC, Circle W of Dimmitt, Inc., and Waggoner Trust.  Lone Star's liens were perfected, and of public knowledge.  Further, Rabo knew those loans financed Waggoner Cattle's cattle operations.

---

[2] The $7,495,525.39 million receivable of Cliff Hanger from Waggoner Cattle constituted the $9,771,891.22 in loans from Cliff Hanger to Waggoner Cattle posted in those Debtors' respective due to/due from accounts, less $2,275,891.39 in miscellaneous credits to the Cliff Hanger receivable.

129.    Pursuant to Recital C of the Agreement, Rabo knew the indebtedness to Lone Star was secured by security interests and a lien on the cattle at the Waggoner Calf Ranch, and that such was Waggoner Collateral.

130.    Pursuant to Paragraph 2(a) of the Agreement, Rabo knew that cattle transferred from Waggoner Cattle to Cliff Hanger without payment in full by Cliff Hanger to Waggoner Cattle would not become Cliff Hanger Collateral for its loan from Rabo, and would remain Waggoner Collateral for Lone Star's loans to the Debtors.

131.    Pursuant to Paragraph 2(b) of the Agreement, Rabo knew that any Rabo security interest in, or lien or encumbrance on, or claim to Waggoner Collateral, including proceeds thereof, or rights relating thereto, was junior in priority to the security interest in, lien, and encumbrance on, claims or rights of Lone Star to the Waggoner Collateral.

132.    At all times pertinent, Lone Star performed its obligations under the Intercreditor Agreement.

133.    In contrast, Rabo breached the Intercreditor Agreement in 2014, 2015, 2016, and 2017 when Rabo participated with Waggoner Cattle and/or Cliff Hanger in transferring Waggoner Collateral to Cliff Hanger without Waggoner Cattle being paid, or not being paid full value for the collateral, and then having Cliff Hanger resell the cattle (Lone Star's collateral) with Rabo receiving the proceeds of the resale of such cattle, all without paying any of the proceeds to the priority perfected lienholder, Lone Star.

134.    The breach of contract by Rabo proximately caused actual damages to Lone Star. But for the wrongful transfer of the cattle from Waggoner Cattle to Cliff Hanger for less than full value and then resale of the cattle with Rabo receiving the cattle proceeds, Lone Star would have

been paid the cattle proceeds to reduce the prior and superior secured debt lien owed by the Debtors to Lone Star.

135.    Lone Star suffered actual damages in the amount of the transfers of cattle proceeds from Waggoner Cattle's cattle to Rabo.  In the alternative, Lone Star suffered actual damages in the amount of the difference between the actual value of the Waggoner Cattle cattle transferred to Cliff Hanger, and the amount Cliff Hanger paid Waggoner Cattle for those cattle.

## I.    NINTH CAUSE OF ACTION – CONVERSION

136.    Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

137.    Pursuant to a less than full payment, or no payment whatsoever, for the transfers of Waggoner Cattle cattle to Cliff Hanger, Rabo acquired no security interest, or in the alternative, only acquired a junior or subordinated security interest in, or lien or encumbrance on the cattle in the possession of Cliff Hanger.  Then, when the cattle were sold by Cliff Hanger, Rabo had no security interest in the proceeds of those cattle, or only, at best, a junior or subordinated security interest in, or lien or encumbrance on the proceeds of the cattle.

138.    Despite the lack of a security interest, or in the alternative despite only holding a junior or subordinate security interest in, lien or encumbrance on the cattle, and while knowing that Lone Star had the prior and continuing primary security interest in, lien and encumbrance on the cattle, Rabo accepted proceeds from the sale of the cattle in 2014, 2015, 2016, and 2017 and wholly excluded Lone Star from the proceeds of its collateral, thereby converting Lone Star's collateral and the proceeds of Lone Star's collateral.

139.    Lone Star had a legal interest, its prior and primary security interest in, and lien and encumbrance on, the cattle and the proceeds of the cattle.

33

140.    Rabo assumed and exercised dominion and control over the proceeds of the transferred cattle in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Lone Star's rights and Lone Star's prior and primary lien.

141.    At the time Rabo obtained the proceeds of the transferred Waggoner Cattle cattle, it knew it did not have a primary lien on the proceeds because Cliff Hanger did not pay full value for the cattle, or in some instances, did not pay anything for the Waggoner Cattle cattle.

142.    And, pursuant to the Intercreditor Agreement, Rabo knew Lone Star's prior and primary lien applied to the Waggoner Cattle cattle, and their proceeds.

143.    Rabo refused Lone Star's demand for the return to Lone Star of the proceeds of the sale of the cattle, its collateral.

144.    The conversion by Rabo of cattle proceeds on which Lone Star has a prior, primary, and superior continuing security interest and lien proximately caused damages to Lone Star in an amount in excess of the jurisdictional limits of the Court, and in the amount of the proceeds transferred to Rabo.

145.    In addition to recovery of damages in the value of the converted property on the dates of conversion, Lone Star seeks pre-judgment interest from the date of each conversion.

**J.      TENTH CAUSE OF ACTION – FRAUDULENT INDUCEMENT**

146.    Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

147.    In the Intercreditor Agreement, Rabo made a material representation that Waggoner Collateral would not become Cliff Hanger Collateral unless Cliff Hanger paid in full for the cattle.

148.    Such representation by Rabo was a material and essential part of the Agreement and but for that representation, Lone Star would not have agreed to the Intercreditor Agreement.

34

149.     After Rabo entered into the Intercreditor Agreement with no intent to perform ¶2(a), and before Rabo claimed a security interest and lien and accepted proceeds of sale of cattle by Cliff Hanger, Rabo had the duty to verify that Waggoner Cattle was paid full value for the cattle by Cliff Hanger before asserting a lien upon the transferred cattle and taking their proceeds.  Rabo wholly failed to comply with such duty, and, instead, fraudulently accepted cattle proceeds as to cattle in which it had no security interest or lien.

150.     As is evident from the repeated transfers of cattle from Waggoner Cattle to Cliff Hanger for less than full value, or for no value, and then Cliff Hanger selling the transferred cattle and remitting all the proceeds to Rabo, Rabo's representation that the Waggoner Collateral would remain subject to Lone Star's security interest and lien unless Cliff Hanger paid full value was false.

151.     The false representation was part of a fraudulent scheme of Cliff Hanger and Rabo to obtain cattle from Waggoner Cattle for Cliff Hanger at less than full value and deliver all the cattle sale proceeds to Rabo, even though Waggoner Cattle and Cliff Hanger's prior lender, Lone Star, had a prior and continuing primary lien on the transferred cattle and the proceeds of such cattle.

152.     When Rabo made the representation, Rabo knew it was false, made the representation with no intent to perform it, or made the representation recklessly without any knowledge of the truth and as a positive assertion.

153.     Further, Rabo made the false representation with the intent that Lone Star would act upon it and to induce Lone Star to sign the Intercreditor Agreement, and to allow Lone Star's collateral, the Waggoner Cattle cattle, to be transferred to the possession of Cliff Hanger.

154.    Lone Star signed the Intercreditor Agreement and continued to loan funds to Waggoner Cattle in reliance on the representations made by Rabo, and in reliance on the borrowing bases submitted by Quint Waggoner to Rabo and to Lone Star.

155.    Rabo's false representation and Lone Star's reliance on the representation was the proximate cause of actual damages to Lone Star.  As a result of Rabo's false representation, cattle were transferred by Waggoner Cattle to Cliff Hanger for less than full value, or for no consideration, Cliff Hanger then resold the cattle, and Rabo accepted all the proceeds of these cattle sales, even though Rabo had no security interest or lien as to the Waggoner Collateral or proceeds of such collateral pledged previously to Lone Star, or in the alternative, Rabo only held a junior or subordinated lien in such cattle and proceeds.

156.    Lone Star seeks its actual damages resulting from the described conduct of Rabo, Cliff Hanger, Circle W and Waggoner Cattle.

## K.    ELEVENTH CAUSE OF ACTION – MONEY HAD AND RECEIVED BY RABO AND CONSTRUCTIVE TRUST

157.    Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

158.    Rabo holds money that in equity and good conscience belongs to, or should be paid to, Lone Star, which Lone Star seeks to recover by this suit.

159.    Rabo has been and will be unjustly enriched by its receipt of the proceeds of Lone Star's collateral which Rabo misappropriated, accepted and/or withheld from Lone Star.

160.    The court should impose a constructive trust upon the proceeds of Lone Star's collateral which was taken by Rabo.

161.    Lone Star seeks recovery of the money which constitute the proceeds of Lone Star's collateral that Rabo had and received.

**L.     TWELFTH CAUSE OF ACTION – SUIT TO AVOID FRAUDULENT TRANSFERS TO TRANSFEREE RABO**

162.    Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

163.    Debtors transferred cattle belonging to Waggoner Cattle to their affiliate and/or insider Cliff Hanger, which then sold the cattle and transferred the proceeds to transferee Rabo.

164.    Cliff Hanger, and then Rabo, did not take and/or receive each transfer in good faith and for reasonably equivalent value.

165.    As a result of the fraudulent transfers involving Debtors and Rabo, Lone Star has been damaged in an amount in excess of the minimum jurisdictional limits of this court, for which it seeks avoidance of the transfers, and a judgment against transferee Rabo.

166.    Lone Star seeks judgment avoiding the transfers by Waggoner Cattle, Cliff Hanger and Circle W.  Then, Lone Star seeks judgment against Rabo for the value of all monies, assets or property interests received and/or transferred.   In addition, Lone Star seeks an attachment, lien or other provisional remedy against the funds, assets, and/or property interests received and/or transferred to Rabo.  Lone Star also seeks all other relief to which it may show itself justly entitled, whether legal or equitable, whether general or special.

**M.     THIRTEENTH CAUSE OF ACTION – CIVIL CONSPIRACY**

167.    Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

168.    Lone Star alleges, on information and belief, that Quint Waggoner, on behalf of himself, Waggoner Cattle, Cliff Hanger, and Circle W, with Rabo, agreed to engage in, and actually did engage in, an actual civil conspiracy, the object of which, in general terms, was to conceal and hide from Lone Star the financial condition of Debtors and to fraudulently transfer

collateral of Lone Star, the Waggoner Cattle cattle and their proceeds, and loan funds of Lone Star and their proceeds to Cliff Hanger, and then for Cliff Hanger to transfer those proceeds to Rabo.

169.     On information and belief, Lone Star alleges that the co-conspirators' acts were committed with a calculated, malicious and deceitful intent as demonstrated by the secretive manner in which they acted.  In the alternative, such conduct, at a minimum, was the result of reckless disregard for Lone Star's rights.  One or more persons carried out acts to further the goals of the conspiracy: to convert Lone Star's loan funds and collateral, and to fraudulently transfer the collateral of Lone Star and those proceeds to Rabo.

170.     The conduct of Rabo, as alleged herein, directly and proximately caused and produced actual damages to Lone Star for which Lone Star seeks judgment against Rabo.

**N.      FOURTEENTH CAUSE OF ACTION – ACCOUNTING**

171.     Lone Star realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

172.     By reason of the conduct of Quint Waggoner, Waggoner Cattle, Circle W, Cliff Hanger and Rabo, the full extent and amounts of the fraudulent transfers and preferential transfers of the funds and assets of Waggoner Cattle are currently not fully known to Lone Star and cannot be determined without an accounting of the transactions and the transfers and collections of Waggoner Cattle, Circle W, Cliff Hanger and the Transferee Rabo, and an investigation of the accounts between the parties in order to establish the full extent of the fraudulent and/or preferential transfers.

173.     Lone Star has demanded that Waggoner Cattle, Cliff Hanger and Circle W account for all the cattle transactions, collections, and transfers.  Waggoner Cattle, Cliff Hanger and Circle W have failed or refused, and continue to fail or refuse, to render a complete

accounting or to pay to Lone Star the funds and property interests misappropriated and/or transferred.

**O.     FIFTEENTH CAUSE OF ACTION – WRONGFUL OFFSET**

174.    Between October 24, 2014 and June 30, 2016, Cliff Hanger transferred $9,133,166.79 to Waggoner Cattle, and posted on the due to/due from accounts in the general ledger of both Cliff Hanger and Waggoner Cattle that those transfers were loans to Waggoner Cattle.  $2,275,891.39 in various credits to Waggoner Cattle's $9,771,416.79 payable to Cliff Hanger were posted to the general ledgers.  As of June 30, 2016, due to miscellaneous credits to Cliff Hanger's booked receivable from Waggoner Cattle, the general ledgers of both Cliff Hanger and Waggoner Cattle showed that Cliff Hanger had outstanding loans of $7,495,525.39 to Waggoner Cattle.  That meant that even at the "below market" and "below Overland Auction" prices, no less than $7,495,525.39 of Waggoner Cattle collateral had been transferred to Cliff Hanger with no payment to Waggoner Cattle. (In addition, several million dollars of other Waggoner Cattle cattle had previously been transferred to Cliff Hanger for only approximately 75% of its actual market value.)

175.    After June 30, 2016, Waggoner Cattle continued to ship cattle to Cliff Hanger. From records examined to date, it appears that between July 1, 2016 and December 31, 2016, Waggoner Cattle transferred another 14,094 head of Waggoner Cattle cattle to Cliff Hanger.  It appears that these cattle were worth approximately $4,028,829.69, but Cliff Hanger only paid Waggoner Cattle approximately $751,375.00 for them.   Thus, as of December 31, 2016, Waggoner Cattle had transferred $10,772,980.59 of its cattle, for which Cliff Hanger paid nothing. ($7,495,525.39 + $3,277,454.69).

176.    Effective no later than December 31, 2016, Cliff Hanger offset $3,004,041.21 of its payable to Waggoner Cattle for delivered cattle against the $7,495,525.39 receivable of Cliff Hanger from Waggoner Cattle.

177.    If the $9,771,416.79 in transfers from Cliff Hanger to Waggoner Cattle were loans, as they were booked on the general ledgers of both Cliff Hanger and Waggoner Cattle, then if the credits were appropriate, Cliff Hanger received *at least* $7,495,525.39 of Waggoner Cattle cattle for which it never paid Waggoner Cattle, (in addition to the $3,277,454.69 unpaid deliveries after the effective June 30, 2016 offset of at least $751,375.00; and, in addition to the millions of dollars' worth of underpriced cattle which Waggoner Cattle transferred to Cliff Hanger).   However, if the $9,771,416.79 in transfers from Cliff Hanger to Waggoner Cattle, which were booked as loans by both Cliff Hanger and Waggoner Cattle, were actually intended to be payments for Waggoner Cattle cattle, then there was no Cliff Hanger receivable from Waggoner Cattle against which Cliff Hanger could offset Waggoner Cattle for the Waggoner Cattle cattle deliveries between November 25, 2014 and June 30, 2016.  If that is the case, then by virtue of the offset, Cliff Hanger and Rabo converted 1) $3,004,041.21 of Waggoner Cattle's receivable from Cliff Hanger, 2) $3,004,041.21 of underpriced Waggoner Cattle cattle, and 3) $3,004,041.21 of proceeds of those Waggoner Cattle cattle … which was Lone Star's collateral.

P.    **SIXTEENTH CAUSE OF ACTION – ATTORNEY'S FEES AND COSTS**

178.    As a result of the conduct described above by Rabo, Lone Star was required to engage the services of the undersigned attorneys, and has agreed to pay the attorneys a reasonable fee.

179.    Pursuant to TEX. BUS. & COM. CODE § 24.013 and 11 U.S.C. § 544, Lone Star is entitled to a judgment against Rabo for costs and reasonable attorney's fees as are equitable and just.

180.    Pursuant to TEX. BUS. & COM. CODE § 38.001 et seq. and 11 U.S.C. § 544, Lone

Star is entitled to recover its reasonable attorney's fees in addition to its damages.

## V.    CONDITIONS PRECEDENT

181.    Lone Star has fully satisfied and complied with all required notices, demands and

conditions precedent to asserting its rights for recovery of all damages and attorney's fees as

stated herein and to its right to all relief sought from Rabo.

## VI.    PRE-JUDGMENT INTEREST

182.    As a result of the actions and conduct of Rabo, as hereinabove described, Lone

Star has been damaged and is entitled to recover pre-judgment interest. Lone Star seeks pre-

judgment interest at the maximum lawful rate.

## VII.    POST-JUDGMENT INTEREST

183.    Lone Star is entitled to interest on any judgment against Rabo received in this

action at the rate provided by law from the date of judgment until paid.

## VIII.    RESERVATION OF RIGHT TO AMEND

184.    Lone Star reserves the right to further amend this pleading as additional

information, defenses and/or claims are discovered or developed.

## IX.    REQUEST FOR RELIEF

WHEREFORE, Lone Star respectfully requests that this Court enter judgment in its favor

and against Rabo as follows:

1.  Ordering that Rabo's Claims in these bankruptcy cases are disallowed in their
    entirety for all purposes;

2.  In the alternative, ordering that the Fraudulent Transfers are avoided and set
    aside;

3.  Further, in the alternative, ordering that any allowed portion of Rabo's claims are
    subordinated or equitably subordinated;

4.  Avoiding and setting aside the Fraudulent Transfers;

41

5. Ordering that Rabo must return all the transfers to the respective Estates or pay the Estates the value thereof;

6. Ordering that Rabo's claims are disallowed until the transfers or the value thereof, for which Rabo is liable under Section 550 of the Bankruptcy Code, have been returned to the Estates;

7. Judgment in favor of Lone Star against Rabo in the amount of the transfers of cattle sales proceeds from and after November 26, 2014 to the present, which transfers Rabo received from Waggoner Cattle, Cliff Hanger and/or the feed yards or cattle buyers;

8. Damages from Rabo for breach of the Intercreditor Agreement and 11 U.S.C. § 544;

9. Declaratory relief as requested in paragraphs 115-125;

10. Declaratory relief determining that at all times, in regard to all cattle of Waggoner Cattle for which it was not fully paid, Rabo was an unsecured creditor of Cliff Hanger;

11. Damages from Rabo for conversions of Lone Star's collateral and prejudgment interest from the date(s) of the respective conversions of Lone Star's collateral;

12. That the Court impose a constructive trust upon the proceeds of Lone Star's converted collateral;

13. Damages from Rabo under the Texas Uniform Fraudulent Transfers Act and 11 U.S.C. § 544;

14. Damages from Rabo for fraud, fraud in the inducement and accounting documents, fraud as to the representation of feedlot financing as an inducement for Lone Star to sign the Intercreditor Agreement, money had and received, and conspiracy;

15. Ordering an Accounting of Cattle Transfers and Sales by Waggoner Cattle and Cliff Hanger and Distribution of Proceeds to Transferee Rabo;

16. Awarding Lone Star its attorney's fees and costs of suit from Rabo, as well as from Debtors;

17. Prejudgment Interest from Rabo and Debtors;

18. Post-judgment Interest from Rabo and Debtors;

19. Awarding Lone Star all such other and further relief, at law or in equity, to which it may be justly entitled.

Dated this 29th day of June, 2018.

Respectfully submitted,

**LOVELL LOVELL ISERN & FARABOUGH, LLP**
John H. Lovell, SBN 12609300
john@lovell-law.net
Joe L. Lovell, SBN 12609100
joe@lovell-law.net
Deborah D. Reeves, SBN 24006668
deborah@lovell-law.net
Barbara A. Bauernfeind, SBN 08190500
barbara@lovell-law.net
Matthew S. Merriott, SBN 24100846
matthew@lovell-law.net
112 Southwest 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Telephone: (806) 373-1515
Facsimile:  (806) 379-7176

By:___*/s/ John H. Lovell*_____
        John H. Lovell

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that a true and correct copy of the foregoing was sent via ECF on this the 29th day of June, 2018, to the following listed parties in interest:

Matt R. Tarbox
TARBOX LAW, P.C.
2301 Broadway
Lubbock, TX  79401
max@tarboxlaw.com
      *Attorney for Waggoner Cattle, LLC, Cliff Hanger Cattle, LLC,*
      *Circle W of Dimmitt, Inc., and Bugtussle Cattle, LLC*

R. Byrn Bass, Jr.
Compass Bank Building
4716 4th Street, Suite 100
Lubbock, TX  79416-4953
bbass@bbasslaw.com
      *Attorney for Michael Quint Waggoner*

Johnny Merritt
3144 Bee Caves Road
Austin, TX 78746
JMerritt@legalstrategy.com

All creditors and parties in interest registered with the U. S. Bankruptcy Court to receive electronic notices in this case.

        */s/ John H. Lovell*
        John H. Lovell

Cliff Hanger Cattle, LLC RLOC 2014
Line of Credit: 22106100/kd

## AMENDED AND RESTATED CREDIT AGREEMENT

This Amended and Restated Credit Agreement is dated as of December 2, 2014. It is between CLIFF HANGER CATTLE, LLC, a Texas limited liability company ("Cliff Hanger Cattle, LLC"); BUGTUSSLE CATTLE, LLC, a Delaware limited liability company ("Bugtussle Cattle, LLC"); CIRCLE W OF DIMMITT, INC., a Texas corporation ("Circle W of Dimmitt, Inc."); WAGGONER CATTLE, LLC, a Texas limited liability company ("Waggoner Cattle, LLC"); DWAYNE JAY SMITH, as trustee of the WAGGONER TRUST, under Trust dated August 13, 2010 ("Waggoner Trust"); and MICHAEL QUINT WAGGONER ("Michael Quint Waggoner") (Cliff Hanger Cattle, LLC; Bugtussle Cattle, LLC; Circle W of Dimmitt, Inc.; Waggoner Cattle, LLC; Waggoner Trust  and Michael Quint Waggoner are herein individually and collectively, "Borrower") and RABO AGRIFINANCE, INC., a Delaware corporation ("Lender").

This  Amended and Restated Credit Agreement is an amendment and restatement in the entirety of that certain Credit Agreement dated October 27, 2014.  This Amended and Restated Credit Agreement does not release or extinguish the indebtedness, liabilities and obligations of the Borrower under the Existing Loan.

Borrower requests that Lender provide a line of credit to Borrower.  Lender will provide a line of credit, subject to the terms of this agreement.

## ARTICLE 1 - THE LINE OF CREDIT

1.01    **The Line of Credit.**  Lender shall extend credit (the "Line of Credit") from time to time during the period from the Closing Date to the Maturity Date (that period, including extensions, if any, the "Advance Period") by making loans to Borrower (each such loan the "Loan") on a revolving basis.

1.02    **Maximum Amount.**  The aggregate unpaid principal balance of the Loans must not exceed the lesser of:  (i) $35,000,000.00 or (ii) the Borrowing Base.

1.03    **Borrowing Base.**

(a)     "Borrowing Base" means the sum of:

(i)      85% of the Value of Eligible Hedged Cattle; plus

(ii)     80% of the Value of Eligible Option-Protected Cattle; plus

(iii)    75% of the Value of Eligible Cattle (unhedged); plus

(iv)    80% of the Value of Eligible Prepaid Feed Inventory; plus

(v)     75% of the Value of Eligible Feed and Grain Inventory; plus

(vi)    80% of the Eligible Accounts Receivable; plus

(vii)   100% of the Eligible Demand Deposit Accounts (less book overdrafts, as determined by Lender); plus

(viii)  100% of the Eligible Commodity Hedge Accounts; plus

(ix)    100% of the net positive gains on Rabobank International commodity swaps evidenced under a commodity Hedge Agreement (as determined by and acceptable to Lender); plus

(x)     100% of the Eligible Packer  Accounts Receivables; less

(xi)    100% of  Related Payables and Liabilities; less

(xii)   100% of the net negative losses on Rabobank International commodity swaps evidenced under a commodity Hedge Agreement (as determined by and acceptable to Lender); plus

(b)     For purposes of calculation of the Borrowing Base:

(i)      "Accounts Receivable" means accounts which: (A) arise from the sale of goods or the providing of services by Borrower, which comply with the account debtor's specifications (if any) and have been provided or delivered to, and have been accepted by, account debtor, (B) arise in the ordinary course of Borrower's business, (C) are evidenced by an invoice rendered to account debtor dated not earlier than the date of the provision of services or the date of shipment or delivery of goods, as applicable, (D) have payment terms acceptable to Lender, (E) are not evidenced by a note, chattel paper or other instrument, (F) are not payable on an installment basis, (G) are valid, legally enforceable and unconditional obligations of account debtor, and not subject to any setoff, counterclaim, or credit, allowance or adjustment by account debtor, or to any claim by account debtor denying liability thereunder in whole or in part (to the extent of the amount of such setoff or counterclaim) or are restructured, extended or modified, (H) do not arise out of a contract which, by its terms, forbids, restricts or makes void or unenforceable the assignment by Borrower to Lender of the account arising with respect thereto, (I) are owing by an account debtor which (1) is not an Affiliate of Borrower, (2) is a resident or citizen of, and is located within, the United States of America, and (3) is not the subject of an Insolvency Proceeding, (J) are not accounts arising from a "sale on approval", "sale or return" or "consignment", or subject to any other repurchase or return agreement, (K) are not accounts with respect to which possession and/or control of the goods sold giving rise thereto is held, maintained or retained by Borrower (or by any agent or custodian of Borrower), (L) comply with all warranties, representations and covenants in the Loan Documents relating thereto, (M) if account debtor is the United States of America or any state or local governmental entity, or any department, agency or instrumentality thereof, Borrower has assigned its rights to payment of such Accounts to Lender, pursuant to the Assignment of Claims Act of 1940, as amended, or pursuant to any similar state or local law, regulation or requirement, or as otherwise acceptable to Lender and (N) are not owing by an account debtor with respect to which 20% or more of the aggregate accounts owing by such account debtor to Borrower are ineligible Accounts Receivable for any reason; provided, that Lender may, consistent with Lender's normal credit practices, from time to time upon 30 days prior written notice to Borrower, designate categories of ineligible accounts in addition to those



EXHIBIT
A
PENGAD 800-631-6989

above; provided, also, that such designation shall be immediately effective upon the occurrence of an Event of Default or if an Event of Default is in existence at the time of such designation;

(ii)    "Cattle Finishing Costs" means the aggregate of all costs and expenses for Feed, medicine, shelter and all other items of cost or expense which are customarily or otherwise expected to be incurred to bring cattle to a weight at which they are to be sold for slaughter;

(iii)    "Cattle Marketing Costs" means reasonable expenses to be incurred in the sale of the cattle at the point for delivery under a Live Cattle Futures Contract;

(iv)    "Eligible Accounts Receivable" means (as may be further limited by specific defined terms) Accounts Receivable which are (A) owned by Borrower, (B) subject to a first priority perfected security interest in favor of Lender, (C) not subject to any Lien in favor of a Person other than Lender, and (D) otherwise acceptable to Lender; excluding any portion constituting advertising, finance charges, services charges, or sales or excise taxes;

(v)    "Eligible Cattle" means calves, heifers, steers, cows, bulls and other cattle acceptable to Lender other than Eligible Hedged Cattle those which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender;

(vi)    "Eligible Commodity Hedge Accounts" means the net equity position in favor of Borrower in Commodity Hedge Accounts, as determined by brokerage statements satisfactory to Lender (A) subject to a first priority perfected security interest in favor of Lender; (B) subject to a control agreement in favor of Lender, (C) not subject to any Lien in favor of a Person other than Lender; and (D) are otherwise acceptable to Lender;

(vii)    "Eligible Demand Deposit Accounts" means the balance of demand deposit accounts which are (A) owned by Borrower, (B) with Rabobank, N.A. or another financial institution approved by Lender; (C) subject to an account control agreement acceptable to Lender, or otherwise subject to a first priority perfected security interest in favor of Lender; (D) not subject to any Lien in favor of a Person other than Lender; and (E) otherwise acceptable to Lender, less uncashed checks, overdrafts and other outstanding debits related thereto;

(viii)    "Eligible Feed Inventory" means Feed which is (A) owned by and in the possession of Borrower, (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; (D) not spoiled or otherwise in a condition unsuitable for feeding livestock; and (E) otherwise acceptable to Lender;

(ix)    "Eligible Hedged Cattle" means calves, heifers, steers, cows, bulls and other cattle acceptable to Lender other than Eligible Cattle which are subject to a commodity hedge agreement involving hedge transactions as carried under a related Commodity Hedge Account, including Eligible Packer Contracted Cattle, and which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender;

(x)    Eligible Option Protected Cattle" means Eligible Cattle with respect to which a put option has been purchased and the strike price of the related option is no more than USD $5/cwt below the future market price.

(xi)    "Eligible Packer Contracted Cattle" means Eligible Cattle which are subject to a contractual agreement with a packer deemed acceptable by the Lender, under terms acceptable by the Lender, and which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender;

(xii)    "Eligible Prepaid Feed Expenses" means the amounts prepaid to vendors acceptable to Lender for the purchase of Feed commodities acceptable to Lender;

(xiii)    "Feed " means grain, silage and other roughage feed, feed ingredients, and finished feed normally used for feeding livestock.

(xiv)    "Live Cattle Futures Contract" means a contract for the future sale of cattle which has been entered into or could have been entered into by the owner of such cattle through the Chicago Board of Trade, the Chicago Mercantile Exchange, the Kansas City Board of Trade or any other United States contract market subject to the jurisdiction of the Commodity Futures Trading Commission, acceptable to Lender;

(xv)    "Mark to market Value (Cattle)" means the market value determined by (A) multiplying (1) the price per hundredweight at which a Live Cattle Futures Contract (for delivery of live cattle by a Live Cattle Futures Contract on a delivery date nearest to the estimated date on which such cattle will be finished) could be entered into by the Borrower on the date the Value is determined, plus or minus the local basis (e.g., plus or minus the 5 year average Texas Panhandle Live Cattle Basis provided by the Texas Cattle Feeders Association) and any premiums or discounts or the price per hundredweight based on the packer contract related to the Eligible Packer Contracted Cattle, times (2) the number of hundredweights projected to be deliverable when such cattle are finished, then (B) subtracting the sum of (1) Cattle Finishing Costs projected to be incurred, on the basis of existing market conditions, plus (2) Cattle Marketing Costs; provided that if there is no available Live Cattle Futures Contract, then the market value as determined by Lender;

(xvi)    "Eligible Packer Accounts Receivables" or "Proceeds-In-Transit" means an Account Receivable resulting from the sale of Eligible Cattle to a buyer of such Eligible Cattle acceptable to Lender which have been shipped, not to exceed 10 days past the shipping date when due, and (A) subject to a first priority perfected security interest in favor of Lender, (B) not subject to any Lien in favor of a Person other than Lender, and (3) otherwise acceptable to Lender;

(xvii)    "Related Payables and Liabilities" means all accounts payable including trade account payables or other unpaid costs of acquiring the Collateral included in the Borrowing Base, and the amount of all Liens on and any offsets and contra accounts relating or pertaining to that Collateral; and

(xviii)    "Value" means

(A)     with respect to Eligible Cattle, Eligible Hedged Cattle, and Eligible Option Protected Cattle, the Mark to market Value.

(B)     with respect to all other Collateral, unless otherwise specified, the value as determined by Lender.

The Borrowing Base for purposes of the Initial Loan will be determined by the most recent Borrowing Base Certificate received by Lender, subject however, to adjustments by Lender consistent with this agreement. The Borrowing Base for purposes of subsequent Loans will be determined by Borrower, subject however, to adjustments by Lender consistent with this agreement. Each Loan Request for a Loan will be deemed a representation by Borrower to Lender that the unpaid principal balance of the Line of Credit after the requested Loan will not exceed the maximum amount of the Line of Credit under this agreement. Notwithstanding the provisions of this section to the contrary, Lender may as a precondition to any Loan require Borrower to deliver to Lender a current Borrowing Base Certificate.

1.04    **Loans under the Line of Credit.** Loans under the Line of Credit are subject to Article 4. Loans must be used only for the refinance Incumbent lender First Capital Bank of Texas, cattle and feed notes at feedyards, and finance ongoing cattle purchase and feed costs of Cliff Hanger.

1.05    **Revolving Nature.** The Line of Credit is a revolving line of credit; and during the Advance Period, subject to the terms and conditions of this agreement, Borrower may repay principal amounts and reborrow them.

1.06    **Interest.** The unpaid principal balance of Loans under the Line of Credit will bear interest at a rate equal to the one month LIBOR plus 2.750% per annum, Adjusted on the first day of each month (the "LIBOR Indexed Rate").

1.07    **Required Payments; Maturity Date.**

(a)     Borrower shall pay accrued interest on the Line of Credit on January 1, 2015 and on the first day of each month after the Closing Date to the Maturity Date.

(b)     The unpaid principal balance of, all unpaid accrued interest on, and other charges under this agreement with respect to the Line of Credit, shall be paid on December 1, 2015 (the "Maturity Date").

1.08    **Prepayments.** Subject to Section 2.07, Prepayments of the Line of Credit may be made at any time without prepayment fee or penalty.

1.09    **The Note.** Loans under the Line of Credit will be evidenced by this agreement and a promissory note in a form provided by Lender (the "Note").

1.10    **Increase of the Line of Credit Committed Amount.** At any time, upon Borrower's request, Lender may at its sole option increase the Line of Credit Committed Amount in an additional sum of up to $5,000,000.00. To request such an increase, Borrower shall first deliver a written request to the Lender specifying the amount of the requested increase and the requested effective date thereof. Upon receipt of any such request from Borrower, Lender will have the right, but not the obligation, to increase its Line of Credit Committed Amount. Nothing in this Section shall constitute or otherwise be deemed to be an obligation or commitment on the part of Lender to increase its Line of Credit Committed Amount at any time. Any increase in the maximum principal amount of the Line of Credit shall be subject to the satisfaction of the following conditions precedent: (i) no Event of Default has occurred and then continuing; (ii) all representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects. Such additional sums and increases permitted hereunder shall be subject to all the terms and conditions of this Agreement. Borrower agrees to execute an amended Note evidencing any increase in the Line of Credit Committed Amount.

## ARTICLE 2 - COVENANTS REGARDING THE LOANS

2.01    **Loan Requests.** Each Loan will be made upon the request of Borrower (a "Loan Request"). Each Loan Request (a) must comply with the requirements of Article 8; (b) at Lender's option, must be received by Lender before 12:00 noon (St. Louis, Missouri time) on a Business Day which is not less than one Business day prior to the date of the Loan; and (c) must specify the amount of the Loan. No Loan will be made if the interest rate for that Loan would exceed the Maximum Rate, or, subject to the terms of this Section 2.01, if the amount would exceed the maximum amount thereof under the terms of this agreement. Each Loan Request will be irrevocable. Notwithstanding the provisions of this section to the contrary, Lender may approve Loan Requests for Loans which exceed the maximum amount thereof under the terms of this agreement (each, a "Permitted Over-Advance"). Each Permitted Over-Advance will, unless otherwise agreed by Lender, bear interest at the rate otherwise applicable to a Loan made pursuant to such Loan Request, and be subject to the provisions of Section 2.08 requiring payment of principal and interest upon demand and all other terms and provisions of this agreement otherwise applicable to such Loan.

2.02    **Computation of Interest.** All computations of accrued interest under the Loan Documents other than interest at the Maximum Rate, and all fees under the Loan Documents, will be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) elapsed; and all computations of interest accrued at the Maximum Rate will be based upon a year of the actual number of days in the respective year. Subject to Section 2.04, there is no limit on the amount that a rate of interest subject to Adjustment by Lender may increase at any one time, or in the aggregate. Lender's determination of a rate of interest will be conclusive, absent manifest error.

2.03    **Default Rate.** Upon the occurrence of an Event of Default, the principal balance of the Loans and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the date Lender notifies Borrower that it is waived or cured or all Loan Obligations are paid in full, bear interest at the Default Rate. Subject to the provisions of Section 2.04, the "Default Rate" means the rate applicable to the unpaid principal balance of the Line of Credit plus 10.000% per annum. Interest payable at the Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

2.04    **Maximum Rate.** Notwithstanding any provision of this agreement to the contrary, (a) no interest will be due on any amount due under this agreement if, under Applicable Law, Lender is not permitted to charge interest on that amount, and (b) in all other cases interest due under this agreement will be calculated at a rate not to exceed the Maximum Rate. If Borrower is requested by Lender to pay interest on any amount due under this agreement at a rate greater than the Maximum Rate, the amount of interest due on that amount will be deemed the Maximum Rate and all payments in excess of the Maximum Rate will be deemed to have been Prepayments without prepayment fee or penalty, and not interest. All amounts other than interest which are paid or agreed to be paid to Lender for the use, forbearance, or detention of Borrower's indebtedness to Lender under this

agreement shall, to the extent permitted by Applicable Law, be amortized over the full stated term of the Indebtedness, so that the rate of interest on account of that indebtedness does not exceed the Maximum Rate for so long as the Indebtedness is outstanding.

2.05    **Method and Application of Payments.** All payments of principal, interest, and other amounts to be made under the Loan Documents shall be made to Lender in U.S. dollars and in immediately available funds, without set-off, deduction, or counterclaim, not later than 2:00 pm (St. Louis, Missouri time) on the dates on which those payments will become due (any of those payments made after the time on the due date will be deemed to have been made on the next succeeding Business Day). All payments received by Lender (including, to the extent permitted by Applicable Law, all proceeds received from the sale or other liquidation of the Collateral) will be applied to the Obligations in any order determined by Lender. The early or late date of making a regularly scheduled payment will be disregarded for purposes of allocating the payment between principal and interest. For this purpose, the payment will be treated as though made on the date due. In any legal action or proceeding, the entries made by Lender in an account or accounts maintained by Lender or Rabobank International or any of their Affiliates in accordance with its usual practice and evidencing the Obligations, will be *prima facie* evidence of the existence and amounts of those Obligations.

2.06    **Designated Account.** So long as Lender has any obligation to make Loans, upon the request of Lender, Borrower shall maintain a demand deposit account with Rabobank, N.A., or another bank approved by Lender (the "Designated Account") in good standing. If all of the applicable conditions to the Loan have been fulfilled, Lender shall make the Loan available to Borrower as set forth in the Request for Loan by, at the option of Lender, (a) depositing the proceeds in the Designated Account; (b) if applicable, transferring the proceeds to an agent designated for purposes of an escrowed Closing of this transaction by wire or ACH transfer; or (c) paying or applying the proceeds as otherwise permitted under this agreement, by any means appropriate under the circumstances.

2.07    **Prepayments Generally.** Lender may refuse to accept any Prepayment not expressly permitted in this agreement. If a Prepayment is conditioned upon prior notice to Lender, at the option of Lender, (a) that notice will be irrevocable; (b) a Prepayment will be due in the amount and on the date specified in that notice; and (c) that notice will not affect Borrower's obligation to make all other payments required under the Loan Documents on the date when due. Borrower shall have the option of making any Prepayment subject to payment of all amounts then due Lender under this agreement. Each Prepayment of a portion of a Loan will be applied to the most remote payment of the principal due under this agreement. If Lender receives any Prepayment which it is permitted to refuse, Lender may accept the Prepayment; except that Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount prepaid would be due under this agreement, whichever is earlier.

2.08    **Mandatory Repayments.** If at any time the unpaid principal balance of a Loan exceeds the maximum amount thereof under the terms of this agreement, then, subject to the terms of Section 2.01 applicable to a Permitted Over-Advance, upon demand by Lender, Borrower shall repay that portion of the principal balance thereof in excess of that maximum amount, along with all unpaid accrued interest on that portion.

2.09    **Inability to Determine Rates.** If, in connection with any Loan bearing interest at a rate to be determined in whole or in part on the basis of the applicable LIBOR (a "LIBOR Based Rate"), Lender determines that (a) United States dollar deposits are not being offered to banks in the London interbank market for the applicable amount of such Loan, (b) adequate and reasonable means do not exist for determining the applicable LIBOR Based Rate, or (c) the applicable LIBOR Based Rate does not adequately and fairly reflect the cost to Lender of funding that Loan, Lender will promptly so notify the Borrower. Thereafter, the obligation of Lender to make or maintain any Loan bearing interest at the applicable LIBOR Based Rate shall be suspended until Lender revokes such notice, and all Loans which would otherwise bear interest at the applicable LIBOR Based Rate shall accrue interest at that rate, per annum, equal to a rate determined by Lender in Lender's reasonable discretion.

## ARTICLE 3 - COLLATERAL

The payment and performance of the Obligations are secured by the following:

(a)    all Liens in favor of Lender created under (i) the Amended and Restated Security Agreement dated as of the date of this agreement between Lender, as agent for itself and the other Secured Parties (defined therein) under the Collateral Agency Agreement, and Borrower; and (ii) any other instrument or agreement delivered to Lender in conjunction with this agreement, which states that it secures all or any of the Obligations (the property encumbered by those Liens, the "Collateral;" and those instruments and agreements securing all or any of the Obligations, the "Collateral Documents");

(b)    all Liens upon and security interests created under any other written instrument or agreement stating expressly that it secures the indebtedness, liabilities or obligations of Borrower under the terms of this specific agreement;

## ARTICLE 4 - CONDITIONS

4.01    **Conditions of the Initial Loan.** Lender's obligation to make the initial Loan is subject to the following conditions precedent:

(a)    Borrower has executed and delivered the Loan Documents to Lender; and Lender has executed this agreement and all other Loan Documents to which Lender is a Party;

(b)    Lender has received evidence satisfactory to Lender, of the formation and existence of all parties to the Transaction Documents other than Lender which are anything other than an individual, if any, and authorization of the individuals executing the Transaction Documents on behalf of those parties;

(c)    Lender has received all appraisals and inspection reports required by Lender, in a form and content satisfactory to Lender;

(d)    Lender has received a Borrowing Base Certificate;

(e)    Lender has received evidence satisfactory to Lender, that Borrower is in compliance with all applicable Environmental Laws (that evidence, the "Environmental Information");

(f)    Lender has received evidence satisfactory to Lender, that all regulatory approvals, permits and licenses required under Applicable Law for Borrower's business operations have been issued and are in full force and effect;

(g)    Lender has received evidence satisfactory to Lender, that the Liens granted to Lender under the Collateral Documents are valid, enforceable, properly perfected, and prior to the rights and interests of all other Persons, except those rights and interests acceptable to Lender;  Lender shall permit a prior lien on the Waggoner Cattle, LLC; Bugtussle Cattle, LLC; Circle W of Dimmitt, Inc. and Waggoner Trust Collateral in favor of Lone Star State Bank of West Texas evidenced by Uniform Commercial code financing statement filings.

(h)      Lender has received evidence satisfactory to Lender, that all policies of insurance and endorsements required by Lender or under the Loan Documents are issued by the same title insurance company and are in full force and all premiums for those policies have been paid through the date required by Lender;

(i)      all representations and warranties of all parties other than Lender in the Transaction Documents are true and correct;

(j)      Lender has received a written opinion from Borrower's legal counsel acceptable to Lender, covering all issues required by Lender;

(k)      reimbursement of Lender's out of pocket expenses, including Legal Fees, incurred in connection with the underwriting of the Loans or the Closing (collectively, the "Closing Expenses"); and

(l)      Lender has received all other documents, information and other preconditions required by Lender.

4.02      **Additional Loans.**  Lender's obligation to make each additional Loan is subject to the condition precedent that on the Drawdown Date:

(a)      Lender shall receive a Loan Request (defined in Section 2.01);

(b)      the following statements are correct (and Borrower will be deemed to represent to Lender that those representations are correct) as of the Drawdown Date: (i) the representations and warranties in the Loan Documents are correct as though made on that date; (ii) no Event of Default or event which, with the passage of time or the giving of notice would constitute an Event of Default, has occurred and remains uncured or would result from the additional Loan; (iii) there has been no change in the financial condition of Borrower since the effective date of this agreement, that would have a Material Adverse Effect on Borrower; and (iv) the unpaid principal amount of all outstanding Loans under the line of credit facility under which those Loans are made, together with the amount of that additional Loan does not exceed the maximum amount thereof under the terms of this agreement and

(c)      Lender has received all other documents, information and other preconditions required by Lender.

## ARTICLE 5– BORROWER REPRESENTATIONS

5.01      **Representations.**  Borrower represents to Lender that:

(a)      if Borrower is anything other than an individual, it has complied with all Applicable Laws concerning its organization, existence and the transaction of its business, and is in existence and good standing in its state of organization and each state in which it conducts its business;

(b)      the execution, delivery and performance by Borrower of each Transaction Document to which it is a Party, is within the powers and authority of Borrower and has been duly authorized;

(c)      to Borrower's knowledge, the Transaction Documents do not conflict with any Applicable Law;

(d)      each Transaction Document to which Borrower is a Party is a legal, valid and binding agreement of Borrower, enforceable against Borrower in accordance with its terms, and any instrument or agreement required thereunder, when executed and delivered to Lender, will be similarly legal, valid, binding and enforceable;

(e)      all financial statements and other reports, documents, instruments, information and forms of evidence concerning Borrower, the Collateral, or any other fact or circumstance (the "Financial Information"), delivered to Lender in connection with Borrower's application for the Loan, Lender's underwriting and approval of the Loan, or this agreement and the other Loan Documents, are accurate, correct and sufficiently complete in all material respects to provide Lender true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities;

(f)      there has been no Material Adverse Effect as to Borrower since the effective date of the Financial Information provided to Lender;

(g)      Borrower is not the subject of any Judgment; and there is no lawsuit, tax claim or other dispute pending or to Borrower's knowledge threatened against Borrower that, if determined adverse to Borrower, is reasonably likely to have a Material Adverse Effect;

(h)      the Transaction Documents do not conflict with, nor is Borrower in default under any agreement or arrangement in effect providing for or relating to extensions of credit in respect of which Borrower is in any manner directly or contingently obligated;

(i)      Borrower has filed all tax returns (federal, state, and local) required to be filed by Borrower and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties;

(j)      Borrower is in compliance with all Applicable Laws (including all Environmental Laws), and there is no claim, action, proceeding or investigation pending or to Borrower's knowledge threatened against Borrower with respect to a violation of Applicable Law by Borrower;

(k)      Borrower is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986; and

(l)      there is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

5.02      **Information Accurate and Complete.**  Borrower's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of Borrower, from time to time, whether or not required under this agreement, will be deemed accompanied by a representation by Borrower that the report, record or other information is complete and accurate in all material respects as to the condition or operations of Borrower (and, if applicable, Borrower's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities.

## ARTICLE 6 – BORROWER COVENANTS

Until such time as all Obligations have been paid in full and Lender has no obligation to make additional Loans:

6.01      **Debt Service Coverage Ratio.**  Cliff Hanger Cattle, LLC, Buglassto Cattle, LLC, Circle W of Dimmitt, Inc. and Waggoner Cattle, LLC shall maintain a Combined Debt Service Coverage Ratio of not less than 1.25:1.00, determined as of the end of each fiscal year.

6.02      **Tangible Net Worth.**  Cliff Hanger Cattle, LLC shall maintain not less than $10,500,000.00 (or such other sum equal to the amount of 30% of the Line of Credit commitment (which may increase or decrease from time to time pursuant to the terms hereof)) in Tangible Net Worth, determined as of the end of each month.

Cliff Hanger Cattle, LLC RLOC 2014
Credit Agreement

5

6.03    **Tangible Net Worth.** Cliff Hanger Cattle, LLC, Bugiussie Cattle, LLC, Circle W of Dimmitt, Inc. and Waggoner Cattle, LLC shall maintain not less than $15,000,000.00 in combined Tangible Net Worth, determined as of the end of each fiscal year.

6.04    **Debt to Total Assets Ratio.** Cliff Hanger Cattle, LLC, Bugiussie Cattle, LLC, Circle W of Dimmitt, Inc. and Waggoner Cattle, LLC shall maintain a combined Debt to Total Assets Ratio of not greater than 75%, determined as of the end of each fiscal year.

6.05    **Other Debt.** Cliff Hanger Cattle, LLC shall have no outstanding or incur any direct or contingent liabilities or lease obligations, or guaranty of the liabilities of others, except the following if not otherwise prohibited under the Transaction Documents:  (a) liabilities and obligations to Lender or any of its Affiliates; (b) normal trade credit; and (c) if an individual, additional debts as an individual for primarily consumer purposes.

6.06    **Compensation and Distributions.** Cliff Hanger Cattle, LLC shall limit Compensation and Distributions to dividends, if any, payable in equity interests, unless otherwise consented to in writing by Lender with prior approval (including prior written approval to be obtained for any related or intended Distributions to Waggoner); failure to comply with this Section 6.06 shall be an event of default.

6.07    **Other Liens.** Cliff Hanger Cattle, LLC shall not create or suffer any Liens on the rights, title or interests in its property, except the following if not otherwise prohibited under the Loan Documents:  (a) Liens in favor of Lender or any of its Affiliates; (b) if an individual, additional Liens against the personal assets of that individual as an individual, to secure debt for primarily consumer purposes; and (c) Liens for taxes not yet due, (d) a subordinate Lien in favor of Lone Star State Bank of West Texas, provided that an acceptable intercreditor agreement is entered into evidencing the junior security interest to Lender.

6.08    **Key Man Life Insurance – Michael Quint Waggoner.** Borrower shall provide Lender with an assignment of the key man Life Insurance Policy for Michael Quint Waggoner within 45 days of the Closing of the Loan.

6.09    **Price Protection of Cattle.** Cliff Hanger Cattle, LLC shall maintain not less than 75% of cattle inventory priced or price protected at all times, as determined by and acceptable to Lender.

6.10    **Price Protection of Grain.** By May 31, 2015, Cliff Hanger Cattle, LLC shall maintain not less than 50% of grain inventory priced or price protected at all times, as determined by and acceptable to Lender.

6.11    **Transfer Pricing.** The transfer price that Cliff Hanger Cattle, LLC is to purchase 300 pound Holstein calves from Waggoner Cattle, LLC shall be equal to 75% of the average price reported for 300 pound Holstein calves from the most recent sale at Overland Stockyard in Hanford, CA, as determined by and acceptable to Lender.

6.12    **Books and Records.** Borrower shall maintain and cause each of its Subsidiaries to maintain proper books of record and account including full, true, and correct entries of all dealings and transactions relating to its and their business and activities on a cash or an accrual basis, at the option of Borrower, in all material respects in conformity with generally accepted accounting principles ("GAAP") or the Financial Guidelines for Agricultural Producers, published by the Farm Financial Standards Council (those guidelines, the "FFSC"), at Borrower's option.

6.13    **Reporting Requirements.** Borrower shall furnish to Lender:

(a)    as soon as available, but no later than 30 days after the end of each month, a Borrowing Base Certificate current as of the end of that month (Cliff Hanger Cattle, LLC);

(b)    as soon as available, but no later than 30 days after the end of each month, a Borrowing Base Certificate current as of the end of that month (Waggoner Cattle, LLC);

(c)    as soon as available, but no later than 30 days after the end of each month, a copy of Self Prepared Combined financial statements of Bugiussie Cattle, LLC, Circle W of Dimmitt, Inc. and Waggoner Cattle, LLC for that period;

(d)    as soon as available, but no later than 30 days after the end of each month, a copy of Self Prepared financial statements of Cliff Hanger Cattle, LLC for that period;

(e)    as soon as available, but no later than 120 days after the end of each fiscal year, a copy of CPA Audited Combined financial statements of Cliff Hanger Cattle, LLC, Bugiussie Cattle, LLC, Circle W of Dimmitt, Inc. and Waggoner Cattle, LLC for that period;

(f)    as soon as available, but no later than 90 days after the end of each fiscal quarter (excluding fourth quarter), a copy of CPA Compiled Combined financial statements of Cliff Hanger Cattle, LLC, Bugiussie Cattle, LLC, Circle W of Dimmitt, Inc. and Waggoner Cattle, LLC for that period (beginning with the quarter ending December 31, 2014);

(g)    as soon as available, but no later than 30 days after the end of each fiscal year, a copy of Self Prepared financial statements of Michael Quint Waggoner for that period (beginning fiscal year end 2015);

(h)    as soon as available, but no later than 30 days after filing, copies of federal income tax returns filed by Michael Quint Waggoner, including all schedules and exhibits and any extensions of the filing date;

(i)    copies of any feeding agreement or related agreements evidencing the contractual arrangements Borrower has entered into related to the care and feeding of cattle.

(j)    promptly upon sending or receipt, copies of any management letters and correspondence relating to management letters, sent to or received from Borrower's accountants; and

(k)    promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(l)    notice of the occurrence of any of the following, promptly, but in any event no later than five days after such occurrence: (i) any lawsuit, tax claim or other dispute if filed or threatened against Borrower in an amount greater than $100,000.00; (ii) any substantial dispute between Borrower and any Governmental Authority; (iii) the failure by Borrower to comply with the terms and provisions of this agreement; (iv) any Material Adverse Effect as to Borrower; or (vi) any change in Borrower's name, legal structure, place of business, or chief executive office;

(m)    if any financial statement required under this agreement has been compiled, reviewed or audited, a copy of that compiled, reviewed or audited financial statement, along with a copy of any accompanying accountant's report or opinion; and

(n)    promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower requested by Lender.

6.14    **Change in Accounting.**  Borrower shall not make any material change or modification of Borrower's manner and method of accounting except as required by the applicable accounting standard.

6.15    **Maintenance of Assets.**  Borrower shall maintain and preserve all rights, privileges, and franchises Borrower now has; and make any repairs, renewals, or replacements to keep Borrower's properties in good working condition.

6.16    **Existence and Good Standing.**  If Borrower is anything other than an individual, Borrower shall preserve and maintain its existence and good standing in the jurisdiction of its formation, and qualify and remain qualified to conduct its business in each jurisdiction in which such qualification is required;

6.17    **Change in Business or Organizational Structure.**  Borrower shall not engage in any material line of business substantially different from, or unrelated to, those lines of business conducted by Borrower and its Subsidiaries on the date hereof; and if Borrower is anything other than an individual, Borrower shall not (a) form or otherwise acquire any Subsidiary, unless that Subsidiary executes and delivers to Lender a guaranty of all of the Obligations and all other Instruments and agreements required by Lender; or (b) merge, dissolve, liquidate, consolidate with or into another Person, or dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

6.18    **Compliance with Laws.**  Borrower shall comply in all respects with all Applicable Laws and pay before delinquency, all taxes, assessments, and governmental charges imposed upon Borrower or its property.

6.19    **Inspections.**  Borrower shall, at any reasonable time and from time to time, permit Lender or any of its agents or representatives to examine and make copies of and abstracts from the records and books of, and visit the properties of, Borrower and to discuss the affairs, finances, and accounts of Borrower with (if Borrower is other than an individual) officers, directors, partners, or managers or Borrower, as applicable; Borrower's independent accountants; and any other Person dealing with Borrower.

6.20    **Insurance.**

(a)    Borrower shall maintain, or cause to be maintained, all risk property damage insurance policies covering tangible property comprising the Collateral for the full insurable value on a replacement cost basis; and such additional insurance as required by Lender or any Swap Counterparty from time to time.

(b)    All policies of insurance required under the Transaction Documents must be issued by companies approved by Lender and the Swap Counterparties, and must be acceptable to Lender and the Swap Counterparties as to amounts, forms, risk coverages, deductibles, expiration dates, and loss payable and cancellation provisions. In addition, each required policy must contain such endorsements as Lender or the Swap Counterparties may require and must provide that all proceeds be payable to Lender and the Swap Counterparties to the extent of their respective interests.

(c)    If and whenever Lender or a Swap Counterparty believes that any required insurance is not in effect, Lender or that Swap Counterparty may (but will not be obligated to) procure that insurance at Borrower's expense. Borrower shall reimburse Lender and the Swap Counterparties, on demand, for all premiums on that insurance paid by Lender or the Swap Counterparties, respectively.

6.21    **Arms' Length Dealing.**  Except for *de minimis* transactions, Borrower shall not enter into any transaction of any kind with any family member, Subsidiary or Affiliate, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Borrower as would be obtainable by any Borrower at the time in a comparable arm's length transaction with a Person other than a family member, Subsidiary or Affiliate.

6.22    **Use of the Loans.**  Borrower shall not use the Loans (a) for personal, family or household purposes; or (b) to purchase or carry "margin stock" (as that term is defined in Regulation U of the Board of Governors of the Federal Reserve System) or to invest in other Persons for the purpose of carrying any such "margin stock" or to reduce or retire any indebtedness incurred for that purpose.

6.23    **ERISA Plans.**  Borrower shall promptly pay and cause all Subsidiaries to pay contributions adequate to meet not less than the minimum funding standards under ERISA with respect to each and every Plan; file each annual report required to be filed pursuant to ERISA in connection with each Plan for each year; and notify Lender within ten days following the occurrence of any Reportable Event that might constitute grounds for termination of any capital Plan by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a trustee to administer any Plan. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time. Capitalized terms in this section shall have the meanings defined within ERISA.

6.24    **Legal Fees; Costs.**  Borrower shall pay the following: (a) costs, expenses and Legal Fees paid or incurred in connection with the collection or enforcement of the Transaction Documents, whether or not suit is filed; (b) costs and Legal Fees paid or incurred in connection with any Insolvency Proceeding involving a claim under the Transaction Documents; (c) costs, expenses and Legal Fees incurred to protect the liens and security interests under the Collateral Documents; and (d) costs of suit and such sum as the court may adjudge as Legal Fees in any action to enforce payment of the Notes or any part thereof.

6.25    **Lender Expenses.**  Within ten Business Days after demand from Lender to Borrower, Borrower shall pay (or reimburse Lender for payment of) Closing Expenses not previously received by Lender.

6.26    **Other Acts.**  Upon request by Lender, Borrower shall cooperate with Lender for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien granted under this agreement or the Collateral Documents, or to carry out the intent of the Transaction Documents.


## ARTICLE 7 - EVENTS OF DEFAULT AND REMEDIES

7.01    **Events of Default.**  Upon Lender's election, the following each will be an event of default under this agreement (an "Event of Default"):

Cliff Hanger Cattle, LLC RLOC 2014
Credit Agreement

7

(a)    any payment required under the Loan Documents is not made by the first Business Day on or after the fourth calendar day following its scheduled due date;

(b)    the Financial Information or any representation in the Loan Documents (including any representation pursuant to Section 5.02) is materially incorrect or misleading;

(c)    Borrower does not (i) pay (or cause payment of) all taxes assessed on the Collateral prior to the date when delinquent; (ii) maintain (or cause to be maintained) all policies of insurance required under the Transaction Documents and pay (or cause payment of) all premiums for that insurance on or prior to the date when due; and (iii) maintain the Collateral (or cause the Collateral to be maintained) in good condition and repair, all in accordance with the terms and conditions of the Transaction Documents;

(d)    the death of (i) any Borrower who is an individual, (ii) if Borrower is a partnership, any general partner of that partnership who is an individual, or (iii) if Borrower is the trustee under a trust acting in that capacity, any individual trustor under the trust;

(e)    the filing of any federal tax lien against Borrower, any member or general partner of Borrower, or against the Collateral and same is not discharged of record within 30 days after the date filed;

(f)    an Insolvency Proceeding is initiated by Borrower; or any Insolvency Proceeding initiated against Borrower by another Person is not discharged within 60 days after filing;

(g)    Borrower or any Subsidiary are or become subject to a Judgment or Judgments: (i) for the payment of money in an aggregate amount (as to all such Judgments or orders) exceeding $50,000.00, which are not covered by independent third-party insurance as to which the insurer does not dispute coverage, or (ii) that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon any such Judgment, or (B) there is a period of ten consecutive days during which a stay of enforcement of any such Judgment, by reason of a pending appeal or otherwise, is not in effect;

(h)    the violation of any Financial Covenant;

(i)    any "Event of Default" as that term is defined in the Loan Documents other than this agreement which is not cured within any applicable cure or grace period;

(j)    any default in the payment or performance of a term or condition of any credit agreement, note, security agreement, mortgage, deed of trust, deed to secure debt, or other agreement or instrument evidencing or securing any other indebtedness, liabilities or obligations of Borrower to Lender or Rabobank International, Rabobank, N.A., or any other Affiliate of Lender, or any Swap Counterparty;

(k)    any default in the payment or performance of a term or condition of any credit agreement, note, security agreement, mortgage, deed of trust, deed to secure debt, or other agreement or instrument evidencing or securing any other indebtedness, liabilities or obligations of Waggoner Cattle, LLC to Lone Star State Bank of West Texas;

(l)    any default termination event or other similar event under any Hedging Agreement which is not cured within any applicable cure or grace period;

(m)    any Material Adverse Effect as to Borrower;

(n)    for more than ten days after notice from Lender, Borrower is in default under any term, covenant or condition of this agreement not previously described in this Section 7.01, which can be cured by the payment of a sum of money; and

(o)    for 30 days after notice from Lender, Borrower is in default under any term, covenant or condition of this agreement not previously described in this Section 7.01; provided that if (i) it is reasonably certain that the default cannot be cured by Borrower within that 30 day period and (ii) Borrower has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period will be extended for so long as reasonably required by Borrower in the exercise of due diligence to cure that default, up to a maximum of 90 days after the notice to Borrower of the Event of Default.

7.02    Remedies.  Upon the occurrence of an Event of Default, Lender may: (a) without notice to Borrower, decline Loan Requests; (b) declare all Loan Obligations due and payable, without presentment, notice of intent to accelerate or notice of acceleration, demand, protest or further notice of any kind, all of which are expressly waived by Borrower; and (c) exercise all other rights and remedies afforded to Lender under the Loan Documents or Applicable Law or in equity; except that upon an actual or deemed entry of an order for relief with respect to Borrower or any of its Subsidiaries in any Insolvency Proceeding, (i) any obligation of Lender to make additional Loans shall automatically be terminated and (ii) all Loan Obligations shall automatically become due and payable, without presentment, demand, protest or any notice of any kind, all of which are expressly waived by Borrower.

## ARTICLE 8 - NOTICES

All requests, notices, approvals, consents, and other communications between the Parties (collectively, "Notices") under the terms and conditions of the Loan Documents must be in writing and mailed or delivered to the address specified in that Loan Document, or to the address designated by any Party in a notice to the other Parties; and in the case of any other Person, to the address designated by that Person in a notice to Borrower and Lender. All Notices will be deemed to be given or made upon the earlier to occur of (a) actual receipt by the intended recipient or (b) (i) if delivered by hand or by courier, upon delivery; or (ii) if delivered by mail, four Business Days after deposit in the mails, properly addressed, postage prepaid; except that notices and other communications to Lender shall not be effective until actually received by Lender. Borrower requests that Lender make in a manner specified herein (including Notices made verbally, by telephone, telefacsimile, email, or other electronic means of communication), were incomplete or were not preceded or followed by any other form of Notice specified herein, or the terms thereof, as understood by the recipient, varied from any confirmation thereof. All telephonic Notices to and other telephonic communications with Lender may be recorded by Lender, and each Party consents to such recording.

## ARTICLE 9 – GENERAL DEFINITIONS, ACCOUNTING MATTERS AND DRAFTING CONVENTIONS

9.01    **Defined Terms.** Capitalized terms defined in this section are used in this agreement as so defined. Except as otherwise defined in this agreement, or unless the context otherwise requires, each term that is used in this agreement which is defined in Article 9 of the UCC shall have the meaning ascribed to that term in Article 9 of the UCC.

"Adjust" means to increase or decrease; "Adjusted" means increased or decreased; and "Adjustment" means an increase or decrease.

"Adjustment Date" means each date on which the rate of interest on a LIBOR Indexed Rate Loan is or may be Adjusted by Lender pursuant to this agreement.

"Affiliate" of a Person other than an Individual means another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Applicable Law" means all existing and future laws, orders, ordinances, rules and regulations of or by a Governmental Authority; except that in determining the Maximum Rate, Applicable Law shall mean those laws, orders, ordinances, rules and regulations in effect as of the date hereof or if there is a change in Applicable Law which (a) permits Lender to charge interest on amounts which Lender would not otherwise be permitted to charge interest, or (b) increases the permissible rate of interest, then the new Applicable Law as of its effective date.

"Borrower" shall have the meaning specified in the preamble of this agreement.

"Borrowing Base Certificate" means a certificate in a form required by Lender, properly completed and certified by Borrower, for purposes of calculating the Borrowing Base, together with all supporting documentation required by Lender.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the Applicable Laws of the State of Iowa or Missouri, or are in fact closed in the State of Iowa or Missouri.

"Closing" means (a) the acknowledgement by Lender that all conditions precedent to the initial Loan are satisfied or waived in accordance with this agreement, or (b) the initial Loan is made, whichever is earlier.

"Closing Date" means the date of the Closing.

"Collateral Agency Agreement" means the internal collateral agency agreement between Rabo Agrifinance, Inc., Rabobank International, and Rabobank, N.A. governing their rights and obligations permitting Rabo Agrifinance, Inc., to act as a collateral agent in servicing the Loan.

"Commodity Hedge Account" means any commodity hedging or other agreement enabling a Person to limit the market risk of holding a commodity in either the cash or futures market.

"Compensation" means, as applicable, salaries and other compensation paid to shareholders, members, partners, directors, managers, and officers.

"Consolidated" means, in connection with any definition, financial report or financial covenant, the combination of the applicable Persons, together with their Subsidiaries.

"Control" of a Person other than an individual means the power to direct the management and policies of that Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"CPA" means an independent certified public accountant acceptable to Lender.

"CPA Audited" means audited by a CPA, including an auditor's opinion.

"Debt Service Coverage Ratio" means the ratio of EBITDA minus Compensation (to the extent, if any, not treated as an expense for purposes of calculating EBITDA) minus Distributions and plus contributions, to the current portion of Funded Debt plus interest expense.

"Debt to Total Assets Ratio" means total liabilities divided by total assets, multiplied by 100.

"Distributions" means, as applicable, living expenses for individuals, or dividends, distributions or other payments (whether in cash, securities or other property) with respect to any capital stock, membership interest, general or limited partnership interest, beneficial interest in a trust or other equity interest.

"Drawdown Date" means in the case of any Loan, the date on which that Loan is made.

"EBITDA" means at any date (a) net income, excluding any extraordinary and non-operating income (unless deemed by Lender to be recurring in nature), of a Person for the preceding twelve months plus (b) any interest expense, income taxes, depreciation, amortization, and other non-cash charges for that twelve months to the extent they were deducted from gross income to calculate net income.

"Environmental Law" means all Applicable Laws relating to or imposing liability or standards of conduct concerning protection of health or the environment.

"Financial Covenant" means any covenant contained in the Loan Documents regarding the financial status of a Person other than Lender.

"Funded Debt" means all outstanding long term liabilities for money borrowed for non-consumer purposes, other long term interest-bearing non-consumer liabilities, and capital leases.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Hazardous Substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "caustic," "pollutant," or "contaminant" or a similar designation or regulation under any Environmental Law, and shall also include, without limitation, asbestos, PCBs, petroleum, petroleum products, and natural gas.

"Hedging Agreement" means any interest rate swap, interest rate caps, interest rate collars or other similar agreement between Borrower and a Swap Counterparty, for the purpose of fixing or limiting interest expense, or any foreign exchange, currency hedging, commodity hedging, security hedging or other agreement between Borrower and a Swap Counterparty, for the purpose of limiting the market risk of holding currency, a security or a commodity in either the cash or futures markets.

"Hedging Obligations" means all indebtedness, liabilities and obligations of Borrower under any Hedging Agreement, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several.

"Indemnified RNA Liabilities" means all indebtedness, liabilities and obligations of Borrower to Rabobank, N.A. ("RNA"), in connection with banking products and services provided by RNA to Borrower, if any, including all obligations of Borrower to RNA as a result of: (a) deposits of credit items that are returned by the issuing bank; (b) ACH debit items originated by Borrower which settle with insufficient funds in Borrower's deposit account; (c) letters of credit issued by RNA for the benefit of Borrower; (d) trade finance services; and (e) all service charges and fees posted to the account.

"Insolvency Proceeding" means the insolvency of a Person, the appointment of a receiver of any part of Person's property, an assignment by a Person for the benefit of creditors, or the commencement of any proceeding under the Federal Bankruptcy Code or any other bankruptcy or insolvency law, by or against a Person.

"Interest Payment Date" means a date on which regularly scheduled payments of interest are due.

"Interest Period" means with respect to the LIBOR Indexed Rate Loan, each period commencing on the date that the LIBOR Indexed Rate Loan, respectively, is made or the applicable rate is recalculated, until the next Adjustment Date or, if earlier, the respective Maturity Date.

"Judgment" means a judgment, order, writ, injunction, decree, or rule of any court, arbitrator, or Governmental Authority.

"Legal Fees" means any and all counsel, attorney, paralegal and law clerk fees and disbursements, including, but not limited to fees and disbursements at the pre-trial, trial, appellate, discretionary review, or any other level, incurred or paid by Lender in protecting and enforcing its rights and interests under the Loan Documents.

"Lender" shall have the meaning specified in the preamble of this agreement and any successors and assigns of any of its rights and obligations under this agreement.

"LIBOR" means, for any Interest Period, the rate of interest published in the "Money Rates" section of The Wall Street Journal (or if The Wall Street Journal is not available or does not publish that rate, any other authoritative source of that rate, selected by Lender from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in an amount equal to the Loan in the London interbank market at approximately 11:00 a.m., London time) on the London Banking Day immediately preceding the commencement of the Interest Period, as the rate for dollar deposits with a maturity comparable to the applicable contract period; provided, that LIBOR may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs.

"LIBOR Indexed Rate Loan" means a Loan which bears interest at the LIBOR Indexed Rate.

"Lien" means any mortgage, pledge, assignment, deposit arrangement, privilege, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan Documents" means this agreement, the Note, the Collateral Documents, and all other agreements and instruments required by Lender for purposes of evidencing or securing the Loans.

"Loan Obligations" means all indebtedness, liabilities and obligations of Borrower to Lender arising pursuant to any of the Loan Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several.

"London Banking Day" means a day on which banks are open for dealings in dollar deposits in the London interbank market.

"Losses" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, Judgments, awards, amounts paid in settlement of whatever kind or nature (including Legal Fees).

"Material Adverse Effect" means any set of circumstances or events which (a) has or could reasonably be expected to have any material adverse effect as to the validity or enforceability of any Transaction Document or any material term or condition therein against the applicable Person; (b) is or could reasonably be expected to be material and adverse to the financial condition, business assets, operations, or property of the applicable Person; or (c) materially impairs or could reasonably be expected to materially impair the ability of the applicable Person to perform the Obligations.

"Maximum Rate" means that rate per annum which, under Applicable Law, may be charged without subjecting Lender to civil or criminal liability, or limiting Lender's rights under the Loan Documents as a result of being in excess of the maximum interest rate which Borrower is permitted to contract or agree to pay; except that the Maximum Rate on any amount upon which Lender is not permitted to charge interest will be zero percent.

"Obligations" means the Loan Obligations and the Hedging Obligations.

"Party" refers only to a named party to this agreement or another Loan Document, as the context requires.

"Person" means an individual, a corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or other business entity, or a government or any agency or political subdivision thereof.

"Prepay" means to make a Prepayment.

"Prepayment" means a payment of all or a portion of the unpaid principal balance of a Loan prior to the date when due, whether voluntary, by reason of acceleration, or otherwise.

"Prime Rate" means for any day the highest rate published from time to time in the "Money Rates" section of *The Wall Street Journal* as the Prime Rate for that day (or, if *The Wall Street Journal* is not available, any other authoritative source of that rate selected by Lender).

"Rabobank International" means Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (trading as Rabobank International), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands.

"Self Prepared" means for the financial statement of any Person, prepared by that Person, and not compiled, reviewed or audited by a certified public accountant.

"Subsidiary" of a Person which is anything other than an individual means a business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly by that Person. Unless otherwise specified, all references to a "Subsidiary" or to "Subsidiaries" shall refer to any Subsidiary or Subsidiaries, if any.

"Swap Counterparty" means any party to a Hedging Agreement which is Rabobank International or an Affiliate of Rabobank International.

"Tangible Net Worth" means total assets, less the sum of (without limitation and without duplication of deductions) (a) total liabilities, (b) any reserves established by a Person for anticipated losses or expenses, (c) the amount, if any, of all intangible items including any leasehold rights, the amount of any investment in any Affiliate or other entity including a Subsidiary, good will (including any amounts, however designated on the balance sheet, representing the cost of acquisition of business and investments in excess of underlying tangible assets), trademarks, trademark rights, trade name rights, copyrights, patents, patent rights, licenses, unamortized debt discount, marketing expenses, and customer and/or mailing lists, (d) all amounts due from employees, stockholders, and Subsidiaries; and (e) any other asset deemed intangible by Lender.

"Transaction Documents" means the Loan Documents and all Hedging Agreements.

"UCC" means the Uniform Commercial Code in the Governing Law State.

9.02    **Accounting Matters.**  All accounting terms not specifically defined herein will be construed in accordance with GAAP or FFSC, at Borrower's option. All financial covenants applicable to an individual will be calculated based on that individual's business, excluding personal assets and liabilities. Borrower will not change (a) the accounting standards used to prepare Borrower's financial statements or (b) the manner in which either the last day of its fiscal year or the last days of the first three fiscal quarters of its fiscal years is calculated. If at any time any change in GAAP or FFSC would affect the computation of any financial ratio or requirement set forth in any Loan Document Lender may amend that ratio or requirement to preserve the original intent thereof in light of that change. All financial ratios and financial covenants will be measured on a market value basis.

9.03    **Drafting Conventions.**  Unless expressly stated herein or the context otherwise requires, the Loan Documents will be interpreted in accordance with the following (the "Drafting Conventions"): (a) the words "include," "includes," and "including" are to be read as if they were followed by the phrase "without limitation"; (b) unless otherwise expressly stated, terms and provisions applicable to two or more Persons shall apply on an individual, as well as collective basis; (c) headings and captions are provided for convenience only and do not affect the meaning of the text which follows; (d) references to an agreement or instrument means that agreement or instrument, together with all extensions, renewals, modifications, substitutions and amendments thereof, subject to any restrictions thereon in that agreement or instrument or in the Loan Documents; (E) ANY REPORT OR DOCUMENT TO BE RECEIVED BY LENDER SHALL BE SATISFACTORY IN FORM AND CONTENT TO LENDER; (F) WHEREVER (i) LENDER EXERCISES ANY RIGHT GIVEN TO IT TO APPROVE OR DISAPPROVE, (II) ANY ARRANGEMENT OR TERM IS TO BE SATISFACTORY TO LENDER, OR (III) ANY OTHER DECISION OR DETERMINATION IS TO BE MADE BY LENDER, THEN EXCEPT AS MAY BE OTHERWISE EXPRESSLY AND SPECIFICALLY PROVIDED THEREIN, THE DECISION TO APPROVE OR DISAPPROVE, ALL DECISIONS THAT ARRANGEMENTS OR TERMS ARE SATISFACTORY OR NOT SATISFACTORY, AND ALL OTHER DECISIONS AND DETERMINATIONS MADE BY LENDER, SHALL BE IN THE SOLE DISCRETION OF LENDER, WITHOUT REGARD FOR THE ADEQUACY OF ANY SECURITY FOR THE OBLIGATIONS; (g) whenever by the terms of the Loan Documents, Borrower is prohibited from taking an action or permitting the occurrence of some circumstance, Borrower shall not, directly or indirectly take that action or permit that circumstance, or directly or indirectly permit any Subsidiary to take that action or permit that circumstance; (h) existence of the occurrence or non-occurrence of any event, or the existence or non-existence of any circumstance to be delivered to Lender must be in a form satisfactory to Lender; (i) unless specified otherwise, references to a statute or regulation means that statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor statutes or regulations; (j) unless otherwise specified, all references to a time of day are references to the time in St. Louis, Missouri; (k) references to "month" or "year" are references to a calendar month or calendar year, respectively; (l) if any date specified in this agreement as a date for taking action falls on a day that is not a Business Day, then that action may be taken on the next Business Day; (m) a pronoun used in referring generally to any member of a class of Persons, or Persons and things, applies to each member of that class, whether of the masculine, feminine, or neuter gender; (n) references to "articles," "sections," "subsections," "paragraphs," "exhibits," and "schedules" reference articles, sections, subsections, paragraphs, exhibits, and schedules, respectively, of this agreement unless otherwise specifically provided; (o) the words "hereof," "herein," "hereunder," and "hereby" refer to this agreement as a whole and not to any particular provision of this agreement; (p) the definitions in this agreement apply equally to both singular and plural forms of the terms defined; and (q) for purposes of computing periods of time from a specified date to a later specified date, the word "from " means "from and including" and the words "to" and "until" each mean "to but excluding".

## ARTICLE 10 - MISCELLANEOUS

10.01    **Entire Agreement.** This agreement and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them.  In the event of any conflict between this agreement and any other agreements required by this agreement, this agreement will prevail.

10.02    **Joint and Several Obligations.** If Borrower consists of more than one Person, each Borrower (a) expressly acknowledges that it has benefited and will benefit, directly and indirectly, from each Loan and acknowledges and undertakes, together with the other Borrowers, joint and several liability for the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Loan Obligations; (b) acknowledges that this agreement is the independent and several obligation of each Borrower and may be enforced against each Borrower separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Borrower; and (c) agrees that its liability hereunder and under any other Loan Document is absolute, unconditional, continuing and irrevocable.  BORROWER EXPRESSLY WAIVES ANY REQUIREMENT THAT LENDER EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER BORROWERS UNDER THIS AGREEMENT, OR ANY OTHER LOAN DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE OBLIGATIONS.

10.03    **Authority to Bind Borrower.** If Borrower is comprised of multiple Persons, any Person comprising Borrower is authorized to bind all parties comprising Borrower.  Without limitation of the foregoing, Lender may require any Loan Request or other request, authorization, or other action by or on behalf of Borrower be by one or more individuals designated in writing by the parties comprising Borrower (a "Designated Person").  Lender may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person.

10.04    **Binding Effect; Successors and Assigns.** The Loan Documents will inure to the benefit of and be binding upon the parties and their respective successors and assigns.

10.05    **Assignment; Participations.** Borrower shall not assign its rights or obligations hereunder without Lender's consent.  Lender may assign or sell participations in all or any portion of its interest in the Loans or under the Loan Documents to any Person.  Lender may disclose to any actual or potential assignee or participant any information that Borrower has delivered to Lender in connection with the Loan Documents; and Borrower shall cooperate fully with Lender in providing that information.  If Lender assigns or sells a participation in the Loans or the Loan Documents, the purchaser will have the right of set-off against Borrower.

10.06    **Severability.** Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Loan Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Lender may, at its option, declare all Loan Obligations immediately due and payable.

10.07    **Amendments in Writing.** The Loan Documents may not be amended, changed, modified, altered or terminated without the prior written consent of all parties to the respective Loan Document.

10.08    **Governing Law.** Except as expressly stated therein, the Loan Documents will be governed exclusively by the Applicable Laws of the State of Texas (the "Governing Law State") without regard or reference to its conflict of laws principles.  Borrower understands that the laws of the Governing Law State may differ from the laws of the State where Borrower resides or otherwise is located or where the Collateral is located.  Borrower understands, agrees and acknowledges that (a) this agreement and the transaction evidenced hereby have significant and substantial contacts with the Governing Law State, (b) it is convenient to Borrower and Lender to select the law of the Governing Law State to govern this agreement and the transactions evidenced hereby, (c) the transactions evidenced by this agreement bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons, and (e) the choice of the Governing Law State constitutes good and valuable consideration for Lender to enter into this agreement and Lender has entered into this agreement in reliance on this choice.

10.09    **JURISDICTION AND VENUE.** BORROWER IRREVOCABLY AGREES THAT, AT THE OPTION OF LENDER, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA.  BORROWER IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

10.10    **Counterpart Execution.** The Loan Documents may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument.

10.11    **Necessary Action.** Lender is authorized to execute any other documents or take any other actions necessary to effectuate the Loan Documents and the consummation of the transactions contemplated therein.

10.12    **Credit Report.** Lender is authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Borrower.  Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Lender shall authorize third Persons to provide the information requested from time to time.

10.13    **Consent to Disclosure.** Borrower agrees and consents to the communication and disclosure of all information in respect of the transaction governed by this agreement and all matters incidental hereto and thereto by Lender: (i) to the head office and all other branches and Affiliates of Lender, provided such communication and disclosure is for risk management and administrative purposes; and (ii) as required by any Applicable Law or regulation or any court or regulatory or other authority of competent jurisdiction.

10.14    **No Construction Against Drafter.** Each Party has participated in negotiating and drafting this agreement, so if an ambiguity or a question of intent or interpretation arises, this agreement is to be construed as if the parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this agreement.

10.15    INDEMNIFICATION. BORROWER SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS (THE "INDEMNIFIED PERSONS") HARMLESS AGAINST ANY AND ALL LOSSES OF ANY

KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS: (I) INCURRED AS A RESULT OF THE FAILURE BY BORROWER TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OF ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REEMPLOYMENT OF FUNDS ACQUIRED BY LENDER TO FUND THE LOAN; (II) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY BORROWER OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (III) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY BORROWER OF ANY ENVIRONMENTAL LAW; (IV) RESULTING FROM THE RELIANCE BY LENDER ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF BORROWER; (V) INCURRED BY LENDER UNDER ANY GUARANTY, INDEMNITY OR THE LIKE GIVEN TO RABOBANK, N.A., WITH RESPECT TO INDEMNIFIED RNA LIABILITIES; AND (VI) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF LENDER BEING PARTY TO THIS AGREEMENT OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS AGREEMENT; EXCEPT THAT BORROWER SHALL HAVE NO OBLIGATION TO AN INDEMNIFIED PERSON UNDER THIS SECTION WITH RESPECT TO LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT INDEMNIFIED PERSON AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT ANY INDEMNITY UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES IS UNENFORCEABLE FOR ANY REASON, BORROWER SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

10.16   **COLLATERAL AGENCY AGREEMENT.** The Loan Documents are subject to the terms of the Collateral Agency Agreement.

10.17   **WAIVER OF TRIAL BY JURY. THE PARTIES (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS AGREEMENT; OR (II) ANY SECURED OBLIGATION DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY, AND ARE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE SECURED OBLIGATION DOCUMENTS AND THE SWAP COUNTERPARTIES ENTERING INTO THE HEDGING AGREEMENTS.**

10.18   **BALLOON PAYMENT.** THIS AGREEMENT PROVIDES FOR A BALLOON PAYMENT. BORROWER ACKNOWLEDGES THAT LENDER HAS NOT AGREED TO REFINANCE THAT PAYMENT.

10.19   **Office of Foreign Assets Control; Patriot Act; Anti-Corruption.** Without limiting the provisions of any other provision hereof above, the Borrower shall, and the Borrower shall cause each of its Subsidiaries to, (1) ensure that no Person who owns a controlling interest in or otherwise controls such Person shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (2) not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, (3) comply with all applicable Bank Secrecy Act laws and regulations, as amended, and (4) comply with all applicable anti-corruption laws and maintain policies and procedures designed to promote and achieve compliance with such laws. As required by federal law and each Lender's policies and practices, each Lender may need to obtain, verify and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services.

10.20   **Business Loans.** Borrower acknowledges that the proceeds of the Loans are primarily for agricultural, commercial, investment or business purposes, and are not for a consumer transaction.

10.21   **No Individual Liability of Dwayne Smith.** Lender acknowledges that Dwayne Smith is executing the Loan Documents only as the Trustee of the Waggoner Trust and not in his individual capacity. Lender hereby agrees that it does not consider Dwayne Smith an individual Borrower under the loan Documents and is not looking to Dwayne Smith individually for repayment of any Loan Obligations or compliance with the terms of the loan Documents.

10.22   **Notice of Final Agreement. THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

The parties have signed this agreement effective as of the day and year first written above.

**BORROWER**

Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

**CLIFF HANGER CATTLE, LLC**, a Texas limited liability company

By:
MICHAEL QUINT WAGGONER
President/Member/Manager

Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

**BUGTUSSLE CATTLE, LLC**, a Delaware limited liability company

By:
MICHAEL QUINT WAGGONER
Manager

Cliff Hanger Cattle, LLC RLOC 2014
Credit Agreement

Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

**CIRCLE W OF DIMMITT, INC.**, a Texas corporation

By: _____
      MICHAEL QUINT WAGGONER
      President


Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

**WAGGONER CATTLE, LLC**, a Texas limited liability company

By: _____
      MICHAEL QUINT WAGGONER
      Member

By: WAGGONER TRUST

Trustee: _____
              Dwayne Jay Smith, as trustee of the Waggoner Trust, under
              trust August 13, 2010, Member


Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

_____
**DWAYNE JAY SMITH**, as trustee of the WAGGONER TRUST, under
Trust dated August 13, 2010


Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

_____
      MICHAEL QUINT WAGGONER


**LENDER**

Address for notices:

12443 Olive Blvd, Suite 50
St. Louis, MO 63141
Attention: Customer Service Representative

**RABO AGRIFINANCE, INC.**

By: _____

      Name: _____

      Title: _____


Cliff Hanger Cattle, LLC RLOC 2014
Credit Agreement

14

Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

CIRCLE W OF DIMMITT, INC., a Texas corporation

By: _____
MICHAEL QUINT WAGGONER
President


Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

WAGGONER CATTLE, LLC, a Texas limited liability company

By: _____
MICHAEL QUINT WAGGONER
Member

By: WAGGONER TRUST

Trustee: _____
Dwayne Jay Smith, as trustee of the Waggoner Trust, under
trust August 13, 2010, Member


Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

_____
DWAYNE JAY SMITH, as trustee of the WAGGONER TRUST, under
Trust dated August 13, 2010


Address for notices:

2936 US Highway 385 / P.O. Box 162
Dimmitt, Texas 79027
Attention: Michael Quint Waggoner

_____
MICHAEL QUINT WAGGONER


**LENDER**

Address for notices:

12443 Olive Blvd, Suite 50
St. Louis, MO 63141
Attention: Customer Service Representative

RABO AGRIFINANCE, INC.

By: Melissa Batteiger
Name: Melissa Batteiger
Title: Assistant Vice President


Cliff Hanger Cattle, LLC RLOC 2014
Credit Agreement

14

# INTERCREDITOR AGREEMENT

This Intercreditor Agreement (this "*Agreement*") is entered and effective as of November 26, 2014, between **LONE STAR STATE BANK OF WEST TEXAS** ("*Lone Star*") and **RABO AGRIFINANCE, INC.** ("*RAF*") (Lone Star and RAF may each be referred to as a "*Creditor*" and collectively as the "*Creditors*").

## Recitals

A.    **Waggoner Cattle, LLC, a Texas limited liability company** ("*Waggoner*"), and Lone Star have entered into a certain loan documents, promissory notes or other financial agreements dated March 7, 2014 (the "*Lone Star Loan Documents*"), under which certain credit facilities and other accommodations have been extended to Waggoner Cattle, LLC; Cliff Hanger Cattle, LLC; Bugtussle Cattle, LLC; Circle W of Dimmitt, Inc.; and Waggoner Trust (collectively and including any and all amendments, modifications, restatements, renewals or extensions of such credit facilities, the "*Waggoner Indebtedness*") , which will be used by Waggoner to finance the Waggoner's cattle operations located on certain premises specifically owned and operated by Waggoner (said premises, the "Waggoner Calf Ranch").

B.    **Cliff Hanger Cattle, LLC, a Texas limited liability company** ("*Cliff Hanger*") together with other named Borrowers and RAF have entered into a Credit Agreement dated of even date herewith (the "*Cliff Hanger Credit Agreement*"), under which certain credit facilities and other accommodations have been extended to Cliff Hanger (collectively and including any and all amendments, modifications, restatements, renewals or extensions of such credit facilities, the "*Cliff Hanger Indebtedness*"), which will be used by Cliff Hanger to finance Cliff Hanger's cattle operations including the feeding and caring of the its cattle in certain feedyards, specifically but not limited to operations located on the following third party feedyards (1) Bar G Feedyard, (2) Dean Cluck Feedyard (3) Barrett & Crofoot Feedyard, and (4) other feed yards acceptable to RAF (said feedyards, "Cliff Hanger Feedyards").

C.    The Waggoner Indebtedness is secured by certain security interests granted by Waggoner to Lone Star from time to time covering the Collateral located on the Waggoner Calf Ranch.

D.    The Cliff Hanger Indebtedness is secured by certain security interests granted by Cliff Hanger to RAF from time to time covering the Collateral located on the Cliff Hanger Feedyards.

E.    The Creditors desire to enter this Agreement in order to set forth the relative priorities of the liens and security interests securing the Indebtedness (as defined in this Agreement).

## Agreement

In consideration of these premises, the mutual covenants contained in this Agreement, and for other good and valuable consideration, the Creditors agree as follows:

1.    <u>Defined Terms</u>. As used in this Agreement, the terms defined in the introductory paragraph and in the recitals to this Agreement shall have the meanings assigned therein, and the following terms shall have the following meanings:

"Waggoner *Collateral*" means that portion of the Collateral that is located on the Waggoner Calf Ranch, is related to, or arises from or in connection with Waggoner's operations on the Waggoner Calf Ranch.

EXHIBIT

B

PENGAD 800-631-6989

"*Collateral*" means any and all personal property of Waggoner or Cliff Hanger which is subject to a perfected security interest or lien in favor of any one or more of the Creditors to secure all or any portion of the Indebtedness.

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, compromise, or similar debtor relief or corporate Laws of the United States, or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"*Indebtedness*" shall collectively refer to the Waggoner Indebtedness and the Cliff Hanger Indebtedness.

"*Cliff Hanger Collateral*" means that portion of the Collateral that is located in the Cliff Hanger Feedyards, is related to, or arises from or in connection with Cliff Hanger's operations in the Cliff Hanger Feedyards.

2.    Priority of Security Interests in the Collateral. Notwithstanding anything to the contrary contained in any document now or hereafter governing, evidencing, securing, guaranteeing, or otherwise relating to or executed in connection with all or any portion of the Indebtedness, or the order of filing of any financing statement filed to perfect a security interest or lien granted to secure the Indebtedness, as between the Creditors:

(a)  Any Lone Star security interest in, or lien or encumbrance on, or claim to Cliff Hanger Collateral including proceeds thereof or rights relating thereto shall be junior in priority to the security interest in, lien, encumbrance on, claims or rights of RAF to the Cliff Hanger Collateral. Upon delivery of the Collateral to the Cliff Hanger Feedyards and receipt of payment in full by Waggoner, thereafter all Collateral located in the Cliff Hanger Feedyards shall be owned by and in possession of Cliff Hanger and shall be Cliff Hanger Collateral.

(b)   Any RAF security interest in, or lien or encumbrance on, or claim to Waggoner Collateral including proceeds thereof or rights relating thereto shall be junior in priority to the security interest in, lien, encumbrance on, claims or rights of Lone Star to the Waggoner Collateral;

3.    Obligations Separate. Each Creditor may, in its sole discretion, without notice to the other Creditor, (i) agree to modify any of the terms of the Indebtedness owing to it or any agreement governing such Indebtedness to which it is a party; (ii) waive any of such terms or give or withhold consents or approvals to any action or failure to act by the Borrower or any other person thereunder; or (iii) exercise or refrain from exercising any powers or rights it may have (subject to the other terms and conditions of this Agreement), or permit substitutions or releases of security without reduction of the Indebtedness.

4.    Waiver of Marshalling; No Challenge to Liens. Each Creditor waives any rights which it might otherwise have as against the other Creditor to require a marshalling of the assets of Borrower. Each Creditor hereby agrees not to contest the validity, enforceability, perfection, or priority of the lien and security interest of the other Creditor.

5.    Further Assurances.    Each Creditor shall, upon the reasonable request of the other Creditor, from time to time execute and deliver, or cause to be executed and delivered, such further instruments and do, and cause to be done, such further acts as may be necessary or proper to carry out

more effectively the provisions of this Agreement.  Lone Star shall provide written notice to RAF of any material defaults or events of default (including defaults resulting from financial covenant noncompliance) under the Lone Star Documents.

6.     Amendments, Etc.  No amendment or waiver of any provision of this Agreement, nor consent to any departure by a Creditor from any provision of this Agreement, shall be effective unless the same shall be in writing and signed by the Creditors, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

7.     Notices, Etc.  All notices and other communications provided for under this Agreement shall, unless otherwise stated herein, be in writing or by facsimile, and mailed, sent or delivered, as to each party hereto, at its address set forth below or at such other address as shall be designated by such party in a written notice to the other parties hereto in accordance with the requirements of this Section. All such notices and communications shall be effective, in the case of written notice, when sent addressed as follows:

| | |
|---|---|
| If to Lone Star: | Lone Star State Bank of West Texas<br>6220 Milwaukee Avenue<br>Lubbock, Texas 79424<br>Attn:  Bart Schilling<br>Tel: 806-771-7717<br>Fax: 806-771-7716 |
| If to RAF: | Rabo AgriFinance, Inc.<br>12443 Olive Blvd., Suite 50<br>St. Louis, MO 63141<br>Attn: Servicing Dept.<br>Tel: (314) 317-8000<br>Fax: (877) 655-9514 |
| If to Cliff Hanger: | Cliff Hanger Cattle, LLC<br>2936 US Highway 385/PO Box 162<br>Dimmitt, TX  79027<br>Attn: Michael Quint Waggoner<br>Tel: (806) 647-6626 |
| If to Waggoner: | Waggoner Cattle, LLC<br>2936 US Highway 385/PO Box 162<br>Dimmitt, TX  79027<br>Attn: Michael Quint Waggoner<br>Tel: (806) 647-6626 |

F.     Binding Effect; Assignments.  This Agreement shall become effective when it shall have been executed by the Creditors and thereafter shall be binding upon and inure to the benefit of the Creditors and their respective successors and assigns. Neither Creditor may assign its rights under this Agreement without the consent of the other Creditor, which consent shall not be unreasonably withheld.

G.     <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of Texas.

H.     <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts (including by electronic transmission) and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement. Electronic delivery of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement.

I.     <u>Duration</u>. This Agreement shall continue in full force and effect, and shall be binding upon the Creditors for so long as any of the Indebtedness remains outstanding.

J.     <u>Enforceability</u>. This Agreement is enforceable in a case commenced under or in connection with any Debtor Relief Law to the same extent that it is enforceable under other applicable law.

IN WITNESS WHEREOF, the Creditors have executed this Agreement as of the date first written above.

RABO AGRIFINANCE, INC.

By: _Allyson Foley_

Name: _Allyson Foley_

Title: _AVP, Operations Manager_

LONE STAR STATE BANK OF WEST TEXAS

By: _____

Name: _Bart Schilling_

Title: _Senior Vice President_

The undersigned hereby consents to, and to the extent necessary, agrees to be bound by the foregoing Intercreditor Agreement.

Cliff Hanger:

**CLIFF HANGER CATTLE, LLC**, a Texas limited liability company

By: _____
MICHAEL QUINT WAGGONER
President/Member/Manager

Waggoner:

**WAGGONER CATTLE, LLC**, a Texas limited liability company

By: _____
MICHAEL QUINT WAGGONER
Manager