

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 5, 2019**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| WAGGONER CATTLE, LLC, | § | Case No.:  18-20126-RLJ-11 |
| | § | Jointly Administered |
| Debtor. | § | |
| ———————————— | § | ———————————— |
| | § | |
| LONE STAR STATE BANK OF WEST | § | |
| TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 18-02007 |
| | § | |
| RABO AGRIFINANCE, LLC, | § | |
| WAGGONER CATTLE, LLC, CLIFF | § | |
| HANGER CATTLE, LLC, CIRCLE W OF | § | |
| DIMMITT, INC., | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

Waggoner Cattle, LLC, Circle W of Dimmitt, Inc., Bugtussle Cattle, LLC, and Cliff

Hanger Cattle, LLC (collectively, Debtors) each filed for chapter 11 bankruptcy on April 9,

1

2018.  Lone Star State Bank of West Texas (Lone Star) initiated this adversary proceeding by filing its complaint against Rabo Agrifinance, LLC (Rabo), Waggoner Cattle, LLC, Cliff Hanger Cattle, LLC, and Circle W of Dimmitt, Inc. (collectively, Defendants) on June 29, 2018.[1]  The Court considers Rabo's motion requesting dismissal of fourteen of the sixteen causes of action of Lone Star's complaint and, alternatively, abstention.[2]

Rabo's motion raises, in part, the question of whether the Court has jurisdiction to decide certain causes alleged by Lone Star's complaint.  "It is well settled that a court has the jurisdiction to determine its own jurisdiction, subject to appellate review."  *Familia De Boom v. Arosa Mercantil, S.A.*, 629 F.2d 1134, 1137 (5th Cir. 1980).

## Background

### *Relationship of the Parties*

Lone Star is a creditor of Debtors.[3]  Debtors run a cattle operation; the Debtor entities are owned either entirely or mostly by Michael Quint Waggoner.[4]  According to the complaint, Lone Star was the primary lender to the business operations of Debtors until Debtors sought alternative financing from Rabo (the "arrangement" contemplated Lone Star receiving full payment of its loans and for Rabo to take-over as Debtors' lender).[5]  Lone Star asserted a first-position lien against most of Debtors' assets.[6]  For this reason, when Cliff Hanger received financing from Rabo in December 2014, it was necessary for Lone Star and Rabo to enter into an Intercreditor Agreement, defining each lender's rights to certain collateral.[7]  Lone Star alleges that Cliff

---

[1] Doc. No. 1.  All "Doc. No." references herein are to the present adversary proceeding, unless otherwise stated.
[2] Doc. Nos. 14, 15.
[3] Doc. No. 1, ¶¶ 12–15.
[4] *Id.* ¶¶ 6–8.  The complaint alleges that Michael Quint Waggoner is the president for each of the subject entities, except for Bugtussle Cattle, LLC, which is not named in this adversary proceeding.
[5] *Id.* ¶¶ 12–15, 18, 27.
[6] *Id.* ¶¶ 12–15, 27, 29.
[7] *Id.* ¶¶ 28–33.  A copy of the Intercreditor Agreement is attached to the complaint.  *Id.* at Ex. B.

Hanger failed to honor the agricultural security agreement between Cliff Hanger and Lone Star, and that Rabo thus received proceeds from Cliff Hanger in violation of the terms of the Intercreditor Agreement.[8]

### Lone Star's Complaint Against Defendants

Lone Star alleges multiple fraudulent transfers. The alleged facts are summarized as follows. First, Lone Star says that, because of its lien against Waggoner Cattle's cattle, any transfers of cattle to Cliff Hanger were subject to Cliff Hanger paying Waggoner Cattle 100% of their fair market value.[9] Cliff Hanger did not comply with this requirement.[10] Moreover, when Cliff Hanger sold the cattle it received from Waggoner Cattle, it failed to pay any proceeds to Lone Star (despite Lone Star's lien priority and having not received full market value when the cattle was originally transferred); Cliff Hanger instead paid Rabo. Such payment did not comply with the Intercreditor Agreement's terms.[11] Lone Star alleges such transfers amounted to conversion, fraudulent transfers, and a breach of their Intercreditor Agreement.[12]

Second, Lone Star alleges that certain inter-debtor transactions were fraudulent.[13] Michael Quint Waggoner's sons, Tucker and Tyler, allegedly received cattle from Circle W of Dimmitt.[14] Journal entries were then made in the accounting records of Circle W of Dimmitt for the Tucker-and-Tyler receivables.[15] These receivables were transferred to Cliff Hanger, but without payment of corresponding consideration.[16] Similarly, a receivable of Waggoner Cattle (payable by Tucker and Tyler) was paid by Waggoner Cattle, despite receiving no consideration

---

[8] *Id.* ¶¶ 37–39.
[9] *Id.* ¶¶ 30, 32.
[10] *Id.* ¶¶ 34, 35
[11] *Id.* ¶¶ 36, 39
[12] *Id.*
[13] *Id.* § F.
[14] *Id.* ¶¶ 34, 41.
[15] *Id.*
[16] *Id.*

from Tucker or Tyler.[17]  Because Lone Star possessed a lien against Debtors' receivables, these accounting modifications drastically reduced Debtors' borrowing base with Lone Star.[18]  Thus, Lone Star seeks to avoid these transfers among the debtor entities as fraudulent transfers.

Lone Star alleges sixteen causes of action:

1. Avoidance of Fraudulent Transfers – Under 11 U.S.C. § 548,[19] "Lone Star seeks to recover the value of transfers by Debtor Waggoner Cattle to Debtor Cliff Hanger, for transfers from Waggoner Cattle to Circle W [of Dimmitt], and from Circle W [of Dimmitt] on to Rabo, and payments by Cliff Hanger to Rabo."[20]

2. Avoidance of Constructive Fraudulent Transfers – "Lone Star alternatively seeks to recover the value of cattle transferred by Debtor Waggoner Cattle to Debtor Cliff Hanger, and the further transfer of proceeds by Debtor Cliff Hanger to Rabo as constructive Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(B) . . . . Lone Star also alternatively seeks to recover the value of receivables transferred by Debtor Circle W [of Dimmitt] to Debtor Cliff Hanger, with the ultimate transfer by Cliff Hanger to Rabo as constructive Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(B)."[21]

3. Avoidance and Recovery of Fraudulent Transfers – "To the extent the transfers are avoided under §§ 544 and 548 of the Bankruptcy Code, under § 550 of the Bankruptcy Code, the Estate may recover the value of the transfers from the transferees of the transfers -- Cliff Hanger and Rabo -- for the benefit of the Waggoner Cattle and Circle W [of Dimmitt] Estates, and their secured creditors."[22]

---

[17] *Id.* ¶¶ 42–43.
[18] *See id.* ¶ 20.
[19] All "§" references herein are to Title 11 of the United States Code, unless otherwise stated.
[20] Doc. No. 1, ¶ 71.
[21] *Id.* ¶ 79.
[22] *Id.* ¶ 93.

4. Equitable Subordination – "[P]ursuant to §§ 510(c)(1) and 105(a) of the Bankruptcy Code, all claims asserted by, on behalf of, or for the benefit of Rabo against Debtors should be equitably subordinated to the allowed claims of legitimate creditors for distribution purposes because the claims of Rabo arise from improper conduct in the form of Fraudulent Transfers, and receipt and conversion of cattle proceeds on which Rabo held no lien or security interest, or, alternatively held only a junior or subordinated lien, and done in violation of an Intercreditor Agreement."[23]

5. Disallowance of Claim Under 11 U.S.C. § 502(d) – "[P]ursuant to § 502(d) of the Bankruptcy Code, all claims to be asserted by Rabo must be disallowed unless it has turned over to the Estate the property transferred or converted, or unless Rabo has paid to the Estate the value of such property for which it is liable to the Estate under § 550 of the Bankruptcy Code."[24]

6. Texas Uniform Fraudulent Transfer Act – "Lone Star sues transferee Rabo pursuant to TEX. BUS. & COM. CODE §§ 24.008 and 24.009 and 11 U.S.C. § 544. Lone Star seeks avoidance of the transfers to Cliff Hanger and Rabo to the extent necessary to satisfy Lone Star's claim, attachment of the cattle sales proceeds transferred to Rabo by Cliff Hanger, and a judgment against Rabo in the amount of the Fraudulent Transfers from Cliff Hanger to Rabo, or in the amount necessary to satisfy Lone Star's claim, whichever is less."[25]  Additionally, Lone Star requests the issuance of a writ of execution against Rabo and its reasonable attorney's fees.[26]

7. Declaratory Judgment – Under this cause of action, Lone Star seeks the following declarations:

---

[23] *Id.* ¶ 96.
[24] *Id.* ¶ 98.
[25] *Id.* ¶ 110.
[26] *Id.* ¶¶ 113–14

a. "As to the cattle transferred by Waggoner Cattle to Cliff Hanger for which Waggoner Cattle was not paid in full, or for which Waggoner Cattle was not paid at all, the cattle never became Cliff Hanger Collateral."[27]

b. "As to the cattle transferred by Waggoner Cattle to Cliff Hanger, which never became Cliff Hanger Collateral, the Lone Star security interest in, lien, encumbrance on, and claims and rights to said cattle, and all proceeds thereof, takes priority over any claim, lien or security interest of Rabo in the cattle and/or cattle proceeds in the possession of Rabo and/or paid to it by Cliff Hanger, Waggoner Cattle, or by any buyer of the cattle."[28]

c. "In regard to the transfer of the $9,771,891.22 of Cliff Hanger money to Waggoner Cattle, Lone Star prays for a declaratory judgment of this court, declaring and determining whether these transfers of money from Cliff Hanger to Waggoner Cattle were payments for Waggoner Cattle's cattle, as Quint Waggoner testified on May 31, 2018, or whether they were loans, as was reflected on the general ledger and borrowing base certificates of both Cliff Hanger and Waggoner Cattle."[29]

d. Regarding the previously mentioned Tucker-and-Tyler accounting offsets, "Lone Star seeks a declaratory judgment of this Court declaring and determining 1) whether there was a Cliff Hanger receivable from Waggoner Cattle to offset, and, if not, 2) the status of the actual accounts between Cliff Hanger and Waggoner Cattle after the attempted offset."[30]

8. Breach of Intercreditor Agreement – Lone Star claims that it suffered actual damages when "Rabo breached the Intercreditor Agreement in 2014, 2015, 2016, and 2017 when Rabo participated with Waggoner Cattle and/or Cliff Hanger in transferring Waggoner Collateral to Cliff Hanger without Waggoner Cattle being paid, or not being paid full value for the collateral, and then having Cliff Hanger resell the cattle (Lone Star's collateral) with Rabo receiving the proceeds of the resale of such cattle, all without paying any of the proceeds to the priority perfected lienholder, Lone Star."[31]

---

[27] *Id.* ¶ 123.
[28] *Id.*
[29] *Id.* ¶ 124.
[30] *Id.* ¶ 125.
[31] *Id.* ¶ 133.

9. Conversion – Lone Star states that Rabo converted its property when it received, and refused to return, proceeds from cattle sales made by Cliff Hanger.[32] In addition to an award of pre-judgment interest, Lone Star seeks an award of damages "in the amount of the proceeds transferred to Rabo" from Cliff Hanger.[33]

10. Fraudulent Inducement – Lone Star alleges that Rabo made a false representation, upon which Lone Star relied, to induce Lone Star to sign the intercreditor agreement.[34] Rabo, knowing it to be a false statement, agreed with Lone Star that "Waggoner Collateral would not become Cliff Hanger Collateral unless Cliff Hanger paid in full for the cattle."[35] Having suffered damages as a result of this false representation, Lone Star seeks to recover from Rabo, Cliff Hanger, Circle W of Dimmitt, and Waggoner Cattle.[36]

11. Money Had and Received by Rabo and Constructive Trust – Lone Star requests the Court impose a constructive trust for which to hold the money received by Rabo, to avoid the unjust enrichment of Rabo.[37]

12. Suit to Avoid Fraudulent Transfers to Transferee Rabo – "Lone Star seeks judgment avoiding the transfers by Waggoner Cattle, Cliff Hanger and Circle W [of Dimmitt]. Then, Lone Star seeks judgment against Rabo for the value of all monies, assets or property interests received and/or transferred. In addition, Lone Star seeks an attachment, lien or other provisional remedy against the funds, assets, and/or property interests received and/or transferred to Rabo."[38]

---

[32] *See id.* ¶ 138.
[33] *Id.* ¶¶ 144–45.
[34] *Id.* ¶ 151–53.
[35] *Id.* ¶ 147.
[36] *Id.* ¶ 156.
[37] *Id.* ¶¶ 159–61.
[38] *Id.* ¶ 166.

13. Civil Conspiracy – Lone Star alleges that Defendants and Michael Quint Waggoner conspired to mistakenly represent Debtors' financial condition and to fraudulently transfer Lone Star's collateral.[39] The result of such conspiracy caused Lone Star actual damages.[40]

14. Accounting – While Lone Star makes no specific demand in this cause of action, the Court can infer that Lone Star requests an order requiring Defendants to comply with Lone Star's requests for accountings related to "cattle transactions, collections, and transfers."[41]

15. Wrongful Offset – Again, no specific demand for relief is stated in this cause of action; however, the general allegation is that several accounting inaccuracies occurred between Waggoner Cattle and Cliff Hanger, and Lone Star seeks clarity about these inaccuracies.[42]

16. Attorney's Fees and Costs – Relying on Texas statutory authority and the Bankruptcy Code, Lone Star requests an award of its reasonable attorney's fees, in addition to damages.[43]

### *Rabo's Motion to Dismiss or for Abstention*

Rabo's motion says the Court lacks jurisdiction to decide the claims raised by Lone Star's complaint and that Lone Star has failed to state a claim upon which relief may be granted.[44] *See* Fed. R. Civ. P. 12(b)(1), (b)(6). Rabo submits that the fraudulent transfer claims, whether based on the Bankruptcy Code or state law, must be dismissed, as such claims belong to the bankruptcy estate and that, by bringing such actions, Lone Star violates the automatic stay.[45] For Lone Star's state-law claims for breach of contract, conversion, fraudulent inducement, money had and received, and civil conspiracy—the direct causes against Rabo—Rabo contends that the Court

---

[39] *Id.* ¶ 168.
[40] *Id.* ¶170.
[41] *Id.* ¶ 173.
[42] *Id.* ¶¶ 174–77.
[43] *Id.* ¶¶ 179–80.
[44] Doc. Nos. 14, 15. Rabo's motion does not address Lone Star's request for an accounting or wrongful offset. Neither of these claims seeks relief from Rabo.
[45] Doc. No. 14 at 2.

does not have subject matter jurisdiction over these claims because they are not, at least, "related to" Debtors' bankruptcies.[46] And in response to Lone Star's causes of action under §§ 502(d) and 510(c), Rabo argues that it is too early to adjudicate the merits of these claims "because no judgment avoiding any transfer has been entered" and a subordination order would be "purely an advisory opinion."[47]

If dismissal is not granted, Rabo requests that the Court exercise its discretion to abstain from hearing this dispute. Rabo concedes that mandatory abstention is not available but requests permissive abstention under 28 U.S.C. § 1334(c)(1). Analyzing a list of factors developed by case law (discussed below), Rabo contends that several factors favor abstention and thus the "court need not address all [] twelve factors in deciding the abstention question."[48]

### Lone Star's Response and Rabo's Reply

Lone Star counters Rabo's motion by, first, arguing that "[a]ny award to the Waggoner Entities will affect the respective Bankruptcy Estates" and, second, that "[a]ny award to Lone Star will reduce its claims . . . against the Waggoner Entities, thereby affecting the respective Bankruptcy Estates."[49] Essentially, Lone Star asserts that the Court *has* "related-to" jurisdiction over this adversary proceeding because any damages awarded to Lone Star will reduce its secured claims against Debtors' estates.[50] And the recovery of fraudulently transferred assets directly benefits Debtors' estates, the pursuit of which is required of the debtors-in-possession, as fiduciaries, for the benefit of creditors.[51] Lone Star also contends that Debtors' post-petition conduct suggests that they have no intention of pursuing their debtor-owned Chapter 5 causes of

---

[46] *Id.* at 3.
[47] *Id.*
[48] Doc. No. 15 at 21 (citing *Estate of Fisher v. JPMorgan Chase Bank, N.A. (In re Fort Worth Osteopathic Hosp.)*, 406 B.R. 741, 747 (Bankr. N.D. Tex. 2009)).
[49] Doc. No. 19, ¶ 3. *See also* Doc. No. 20.
[50] Doc. No. 19, ¶ 3, 14.
[51] Doc. No. 20 at 10 § C.

action against any of the related entities or against Rabo, nor do they have the financial capability to adequately assert such claims.[52] Lone Star thus argues that it should be allowed to prosecute the fraudulent-transfer-based claims on behalf of Debtors' estates to avoid a $163,000,000-windfall to Rabo.[53] Regarding abstention, Lone Star refutes the allegations raised by Rabo that the factors for permissive abstention are met and states, "Abstention in this case is not required for the sake of justice or comity."[54]

Rabo's reply, in summary, asserts that Lone Star's fraudulent transfer claims violate the automatic stay because they necessarily implicate at least one of the debtors, and the bankruptcy cases, although administratively consolidated, have not been substantively consolidated.[55] Lone Star, likewise, does not have standing to pursue Debtors' causes of action, and a motion to seek such standing is not enough to save the claims from dismissal.[56] Also, for Lone Star's state-law claims against Rabo, Rabo says this Court does not have "related-to" jurisdiction because any recovery by Lone Star, that Lone Star argues will reduce its claims against the estates, will result in a congruent increase in Rabo's claims against the estate; thus, the end sum remains the same.[57] Rabo reiterates its arguments for dismissal of Lone Star's disallowance claim under § 502(d) and equitable subordination claim as being premature.[58] Accordingly, Rabo requests the Court dismiss Lone Star's actions against it or, in the alternative, abstain from hearing the proceeding.

Hearing on Rabo's motion to dismiss occurred on December 11, 2018. Prior to the December 11 hearing, the Court considered the Motion of Lone Star State Bank of West Texas for Order Granting Leave, Standing, and Authority to Commence, Prosecute, and Settle Causes

---

[52] *Id.*
[53] *See id.* ¶ 38, 49.
[54] *Id.* ¶ 73.
[55] Doc. No. 22 at 1–5.
[56] *Id.* at 6–7.
[57] *Id.* at 7–8.
[58] *Id.* at 9–11.

of Action on Behalf of the Debtors' Estates Against Rabo Agrifinance, LLC f/k/a Rabo

Agrifinance, Inc., and Among the Debtors.[59]  On November 9, 2018, the Court denied Lone

Star's motion for leave to prosecute Debtors' causes of action.[60]  In accordance with the Court's

November 9 Order, the Court dismisses, without prejudice, causes of action numbers one, two,

three, six, and twelve, as those actions are property of Debtors' estates and Lone Star has no

standing to pursue those claims.

## Analysis

Rabo's 12(b)(1) motion is a facial attack of the allegations made by Lone Star's

complaint.  If a 12(b)(1) motion challenges whether the complaint alleges sufficient facts upon

which subject matter jurisdiction can be based, a court can dismiss such claim based on the

complaint alone.  *See Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 293 (5th Cir. 2008).

In a facial attack, the court accepts all material allegations in the complaint as true and construes

them in the light most favorable to the non-movant.  *Scheuer v. Rhodes*, 416 U.S. 232, 236

(1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  The court

does not look beyond the allegations of the complaint.  *Apex Dig., Inc. v. Sears, Roebuck & Co.*,

572 F.3d 440, 443–44 (7th Cir. 2009).

### *Bankruptcy Jurisdiction – Causes of Action Seven, Eight, Nine, Ten, Eleven, Thirteen, and Sixteen*

The Court finds that its opinion in another adversary proceeding related to Debtors'

bankruptcies controls on this point.  In *Lone Star State Bank of West Texas v. Moseley, et al.*, the

Court held that it had "related-to" jurisdiction over Lone Star's causes of action against a third

---

[59] Case No. 18-20126, Doc. No. 123.
[60] Case No. 18-20126, Doc. No. 189.

party, unrelated to the Debtors, because adjudication of those claims will "conceivably affect" the bankruptcy estates.[61] The same analysis applies here.

Rabo argues that, unlike the *Moseley* case, any recovery by Lone Star that reduces Lone Star's secured claim will result in an increase in Rabo's claim by the same amount. Thus the total claims made against the estate would not change. The Court cannot, at this stage of proceedings, facilely conclude that the net effect is a draw. Any recovery by Lone Star against Rabo will, by Lone Star's admission, reduce Lone Star's claim against the Debtors. And while a payment by Rabo to Lone Star may result in its right to file a claim against the Debtors, it is premature to determine the bottom-line effect on the Debtors' estates and their creditors. Both Lone Star and Rabo state that they are secured creditors, that their respective claims are *not* filed against the same debtor entities, and that the nature and extent of any potential recovery by Lone Star is unknown. It is not presently possible to quantify the net effect of any recovery by Lone Star. What is certain, however, is that a recovery will change each of Lone Star's and Rabo's claims against the Debtors. That is enough to confer "related-to" jurisdiction. *See generally Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 753 n.21 (5th Cir. 1995) (citing many cases that require more than "shared facts" with the debtor-creditor relationship to establish "related-to" jurisdiction in a third-party action, including *Home Ins. Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 749 (7th Cir. 1989) ("A controversy is not 'related' to the bankruptcy . . . unless its resolution 'affects the amount of property available for distribution or the *allocation* of property among creditors.'") (emphasis added) (internal citation omitted)).

---

[61] Adversary No. 18-02003, Doc. No. 54 at 6–7.

For the reasons stated in its November 19 Opinion addressing "related-to" jurisdiction in the *Moseley* case, the Court, here, also finds that Lone Star's state law claims against Rabo are related to Debtors' bankruptcies.[62]  One point requires further analysis.

Rabo, in briefing its motion to dismiss, cites to *Bass v. Denney (In re Bass)* to make the point that to invoke "related-to" jurisdiction, the claim must satisfy a conjunctive test.  *See* 171 F.3d 1016, 1022 (5th Cir. 1999).  "This test is obviously conjunctive: For jurisdiction to attach, the anticipated outcome of the action must both (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate."  *Id*.  One bankruptcy case from the Northern District of Texas favorably cites the same language.  *Kimpel v. Meyrowitz (In re Meyrowitz)*, No. 10-03227, 2010 WL 5292066, at *5–6 (Bankr. N.D. Tex. 2010).  In 2014, however, the Fifth Circuit opted for disjunctive language to reach its holding on "related-to" jurisdiction.  *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 526 (5th Cir. 2014).  The court said that "an action is 'related to' bankruptcy if the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action *or* could influence the administration of the bankrupt estate."  *Id*. (quoting *Edge Petroleum Operating Co. v. GPR Holdings, L.L.C. (In re TXNB Internal Case)*, 483 F.3d 292, 298 (5th Cir.2007)) (emphasis added) (internal quotation omitted).  Thus whether the test for "related-to" jurisdiction is conjunctive or disjunctive is arguably unsettled.  Nonetheless, an adjudication of Lone Star's state-law claims could alter Debtors' obligations to their creditors and will have an effect on administration of the estates.

The Court denies Rabo's motion to dismiss as to the seventh, eighth, ninth, tenth, eleventh, thirteenth, and sixteenth causes of action alleged in Lone Star's complaint.

---

[62] *See id.* at 3–7.

### *Cause of Action Four – Equitable Subordination*

Section 510(c)(1) states

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

Lone Star requests that the Court equitably subordinate Rabo's claim to be paid after other "legitimate" creditors.

Rabo argues that Lone Star's fourth cause of action should be dismissed because the claim is not ripe as "*no distributions will be made to unsecured creditors*" in the case and the Court's ruling would amount to an advisory opinion. While the Court agrees that an equitable subordination claim, at this stage, is not ripe, it does so for other reasons.

The Court must, first, determine if Lone Star has standing to request equitable subordination of Rabo's claim. There are three types of standing: constitutional standing, prudential standing, and statutory standing. *See, e.g.*, *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302–03 (2017) (noting, however, that the "prudential standing" label is misleading because "the requirement at issue is in reality tied to a particular statute"). Constitutional standing, tied to the jurisdictional concept of "cases" and "controversies" of Article III, § 2 of the Constitution, requires a plaintiff to "show an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision.'" *Id.* at 1302 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). The plaintiff bears the burden of clearly alleging facts satisfying each element to establish standing. *Robins*, 136 S. Ct. at 1547.

Courts are conflicted about who has standing to assert equitable subordination claims. *See AppliedTheory Corp. v. Halifax Fund, L.P. (In re AppliedTheory Corp.)*, 493 F.3d 82, 85–86 (2d Cir. 2007) (announcing that an unsecured creditors' committee may bring an equitable subordination claim only after it receives leave of court and the trustee/debtor-in-possession unjustifiably refuses to pursue the claim); *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990) (deciding that an unsecured creditor had standing to seek equitable subordination under § 510(c), stating that "individual creditors have an interest in subordination separate and apart from the interests of the estate as a whole. The individual creditor should have an opportunity to pursue its separate interest."); *Official Comm. Of Unsecured Creditors of Grand Eagle Cos. v. ASEA Brown Boveri, Inc.*, 313 B.R. 219, 228–29 (N.D. Ohio 2004) (concluding that a creditors' committee has direct standing to assert an equitable subordination claim); *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 392 B.R. 110, 115 (Bankr. D. Del. 2008) ("[T]he Court holds that a secured creditor has standing to seek the equitable subordination of another secured creditor's claim to the extent that it seeks relief for a particularized injury, which differs from the injury incurred by all creditors."); *Weeks v. Kinslow (In re Weeks)*, 28 B.R. 958, 960 (Bankr. W.D. Okla. 1983) (holding that only a creditor, or trustee acting on behalf of a creditor, not the debtor, has standing to pursue an equitable subordination claim).

Despite these inconsistent holdings, courts agree that a creditor asserting equitable subordination must have suffered some particularized injury to satisfy the standing requirement. *See* Collier on Bankruptcy ¶ 510.05[1] (Richard Levin & Henry J. Sommer eds., 16th ed.) (collecting cases).  Thus, particularized injury is a prerequisite of a creditor's equitable subordination claim.  Here, Lone Star alleges several injuries it suffered because of Rabo's conduct.  An adjudication of allegations in favor of Lone Star would satisfy the particularized

injury requirement. But such an adjudication is lacking at this point. Lone Star's equitable subordination claim, therefore, is not ripe. *See generally Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010); *Lopez v. City of Hous.*, 617 F.3d 336, 341–42 (5th Cir. 2010) (discussing the constitutional limitation on jurisdiction that an action must be justiciable and noting, "If the purported injury is 'contingent [on] future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe for adjudication.") (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

For these reasons, the Court will dismiss Lone Star's fourth cause of action, without prejudice to re-urging the issue if, or when, it becomes ripe.

### Cause of Action Five – Claim Disallowance under § 502(d)

Section 502(d) states

Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

Lone Star seeks to disallow Rabo's claim if it prevails on its alleged avoidance actions and if Rabo does not comply with the Court's order to turn over recoverable property. Rabo argues that this cause of action must be dismissed as premature because Lone Star has not obtained a judgment against Rabo requiring its compliance to turn over recoverable property.

Notwithstanding the ripeness issue, discussed above, the Court has already issued its order denying Lone Star's standing to prosecute Debtors' causes of action, including fraudulent transfer actions. The § 502(d) claim, therefore, must also be dismissed because Lone Star lacks standing. Such dismissal is without prejudice to Lone Star seeking the same relief later.

### *Causes of Action Fourteen and Fifteen – Accounting and Wrongful Offset*

Rabo's motion does not address these causes of action, and neither party addressed these claims at the hearing. These claims are made against Debtors, and the Court has not received a motion requesting dismissal of these claims from Debtors.[63] For this reason, the Court will not dismiss Lone Star's causes of action fourteen and fifteen as they are not subject of the motion presently before the Court.

### *Abstention*

The Court now decides if it should abstain from hearing the remaining causes. Mandatory and permissive abstention are both addressed by the jurisdictional statute, 28 U.S.C. § 1334.

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.
>
> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(1)–(2). First, mandatory abstention under 28 U.S.C. § 1334(c)(2) is not available because "an action has [not] been commenced in state court." *In re TXNB Internal Case*, 483 F.3d at 300 (listing the four elements required for mandatory abstention, of which a pending state court proceeding is one). Thus, the Court's analysis will focus on permissive abstention.

---

[63] Debtors did, however, file an answer to Lone Star's complaint denying the allegations related to the accounting and wrongful offset causes of action. Doc. No. 11 at 6. Additionally, Debtors have not alleged any affirmative defenses to the allegations. *Id.*

"[T]he starting point in analyzing whether permissive abstention is appropriate is whether abstention will impede or disrupt the bankruptcy court's exclusive and non-delegable control over the administration of the estate within its possession." *Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.)*, 309 B.R. 217, 221 (Bankr. N.D. Tex. 2004) (internal citation and quotation omitted). To guide its analysis, the Court considers the following factors:

> (1) the effect, or lack thereof, on the efficient administration of the estate if a court recommends abstention;
>
> (2) the extent to which state law issues predominate over bankruptcy issues;
>
> (3) the difficulty or unsettled nature of the applicable state law;
>
> (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court;
>
> (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334;
>
> (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;
>
> (7) the substance rather than form of an asserted "core" proceeding;
>
> (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;
>
> (9) the burden on the bankruptcy court's docket;
>
> (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;
>
> (11) the existence of a right to a jury trial; and
>
> (12) the presence in the proceeding of nondebtor parties.

*Callan v. Black Strata, LLC (In re MontCrest Energy, Inc.)*, No. 13-41129-DML-7, 2014 WL 6982643, at *7 (Bankr. N.D. Tex. Dec. 9, 2014) (citing *Hester v. Coho Energy, Inc. (In re Coho Energy, Inc.)*, No. 3:01-CV-0407-P, 2002 WL 523948, at *7 (N.D. Tex. Apr. 5, 2002); *Denton Cty. Elec. Coop. v. Eldorado Ranch, Ltd. (In re Denton Cty. Elec. Coop.)*, 281 B.R. 876, 881 (Bankr. N.D. Tex. 2002)). Courts have "broad discretion" to abstain in either core or non-core proceedings. *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1206 (5th Cir. 1996).

18

On abstention, this case is not unlike the *Moseley* proceeding discussed *supra*. For that reason, the Court will not discuss each factor and, instead, refers to its holdings in the *Moseley* opinion.[64] Rabo raised four points that do, however, require further discussion.

First, to overcome the Court's prior ruling that it would not abstain where abstention could prejudice the plaintiff because of the statute of limitations,[65] Rabo asserts two points: (i) that Lone Star can take advantage of the Texas "savings statute" and (ii) that limitations is an affirmative defense which Rabo agrees not to raise in a subsequent filing. The "savings statute" refers to Tex. Civ. Prac. & Rem. Code § 16.064(a), which states:

> (a) The period between the date of filing an action in a trial court and the date of a second filing of the same action in a different court suspends the running of the applicable statute of limitations for the period if:
>
> (1) *because of lack of jurisdiction* in the trial court where the action was first filed, the action is dismissed or the judgment is set aside or annulled in a direct proceeding; and
>
> (2) not later than the 60th day after the date the dismissal or other disposition becomes final, the action is commenced in a court of proper jurisdiction.

(emphasis added).[66] This provision does not protect Lone Star.

Under the statute, the running of limitations is suspended if the Court decides it does not have jurisdiction and thus dismisses the action because of its lack of jurisdiction. Here, abstention is considered by the Court exercising its discretion in the interest of justice and comity. Thus, were the Court to dismiss Lone Star's suit, such dismissal would be predicated on abstention and *not* for lack of jurisdiction. The "savings statute" would not apply to a subsequent complaint by Lone Star. *See Allen v. Port Drum Co.*, 777 S.W.2d 776, 778 (Tex. App.—Beaumont 1989, pet. denied) (stating that the "savings statute" only applies if the original

---

[64] *See* Case No. 18-02003, Doc No. 54 at 8–12.

[65] *Id.* at 9–10, ¶ 4.

[66] Originally codified as Art. 5539a of the Tex. Rev. Civ. Stat.

action is dismissed for lack of jurisdiction, a fact lacking in this appeal); *Oram v. Gen. Am. Oil Co. of Tex.*, 503 S.W.2d 607, 608–10 (Tex. Civ. App.—Eastland 1973, writ ref'd n.r.e.) ("['savings statute'] affords relief only when the dismissal of the former action was for lack of jurisdiction; if the court had jurisdiction the statute is not tolled."). *See also Apex Towing Co. v. Tolin*, 997 S.W.2d 903, 906 (Tex. App.—Beaumont 1999, pet. granted) (noting that the "savings statute" did not apply to suit voluntarily dismissed where order of dismissal did not state it was for lack of jurisdiction), *reversed on other grounds by*, 41 S.W.3d 118 (Tex. 2001).[67]

Second, Rabo argues that diversity jurisdiction may apply which thus favors abstention. This argument speaks to the fifth factor identified in *MontCrest Energy*. 2014 WL 6982643, at *7. But, as identified in Rabo's brief in support of its motion to dismiss, "A court need not address all [] twelve factors in deciding the abstention question."[68] Aside from Rabo making the assertion that the parties might be diverse, no evidence was received to validate this point, nor was any evidence necessary. Even if diversity jurisdiction exists, the Court is not persuaded to abstain from hearing the merits of Lone Star's claims against Rabo given the potential prejudice borne by Lone Star from the running of the statute of limitations.

Third, Rabo suggests there exists evidence of forum shopping. To support this contention, Rabo refers to Debtors' chapter 11 plan and disclosure statement, filed on November 15, 2018, wherein it states, "During 2017, bank personnel along with their lawyers met with Mr. Waggoner and requested that he file bankruptcy because they intended to sue Rabo Bank and

---

[67] In argument, counsel for Rabo stated that, in cases unrelated to that before the Court, it has argued that the "savings statute" applies to actions where the cause is dismissed because the court refused to exercise its pendent jurisdiction. The Court notes that the "savings statute" is remedial and liberally construed. *Griffen v. Big Spring Indep. Sch. Dist.*, 706 F.2d 645, 651 (5th Cir. 1983). The missing part of Rabo's argument, though, is that a subsequent cause of action utilizing the "savings statute" requires a prior dismissal for lack of jurisdiction—subject matter, personal, supplemental, or otherwise. *But see Vale v. Ryan*, 809 S.W.2d 324, 327 (Tex. App.—Austin 1991, no pet.) ("for purposes of the applicability of the ['savings statute'], a federal court's refusal to exercise jurisdiction over a pendent state claim is tantamount to a dismissal for lack of jurisdiction."). That is not the situation here.

[68] Doc. No. 15 at 21 (citing *In re Fort Worth Osteopathic Hosp.*, 406 B.R. at 747).

wanted the lawsuit in bankruptcy court."[69]  Lone Star was insistent that Debtors file bankruptcy, even in the face of an accounting that indicated its claims against Rabo might not succeed.[70]  To the extent that unilateral statements from the plan and disclosure statement arguably support a charge of forum shopping, such charge does not require that the Court abstain.

In *Principal Life Ins. Co. v. JPMorgan Chase Bank, N.A. (In re Brook Mays Music Co.)*, the court, analyzing substantially-similar permissive-abstention factors as those noted here, summarily concluded that the plaintiff likely forum-shopped.  363 B.R. 801, 818 (Bankr. N.D. Tex. 2007) (relying on the factors of *Searcy v. Knostman*, 155 B.R. 699, 710 (S.D. Miss. 1993)). The plaintiffs in *Brook Mays* drafted and filed their complaint in state court but did not include the debtor, who was later determined, by the bankruptcy court, to be a necessary party to the litigation.  *Id.* at 813–14.  This evidence of forum shopping led the court to state, "It seems at least plausible, if not likely, that Plaintiffs have artfully drafted their complaint to intentionally omit the Debtor, so as to attempt to defeat the possibility of bankruptcy subject matter jurisdiction."  *Id.* at 814.  Despite this evidence, the court refused to permissively abstain from adjudicating the proceeding.  *Id.* at 818.

Here, the Court collectively considers the permissive-abstention factors in an exercise of its discretion.  *E.g.*, *In re Denton Cty. Elec. Coop.*, 281 B.R. at 881–83.  The Court is not persuaded to abstain based on Rabo's allegations of Lone Star's forum shopping.

Fourth, and finally, Rabo says that it will not consent to a jury trial, to which it is entitled, in the bankruptcy court.  The Court responds as it did in its prior memorandum opinion, "The

---

[69] Case No. 18-20126, Doc. Nos. 191, 192 at 10–11.
[70] *Id.*

right to a jury trial affects where a trial takes place as between the bankruptcy court and the district court. It does not influence abstention here."[71]

### Conclusion

The Court has "related-to" jurisdiction over Lone Star's direct causes of action against Rabo. Although the Court has subject matter jurisdiction under 28 U.S.C. § 1334(b), it may elect to abstain from this proceeding under 28 U.S.C. § 1334(c)(1). The decision to abstain is solely within the Court's discretion. A majority of the applicable factors suggests that abstention would be proper. But there is no parallel proceeding pending in another forum to which this Court could defer in the interest of justice and comity. By abstaining, the Court potentially prejudices Lone Star's rights. The Court will not abstain from hearing this proceeding. The Court thus denies Rabo's motion on causes seven, eight, nine, ten, eleven, thirteen, and sixteen.

By order entered on November 9, 2018, in the main bankruptcy cases that are jointly administered under Case No. 18-20126, the Court denied Lone Star's request seeking leave to pursue estate-owned causes of action against Rabo, including alleged intercompany causes of action. As a result, causes of action one, two, three, five, six, and twelve must be dismissed. For the reasons stated, cause four must also be dismissed. Causes fourteen (for an accounting) and fifteen (for wrongful offset) are not addressed by Rabo's motion.

### End of Memorandum Opinion ###

---

[71] Case No. 18-02003, Doc. No. 54 at 11, ¶ 11.