LOVELL, LOVELL, ISERN & FARABOUGH, L.L.P.
John H. Lovell, SBN 12609300
Barbara A. Bauernfeind, SBN 08190500
Matthew S. Merriott, SBN 24100846
112 Southwest 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Telephone:  806/373-1515
Facsimile:   806/379-7176
*Attorneys for Lone Star State Bank of West Texas*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Chapter 11 |
| WAGGONER CATTLE, LLC, ET AL, | § | |
| | § | CASE NO. 18-20126-rlj-11 |
| | § | Joint Administration |
| *Debtors.* | § | |

| | | |
|---|---|---|
| LONE STAR STATE BANK OF | § | |
| WEST TEXAS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | ADVERSARY NO. 18-02007-rlj |
| | § | |
| RABO AGRIFINANCE, LLC, | § | |
| f/k/a RABO AGRIFINANCE, INC.; | § | |
| | § | |
| *Defendant.* | § | |

**BRIEF IN SUPPORT OF RESPONSE TO MOTION TO WITHDRAW
REFERENCE OF THE ABOVE-ENTITLED ADVERSARY PROCEEDING**

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................................ ii

Argument and Authorities as to Withdrawal of Reference ...................................................... 1

Prayer ..................................................................................................................................... 14

# TABLE OF AUTHORITIES

Page

CASES

*Cobb v. Harrington,* 190 S.W.2d 709 (Tex. 1945) ................................................................. 14

*Curtis v. Loether,* 415 U.S.189 (1974) ................................................................................... 13

*Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992 (5th Cir. 1985) ............................. 3

*Hutchings v. Chevron U.S.A.*, 862 S.W.2d 752 (Tex. App. – El Paso 1993, writ denied) .......... 14

*In re Avado Brands, Inc*., 2006 WL 8437389 (Bankr. N.D. Tex. 2006) ....................... 2,4,7,10,12

*In re Base Holdings, LLC*, 2014 WL 895403 (N.D. Tex. 2014) ............................................... 8

*In re British American Properties III, Ltd*., 369 B.R.322 (Bankr. S.D. Tex. 2007) ............. 3,9

*In re Doctors Hospital 1997, L.P*., 351 B.R. 813 (Bankr. S.D. Tex. 2006) ......................... 4,12

*In re Enron Corp*., 319 B.R. 122 (Bankr. S.D. Tex. 2004) ..................................................... 12

*In re Erickson Retirement Communities, LLC*, 425 B.R. 309 (Bankr. N.D. Tex. 2010) ............... 6

*In re Foster*, 2014 WL 1922759 (Bankr. N.D. Tex. 2014) .................................................... 3,9

*In re Ondova Limited Company*, 2011 WL 3734479 (Bankr. N.D. Tex. 2011) ..................... 13

*Matter of Credit Indus. Corp*., 366 F.2d 402 (2d Cir. 1966) ................................................... 6

*Mirant Corp. v. Southern Co*., 337 B.R. 107 (N.D. Tex. 2006) .............................................. 4

*Richardson v. First National Life Ins. Co*., 419 S.W.2d 836 (Tex. 1967) .............................. 14

*Sherman v. Greenstone Farm Credit Services, ACA*, 2011 WL 2038573 (N.D. Tex. 2011) ...... 13

*Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc*., 48 S.W.3d 865 (Tex.
    App.- Houston [14th Dist] 2001, pet. denied) ................................................................. 14

Case 18-02007-rlj   Doc 92   Filed 05/29/19   Entered 05/29/19 17:52:53   Desc Main
Document      Page 3 of 20

*Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)…………………..13


STATUTES AND RULES

11 U.S.C. 510. ...........................................................................................................................6,8,11

28 U.S.C. 157(b)(2)(K) ...........................................................................................................7,8,10,11

28 U.S.C. 157(c)(1)......................................................................................................................12

28 U.S.C. 157(d) ..............................................................................................................................8

FED. R. CIV. P. 39(a)(2)..................................................................................................................14

FED. R. CIV. P. 42...........................................................................................................................13

FED. R. CIV. P. 53(a)(1)(B) ...........................................................................................................2,8

FED. R. BANKR. P. 5011(a)...............................................................................................................2

FED. R. BANKR. P. 7042 ................................................................................................................13

Local Bankruptcy Rule 5011-1 .....................................................................................................2,3

TEX. BUS. & COM. CODE §38.001 ................................................................................................14

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Plaintiff, Lone Star State Bank of West Texas ("Lone Star" or "Plaintiff") and files this Brief in Support of Response to Motion to Withdraw Reference of the Above-Entitled Adversary Proceeding filed by Rabo AgriFinance, LLC f/k/a Rabo Agrifinance, Inc. (hereafter "Rabo" or "Defendant") [Doc. 73]. Lone Star respectfully states as follows:

**ARGUMENT AND AUTHORITIES**

1.      Rabo filed a Jury Demand [Doc.40, Doc. 52], which was opposed by Lone Star [Doc. 59, Doc. 60 (Brief), and Doc. 68 (Supplemental Brief)]. The Court denied Lone Star's Motion to Strike Jury Demand. [Doc. 85].

2.      Central to Lone Star's claims against Rabo is an Intercreditor Agreement, an express subordination agreement. Interpreting subordination agreements and enforcing lien priorities are core bankruptcy court functions. Either the subject calves were "Waggoner Cattle Collateral" or they were "Cliff Hanger Collateral" as determined under the subordination agreement. The bankruptcy court is empowered to interpret and enforce subordination agreements.

3.      Lone Star opposes the Motion to Withdraw Reference because Rabo is not entitled to a jury trial on five of the pleaded causes of action. There is no right to jury trial as to Count 7, Declaratory Judgment, and the counts seeking equitable relief, namely Count 11, Money Had and Received and Constructive Trust, Count 14, Accounting, Count 15, Wrongful Offset, and Count 16, Attorney's Fees and Costs.

4.      Counts 7, 11, 14, 15, and 16 should be excluded or bifurcated from the withdrawal of reference. Further, the Court should recommend that the bankruptcy court retain or be granted jurisdiction to continue to adjudicate pre-trial matters, discovery, and dispositive motions, and the

case not be withdrawn until it is certified that the case is ready for jury trial on counts not bifurcated.

5.    Due to the enormous volume of the debtors' accounting as to the cattle transactions, sales, and payment of cattle proceeds, much of which is highly irregular, if the reference is withdrawn, the District Court should appoint a special master under Federal Rules of Civil Procedure 53(a)(1)(B) to address the accounting issues in this case. Lone Star believes that this Bankruptcy Court would be an especially qualified special master in this case. For an idea of the magnitude of accounting records involved in this case, see the schedule attached to this Brief as Ex. A.

6.    This Adversary Proceeding was filed on June 29, 2018. The Motion to Withdraw Reference was not filed until May 2, 2019, long after this Bankruptcy Court has been actively involved in every phase of the subject underlying bankruptcy cases and in this Adversary Proceeding, including hearing and considering evidence directly related to the issues involved. The reference should not be withdrawn from the court which is already very familiar with the issues involved in this Adversary Proceeding.

7.    Rabo bears the burden to demonstrate that mandatory or permissive withdrawal of the reference is warranted. *In re Avado Brands, Inc.*, 2006 WL 8437389 at *4 (Bankr. N.D. Tex. 2006). Rabo has not met its burden.

8.    Pursuant to Federal Rule of Bankruptcy Procedure 5011(a) and Local Bankruptcy Rule 5011-1, factors to be considered as to a motion to withdraw reference are as follows:

    a.    whether any response to the motion to withdraw the reference was filed;

    b.    whether a motion to stay the proceeding pending the district court's decision on the motion to withdraw the reference has been filed, in which court the motion was filed, and the status (pending, granted or denied on the motion);

2

    c.    whether the proceeding is core or non-core, or both and with regard to the non-core and mixed issues, whether the parties' consent to entry of a final order by the bankruptcy judge;

    d.    whether a jury trial has been timely requested, and if so, whether the parties consent to the bankruptcy judge conducting a jury trial, and whether the district court is requested to designate the bankruptcy judge to conduct a jury trial;

    e.    if a jury trial has not been timely requested or if the proceeding does not involve a right to jury trial;

    f.    whether a scheduling order has been entered in the proceeding;

    g.    whether the parties are ready for trial;

    h.    whether the bankruptcy judge recommends that (1) the motion be granted, (2) the motion be granted upon certification by the bankruptcy judge that the parties are ready for trial, (3) the motion be granted but that pre-trial matters be referred to the bankruptcy judge, or (4) the motion be denied; and

    i.    any other matters relevant to the decision to withdraw the reference.

L.B.R. 5011-1(a).

    9.    As cited in *In re Foster*, 2014 WL 1922759 at *2 (Bankr. N.D. Tex. 2014), "in *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985), the Fifth Circuit held that a decision concerning withdrawal of the reference should be based on factors such as: (a) whether the matter is a core or non-core proceeding, (b) the economy and efficiency for the courts and the parties, and (c) the goal of promoting uniformity in bankruptcy cases, expediting the bankruptcy process and eliminating confusion." In *In re British American Properties III, Ltd.*, 369 B.R.322 (Bankr. S.D. Tex. 2007), the judge included a longer list of *Holland* factors to be analyzed, as follows: (1) whether the underlying lawsuit is a core or non-core proceeding; (2) whether promotion of uniformity in bankruptcy administration will be achieved; (3) whether forum shopping and confusion will be reduced; (4) whether there will be economical use of debtors' and creditors' resources; (5) whether the withdrawal of reference will expedite the bankruptcy process;

3

and (6) whether a party has demanded a jury trial." *Id*. at 326, also citing *Mirant Corp. v. Southern Co.*, 337 B.R. 107, 115 (N.D. Tex. 2006). The same factors were listed in *In re Doctors Hospital 1997, L.P.*, 351 B.R. 813, 865 (Bankr. S.D. Tex. 2006), and *In re Avado Brands, Inc.*, 2006 WL 8437389 at *4 (Bankr. N.D. Tex. 2006).

10. Economy and efficiency for the courts and parties and the goal of promoting uniformity in bankruptcy cases, expediting the bankruptcy process, and eliminating confusion, all weigh in favor of this Court adjudicating the subject causes of action. For example, if this Court does not interpret and enforce the Intercreditor Agreement (an express subordination agreement), from which the other Lone Star pleaded causes of action flow, all the creditors of Waggoner Cattle and Cliff Hanger could be impacted if the District Court later determines Cliff Hanger did not obtain title to cattle it received from Waggoner Cattle, and therefore Cliff Hanger did not own the cattle sales proceeds it paid to Rabo (because Cliff Hanger either *did not pay anything* for the transferred calves, or did not pay in full for the calves it acquired from Waggoner Cattle). In that scenario, which the evidence developed in depositions and in cattle and accounting records of Debtors have shown occurred, neither Debtor Cliff Hanger, nor its creditor Rabo, would have been entitled to millions of dollars of cattle sales proceeds. Instead, Waggoner Cattle, its creditor Lone Star, *and the other creditors of Waggoner Cattle*, would be entitled to court determination of lien priorities, and distribution or re-distribution of cattle sales proceeds.

11. The above scenario is not a hypothetical. It is a fact in this case. The deposition of Paul Stouhal, the Rabo employee integral to the subject events, included testimony admitting that *Cliff Hanger paid Waggoner Cattle nothing for over $6 million in calves that were transferred to Cliff Hanger between May 19 and November 9, 2016, that Cliff Hanger later sold and then Rabo swept Cliff Hanger's bank account and took all the sales proceeds*. Discovery to date has shown

4

that in regard to the cattle transferred by Waggoner Cattle to Cliff Hanger, Cliff Hanger paid $14,284,302 less than their market value. Under the Intercreditor Agreement, Lone Star has the first lien on that collateral and Cliff Hanger never obtained any security interest (or only a subordinated security interest) in those calves. Millions of dollars of Lone Star's collateral were taken for no payment at all to Waggoner Cattle. The evidence will also show millions of dollars of more Lone Star collateral was taken without full payment to Waggoner Cattle.

12. Whether the payments of cattle sales proceeds by Cliff Hanger to Rabo were appropriate under the Intercreditor Agreement is an issue at the heart of this case. If the proceeds were from sale of "Cliff Hanger Collateral",[1] the payments were appropriate. But, if the proceeds were from sale of "Waggoner Cattle Collateral" (pledged to senior lender Lone Star), the payments to junior lender Rabo were conversion and breach of contract procured by actual fraud.

13. If Rabo's motion to withdraw reference is granted, it escapes the Bankruptcy Court timely interpreting the subordination agreement, dodges debtor Waggoner Cattle's other creditors, and just hopes no trustee for Waggoner Cattle is ever appointed to seek the wrongfully taken cattle proceeds or hopes this Court never allows Lone Star to pursue the fraudulent transfers and fraudulent transferee Rabo. Given the fact the Debtors' amended plan that is pending does nothing to actually pursue the fraudulent transfers (except mention it as a possibility [that Quint Waggoner will never pursue]), Rabo escapes all responsibility for its fraudulent actions in this case and keeps millions of dollars of converted collateral sales proceeds to the detriment of Debtor Waggoner Cattle and its creditors.

---

[1] The Intercreditor Agreement provides, "Upon delivery of the Collateral to the Cliff Hanger Feedyards **and receipt of payment in full by Waggoner, thereafter**, all Collateral located in the Cliffi Hanger Feedyards shall be owned by and in possession of Cliff Hanger and shall be Cliff Hanger Collateral." ¶2(a) (emphasis added).

14. *"A bankruptcy court, in order to effectuate its duty to do equity, must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they had 'explicitly agreed not to accept them.'" Matter of Credit Indus. Corp.*, 366 F.2d 402, 410 (2d Cir. 1966), emphasis added. In this case, Rabo *explicitly agreed* that it would not obtain the superior lien on the subject Waggoner Cattle calves until and unless Waggoner Cattle was paid in full for the calves. The bankruptcy court is asked to enforce such provision according to its terms and prevent Rabo from keeping millions of dollars of cattle proceeds Rabo explicitly agreed not to accept and agreed would be subject to Lone Star's prior and superior lien. The bankruptcy court, in its duty to do equity, should be the court to enforce the Intercreditor Agreement. 11 U.S.C. 510. Bankruptcy courts can determine creditor's rights under a subordination agreement. *In re Erickson Retirement Communities, LLC*, 425 B.R. 309, 314-15 (Bankr. N.D. Tex. 2010). In *Erickson* that power included enforcing language that *restricts a creditor's rights until another lender is "paid in full"*. *Id.* at 315. In this case, lender Rabo had only a junior lien as to the subject cattle *until and unless Debtor Waggoner Cattle was "paid in full" by Debtor Cliff Hanger*. Rabo is a "sophisticated commercial entity" who waived any claimed "right" to be the first in line until Waggoner Cattle was paid in full.

15. This Court has already received evidence pertinent to the Intercreditor Agreement including when Lone Star was asking this Court for derivative standing to pursue fraudulent transfers to Cliff Hanger and Rabo and asking to pursue equitable subordination of Rabo's lien. The standing was denied without prejudice. Apparently, the Court wanted to give Waggoner Cattle a chance to pursue these fraudulent transfers and pursue equitable subordination, which Quint Waggoner, the controlling person at Waggoner Cattle, has not done, and likely will never do.

6

16. If Lone Star prevails as to interpretation and enforcement of the Intercreditor Agreement, Rabo has wrongfully received millions of dollars of proceeds of sales of Waggoner Cattle property pledged to Lone Star. In that event, *Debtor Waggoner Cattle's entire financial picture could change dramatically.* In the big picture, it is not a matter of Waggoner Cattle trying to "get the proceeds back" from co-debtor Cliff Hanger, it is the realistic prospect of significant potential recovery from non-debtor Rabo, a multi-national commercial lender, who wrongfully took millions of dollars of proceeds from the sale of Waggoner Cattle property, without recognizing Lone Star's unsubordinated first lien. The entire reorganization of Waggoner Cattle is at issue, and the reorganization process is a core bankruptcy court function.

17. "The right to a jury does not require immediate withdrawal of the reference." *In re Avado Brands*, Inc., 2006 WL 8437389 at *5 (Bankr. N.D. Tex. 2006). In its motion, Rabo does not represent that the case is ready for trial, because it is not ready for trial.

18. This Court should make the initial determination whether the causes of action asserted could or do relate to core functions of this court including the claims allowance process, lien priority determinations, and interpretation and enforcement of subordination agreements. Rabo has a "deemed"[2] proof of claim pending in the Waggoner Cattle, LLC bankruptcy and a filed proof of claim in the Cliff Hanger bankruptcy. This Court should decide whether those claims should be denied or subordinated due to Rabo's wrongful acts as alleged in Lone Star's Complaint.

19. The validity, extent, and priority of Lone Star's lien as to the subject cattle and cattle proceeds is directly at issue in this Adversary Proceeding. 28 U.S.C.157(b)(2)(K). Merely because second-position lender Rabo wrongfully took the cattle sale proceeds does not extinguish the bankruptcy court core jurisdiction to adjudicate Lone Star's lien as to the cattle sale proceeds.

---

[2] Though Rabo never filed a proof of claim in the Waggoner Cattle bankruptcy, Waggoner Cattle scheduled the Rabo debt as undisputed. Rabo did file a proof of claim in the Cliff Hanger bankruptcy.

7

And, more importantly to Debtor Waggoner Cattle, that determination could not just pay Lone Star what it is owed, but also could dramatically affect Waggoner Cattle's estate, especially if the Court determines that equitable subordination is appropriate given Rabo's conduct in instructing the creation of fraudulent Cliff Hanger borrowing bases, and publishing them to Lone Star in order to successfully induce Lone Star to continue allowing its not-fully-paid-for collateral to be transferred to Cliff Hanger, and in seeking to syndicate its loan to Cliff Hanger, even though it knew that financial failure of Cliff Hanger was imminent. In summary, lien determination (28 U.S.C. 157(b)(2)(K), enforcement of a subordination agreement as to rights to debtor's property (11 U.S.C. 510), possible equitable subordination of Rabo's claim, and reconstitution of the debtor's estate and equitable distribution of the Waggoner Cattle estate (all core claims) are at issue in this Adversary Proceeding.

20.     28 U.S.C. 157(d) encourages the court to consider "any and all proceedings" in determining what, *if any*, parts of an Adversary Proceeding to withdraw from the bankruptcy court. The District Court can request that the bankruptcy court make the initial determination whether the causes of action asserted could or do relate to the claims allowance process in the bankruptcy court [or any other core process] the bankruptcy judge is already overseeing, before determining whether the referral should be withdrawn. *In re Base Holdings, LLC*, 2014 WL 895403 (N.D. Tex. 2014). And, due to the massive volume of highly irregular accounting at issue in this case, it would be appropriate for this Bankruptcy Court to first act as a special master under FED. R. CIV. P. 53(a)(1)(B). (*See* Exhibit A.)

21.     The complexity of adjudicating a motion to withdraw reference is shown in the opinion of Judge Fitzwater in *In re Base Holdings, LLC*, 2014 WL 895403 (N.D. Tex. 2014). The bankruptcy court recommended that the district judge deny the motion to withdraw the reference

8

because it was necessary to resolve the debtor's counterclaims as part of allowing or disallowing the landlord's proof of claim. *Id.* at *1. Judge Fitzwater agreed with the bankruptcy judge and denied the motion to withdraw the reference. Similarly, Rabo's deemed secured claim in the Waggoner Cattle bankruptcy and its filed proof of claim in the Cliff Hanger bankruptcy are at issue in this Adversary Proceeding. If Lone Star prevails, Rabo has wrongfully taken millions of dollars of cattle proceeds on which Lone Star had the unsubordinated and perfected first lien.

22.  At this stage in this case, the bankruptcy court has not made the predicate determinations necessary as to the non-legal relief claims asserted by Lone Star for the District Court to assess whether the case should be withdrawn from the bankruptcy court. An interpretation of the subordination agreement has not been made, declaratory relief has not been adjudicated, the equitable claims have not been adjudicated, and recission of the Intercreditor Agreement has not been adjudicated. Discovery on all claims is in progress. Further, the bankruptcy court is being presented plans for possible confirmation and the bankruptcy court has to decide how this Adversary Proceeding, which could dramatically impact Debtors Waggoner Cattle and Cliff Hanger, should proceed. The bankruptcy court should be allowed to continue and complete that process before reference is withdrawn as a matter of equity to all creditors.

23.  As the court said in *In re Foster*, 2014 WL 1922759 at *2 (Bankr, N.D, Tex, 2014), the court "may withdraw the reference, in whole or in part." *A complete withdrawal is not required*. As the court noted in *In re British American Properties III, Ltd*., 369 B.R.322, 332-33 (Bankr. S.D. Tex. 2007), an alternative that bankruptcy court recommended was that, in order to save the resources of the District Court and to utilize the bankruptcy court's familiarity with the main bankruptcy case, the District Court could withdraw the reference of the adversary proceeding for the purpose of conducting a jury trial, but direct the bankruptcy court to handle all discovery,

9

dispositive motions, and other matters leading up to a jury trial. *Id.*, emphasis added. Similarly, in *In re Avado Brands, Inc.*, 2006 WL 8437389 at *5 (Bankr. N.D. Tex. 2006), the bankruptcy court noted the "bankruptcy court has an interest in *coordinating and efficiently and timely resolving litigation involving the Debtors' estates so the bankruptcy case may be closed*. If the case is withdrawn and referred to the bankruptcy court for pretrial matters, it appears that duplicate court appearances may be reduced and pretrial rulings may considerably reduce the complexity of the litigation." *Id.* at 5, emphasis added. The court in *Avado* also said "A District Court may consider a demand for jury trial insufficient cause for discretionary withdrawal if the motion is made at an early stage of the proceedings and dispositive motions may resolve the matter." *Id.* at *5. All the above-factors in the determination are also present in this case and weigh against immediate withdrawal of the reference.

24.     The validity, extent, and priority of Lone Star's lien and Rabo's lien as to the subject cattle and their proceeds is directly at issue in this Adversary Proceeding. 28 U.S.C.157(b)(2)(K). Merely because second-position lender Rabo wrongfully took the cattle sale proceeds does not extinguish the bankruptcy court core jurisdiction to adjudicate Lone Star's lien as to the cattle sale proceeds. And, more importantly to Debtor Waggoner Cattle, that determination could not just pay Lone Star what it is owed, but also could dramatically affect Waggoner Cattle's estate, especially if the Court determines that equitable subordination is appropriate given Rabo's conduct.[3] In

---

[3] The Rabo documents produced, and the depositions of Quint Waggoner, Paul Strouhal (former Rabo loan officer on the Cliff Hanger credit) and Bart Schilling (former Lone Star loan officer on the Waggoner Cattle, Bugtussle and Circle W loans) have established proof that:
1. Rabo loan officers and inspectors knew that "cost of gain" numbers used in the Cliff Hanger borrowing base were unrealistically low, which resulted in the stated values of those cattle being overstated by millions of dollars.
2. Though they knew from actual close outs of Cliff Hanger cattle the actual costs of gain, Rabo loan officers directed the Cliff Hanger accountants and Quint Waggoner to use specific cost of gain numbers which were unrealistically low, resulting in the value of the Cliff Hanger cattle being overstated by millions of dollars.

10

summary, lien determination (28 U.S.C. 157(b)(2)(K), enforcement of a subordination agreement as to rights to debtor's property (11 U.S.C. 510), possible equitable subordination of Rabo's claim, and reconstitution of the debtor's estate and equitable distribution of the Waggoner Cattle estate (all core claims) are at issue in this Adversary Proceeding.

25. The possibility of forum shopping and a tactic for delay cannot be ruled out in Rabo's actions. The bankruptcy court has already received evidence pertinent to the issues in this

---

3. Rabo loan officers and inspectors knew that the weight of the cattle used in the Cliff Hanger borrowing base certificates were grossly overstated, resulting in the value of the Cliff Hanger cattle being overstated by millions of additional dollars.
4. Rabo loan officers were transmitting to Bart Schilling at Lone Star the Cliff Hanger borrowing base certificates which Rabo loan officers knew were falsified, and which overstated the value of Cliff Hanger cattle by millions of dollars.
5. Rabo loan officers knew that Quint Waggoner and Debtors' accountants were forwarding to Bart Schilling falsified Cliff Hanger borrowing bases.
6. While Rabo loan officers knew of the myriad financial problems of the Debtors' business and accounting records, Rabo was attempting to syndicate the Cliff Hanger loan. The inference is that Rabo's motive for syndicating the Cliff Hanger loan was to shift some of the anticipated Rabo loss on the Cliff Hanger loan onto other banks.
7. For many months, many Rabo loan officers worked with Quint Waggoner and the Debtors to make Cliff Hanger's borrowing base certificates and various loan ratios look better, to make a "more presentable" syndication package, to induce other banks to buy a share of the troubled Cliff Hanger loan from Rabo.
8. Rabo loan officers knew that if the Cliff Hanger borrowing base certificates ever showed a negative number, the Cliff Hanger line of credit would be instantly shut down, with all outstanding Cliff Hanger checks returned. To override that automatic shutdown, express approval of Rabo's senior loan committee, was required. That approval would easily take a minimum of five days to obtain. A five day shut down would "kill" Cliff Hanger's business, and make a syndication absolutely impossible.
9. Bart Schilling of Lone Star received and relied upon the Cliff Hanger borrowing bases in making Lone Star lending decisions.
10. Bart Schilling was unaware that the Cliff Hanger borrowing base certificates he received had been falsified with unrealistically low costs of gain and unrealistically high weights of cattle. Bart Schilling did not have access to Cliff Hanger's cattle close outs (as did Rabo loan officers and inspectors) which disclosed the actual slaughter weights and actual cost of gain.
11. Bart Schilling relied upon the false values in the Cliff Hanger borrowing base certificates, believing that there was sufficient equity in the Cliff Hanger cattle, upon slaughter of those cattle, to fully pay Waggoner Cattle, and to significantly pay down Waggoner Cattle's loans from Lone Star.
12. As late as November of 2016, Rabo loan officers were assuring Bart Schilling that Rabo would soon take over Lone Star's cattle loan to Waggoner Cattle. Rabo falsely induced Bart Schilling to believe that Lone Star cattle loan to Waggoner Cattle was about to be paid off…in full.
13. Because Bart Schilling had been deceived into believing that the Cliff Hanger borrowing base certificates were correct, and that upon the sale of Cliff Hanger's finished cattle Waggoner Cattle would be fully paid and Lone Star's notes to Debtors would be materially paid down, Bart Schilling did not stop Waggoner Cattle's shipment of millions of dollars of calves to the Cliff Hanger feedlots. Had Bart Schilling known the truth about Cliff Hanger's borrowing base certificates, he would have stopped Waggoner Cattle's shipments of calves to Cliff Hanger, and required Waggoner Cattle to sell all its calves to third parties, who would pay full market price upon delivery.

11

Adversary Proceeding and has already left the door cracked open for Lone Star to later obtain bankruptcy court approval to pursue the fraudulent transfers and equitable subordination of Rabo's lien (if Waggoner Cattle does not do so and no trustee is appointed who does so). As this Court knows, Lone Star had such causes of action in its Original Complaint in this Adversary Proceeding, but they were dismissed, without prejudice, due to lack of standing and leave has not yet been granted for Lone Star to pursue such claims.

26. Rabo taking numerous affirmative actions to obtain relief in the bankruptcy court *before* filing the jury demand or the motion to withdraw reference (all as outlined in the *Brief in Support of Response to Jury Demand and Motion to Strike Jury Demand* [Doc. 60]), can and should be viewed by the Court as reasons to recommend that the withdrawal motion be denied. See *In re Doctors Hospital 1997, L.P.*, 351 B.R. 813, 865 (Bankr. S.D. Tex. 2006).

27. As the court noted in *Avado*, from an *Enron* case, "Courts have… recognized that it serves the interest of judicial economy and efficiency to keep an action in Bankruptcy Court for the resolution of pretrial, managerial matters, even if the action will ultimately be transferred to a district court for trial." *Id.* When the district court reviewed the bankruptcy court order in *Avado*, the District Court stated: "The Court agrees with the Trustee that reference of pretrial matters to the Bankruptcy Court is an established practice. Further, as pointed out by the Trustee, the Court does not need to conduct a *de novo* review of all rulings by the Bankruptcy Court on dispositive motions. Section 157(c)(1) only requires *de novo* review of final orders or judgments. Thus, if the Bankruptcy Court denies a dispositive motion, the Court need not make a *de novo* review of that decision." *In re Avado Brands, Inc.*, 2006 WL 8436979 at *2 (N.D. Tex. 2006).

28. Further, as the bankruptcy court did in *In re Enron Corp.*, 319 B.R. 122, 127-28 (Bankr. S.D. Tex. 2004), this Court has the option to enter a scheduling order as if the jury trial, if

any, would be in district court. Such an order "protects parties should [the movant for withdrawal of reference] have a right to jury trial, while assuring that the parties efficiently prepare for trial.". As shown in *Sherman v. Greenstone Farm Credit Services, ACA*, 2011 WL 2038573 (N.D. Tex. 2011), the withdrawal of reference can be after the bankruptcy court hears cross motions for summary judgment and issues an order recommending that one of the summary judgment motions be granted.

29.     Another option is bifurcation, as permitted under FED. R. BANKR. P. 7042 and FED. R. CIV. P. 42. In *In re Ondova Limited Company*, 2011 WL 3734479 (Bankr. N.D. Tex. 2011), the bankruptcy judge made the following recommendation as to the motion to withdraw reference: "(a) the bankruptcy court should bifurcate Counts Three and Four from the remaining counts in the Adversary Proceeding; (b) the Bankruptcy Court should finally adjudicate (through a bench trial) all matters in the adversary proceeding except Counts three and four; (c) the District Court should withdraw the reference as to Counts three and four and hold jury trial therein, at such time as the Bankruptcy Court has certified that the parties are ready for trial, with the Bankruptcy Court to preside over all pretrial matters." *Id*. at *3. The district court adopted the bankruptcy court's recommendation. *In re Ondova Limited Company*, 2011 WL 3739553 (N.D. Tex. 2011).

30.     Under the bifurcation option, this Court could retain the declaratory judgment cause of action, and the equitable causes of action, make a determination as to the declaratory judgment cause of action and equitable causes of action, and such determination could significantly reduce what may need to be withdrawn and tried to a jury in district court and/or lead to resolution of the case. Bifurcation of the declaratory judgment action and the equitable causes of action is appropriate in this case. When the cause of action is in equity, there is no right to a jury trial. *Curtis v. Loether,* 415 U.S.189, 192-93 (1974); *Tull v. United States,* 481 U.S. 412, 417, 107 S.Ct. 1831,

13

1835, 95 L.Ed.2d 365 (1987); *see also* Fed. R. Civ. P. 39(a)(2). As to the causes of action by Lone Star seeking equitable relief there is no reason to withdraw the reference. Lone Star's declaratory judgment action is neither equitable nor legal, it is "sui generis". *Cobb v. Harrington,* 190 S.W.2d 709, 713 (Tex. 1945). A constructive trust is an equitable remedy. *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 878 (Tex. App.- Houston [14th Dist] 2001, pet. denied). A request for an accounting seeks an equitable remedy. *Hutchings v. Chevron U.S.A.*, 862 S.W.2d 752, 762 (Tex. App. – El Paso 1993, writ denied); *Richardson v. First National Life Ins. Co.*, 419 S.W.2d 836, 838 (Tex. 1967). A request for wrongful offset seeks an equitable remedy. A request for attorney's fees in federal court is subject to the discretion of the court and its equitable powers, especially when declaratory relief is sought. Insofar as attorney's fees are sought for breach of the Intercreditor Agreement, the relief under TEX. BUS. & COM. CODE §38.001, et seq. is also subject to the court's discretion. All such causes of action should be retained by or assigned to the bankruptcy court to adjudicate.

WHEREFORE, PREMISES CONSIDERED, Lone Star prays that Rabo's Motion to Withdraw Reference of the Above-Entitled Adversary Proceeding be denied. In the alternative Lone Star prays that this Court retain or be granted jurisdiction to continue to adjudicate pre-trial matters, discovery, and dispositive motions, and the case not be withdrawn until it is certified that the case is ready for jury trial, or that this Court retain or be granted jurisdiction to adjudicate the declaratory judgment cause of action and the causes of action that seek equitable relief (i.e. bifurcation of causes of action), and continue to adjudicate pre-trial matters, discovery, and dispositive motions as to the entire case, and the case not be withdrawn as to legal relief sought until it is certified that the case is ready for jury trial. Lone Star seeks such other and further relief to which it may be justly entitled, at law, or in equity.

Dated this 29th day of May, 2019.

        Respectfully submitted,

        LOVELL LOVELL ISERN & FARABOUGH, LLP
        John H. Lovell, SBN 12609300
        john@lovell-law.net
        Joe L. Lovell, SBN 12609100
        joe@lovell-law.net
        Barbara A. Bauernfeind, SBN 08190500
        barbara@lovell-law.net
        112 Southwest 8th Avenue, Suite 1000
        Amarillo, Texas 79101-2314
        Telephone: (806) 373-1515
        Facsimile: (806) 379-7176

        *Attorneys for Plaintiff, Lone Star State Bank of West Texas*

        By: */s/ John H. Lovell*
            John H. Lovell

Case 18-02007-rlj    Doc 92    Filed 05/29/19    Entered 05/29/19 17:52:53    Desc Main
Document      Page 19 of 20

## CERTIFICATE OF SERVICE

      I hereby certify that on May 29, 2019, the foregoing document was filed with the Clerk of Court using the CM/ECF system, which sent notice of electronic filing to all electronic filing users in this case, including the following:

Michael Johnson
RAY QUINNEY & NEBEKER, P.C.
36 South State, Suite 1400
Salt Lake City, UT 84111
mjohnson@rqn.com
and
Thomas C. Riney
W. Heath Hendricks
RINEY & MAYFIELD, LLP
320 S. Polk Street, Suite 600
Amarillo, TX 79101
triney@rineymayfield.com
hhendricks@rineymayfield.com
      *Attorneys for Rabo Agrifinance, LLC*

Max R. Tarbox
TARBOX LAW, P.C.
2301 Broadway
Lubbock, TX  79401
max@tarboxlaw.com
    *Attorney for Waggoner Cattle, LLC, Cliff Hanger Cattle, LLC,*
    *Circle W of Dimmitt, Inc., and Bugtussle Cattle, LLC*

R. Byrn Bass, Jr.
Compass Bank Building
4716 4th Street, Suite 100
Lubbock, TX  79416-4953
bbass@bbasslaw.com
    *Attorney for Michael Quint Waggoner*

Brad W. Odell
MULLIN HOARD & BROWN, LLP
P.O. Box 2585
Lubbock, TX 79408
bodell@mhba.com
    *Attorneys for Lone Star State Bank of West Texas*

                                                */s/ John H. Lovell*
                                                John H. Lovell

# EXHIBIT A

**Waggoner Cattle Company**  (in Quickbooks Accounting Program)

      18,125 transactions from October 2014 – December 2017
  +  2,000 transactions from January – October 2014
      20,000 accounting transactions from January 2014 – December 2017

Journal Entries:
     259 through 1-12-2014
     758 through 12-31-2017

The 20,000 accounting transactions from January 2014 – December 2017 listed above include:

- 500 Adjusting Journal Entries
- $27,809,350 of inventory purchased (from 2014-2016) (2475 transactions)
- 116,000 head of cattle shipped and billed from 10-1-13 to 12-31-16
    - $78,678,300 of cattle shipped – just to Cliff Hanger from Waggoner Cattle; not including Waggoner Cattle sales to other buyers

In addition, Waggoner Cattle has a specialized feed yard program, Turnkey, on which records of the Waggoner Cattle shipments, performance, etc. is kept.

**Circle W**  (in Quickbooks Accounting Program)

- Over 50,000 transaction lines from October 2014 to December 2017

        (So much data that it wouldn't print/download to one file)

Journal Entries:
      350
      853
    1,203 } Over 500 Adjusting Journal Entries

**Also**

  190 cash transfers from Waggoner Cattle to Bugtussle

  370 cash transfers from Waggoner Cattle to Circle W

  **Cliff Hanger** – 1426 cash transaction lines

     * mostly money to Waggoner Cattle and cattle sales settlement

Between 2014 and 2016, the Debtors had two full-time CPAs and one part-time CPA employed working on this accounting.