LOVELL, LOVELL, ISERN & FARABOUGH, LLP
John H. Lovell, SBN 12609300
Joe L. Lovell, SBN 12609100
112 Southwest 8th Avenue, Suite 1000
Amarillo, Texas 79101-2314
Telephone:  806/373-1515
Facsimile:  806/379-7176
***Attorneys for Lone Star State Bank of West Texas***

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Chapter 11 |
| WAGGONER CATTLE, LLC, ET AL, | § | |
| | § | CASE NO. 18-20126-rlj-11 |
| | § | Joint Administration |
| *Debtors.* | § | |

| | | |
|---|---|---|
| LONE STAR STATE BANK OF | § | |
| WEST TEXAS, | § | |
| | § | ADVERSARY PROCEEDING NO. |
| *Plaintiff,* | § | 18-02007-rlj-11 |
| | § | |
| v. | § | |
| | § | |
| RABO AGRIFINANCE, LLC, | § | |
| f/k/a RABO AGRIFINANCE, INC. | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.      JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.      Loans by Lone Star to Waggoner-Related Entities. . . . . . . . . . . . . . . . . . . . . . . 6

    B.      Waggoner Entities Expand Business, and Need Additional
        Financing, an Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.      2014 Loan by Rabo to Cliff Hanger, and the Intercreditor Agreement. . . . . . . . . 9

    D.      The Parties' Course of Performance of "Payment in Full" to
        Waggoner Cattle, and Lone Star's Use of the Cliff Hanger
        Borrowing Bases Submitted to Rabo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    E.      Specific Knowledge and Actions of Rabo . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    F.      Rabo Headquarters in Utrecht, Netherlands, Gives Notice That it Has
        "Reached the Limit of its Appetite" on Cliff Hanger. Any Additional
        Funds Will Have to Come from Some Other Lender . . . . . . . . . . . . . . . . . . . . . . 24

        i.      Rabo's Efforts to Syndicate the Troubled Cliff Hanger
            Loan Begins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    G.      Rabo Becomes Increasingly Aware of the Many and Increasingly
        Serious Problems with the Loans to the Waggoner Entities. . . . . . . . . . . . . . . . 26

    H.      False Assurances by Rabo to Lone Star . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    I.      Lone Star Forbearance Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    J.      Contrary to the Terms of the Intercreditor Agreement, Waggoner Cattle
        Calves Were Transferred to Cliff Hanger Without Full Payment. . . . . . . . . . . . 49

    K.      Obligations of Rabo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

III.    CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    L.      First Cause of Action – Declaratory Judgment. . . . . . . . . . . . . . . . . . . . . . . . . 53

    M.      Second Cause of Action – Breach of Intercreditor Agreement. . . . . . . . . . . . . 58

    N.      Third Cause of Action – Conversion of Proceeds of Lone Star Collateral. . . . . 61

    O.      Fourth Cause of Action – Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

        i.      Fraud in Cliff Hanger Borrowing Base Certificates . . . . . . . . . . . . . . . . 62

        ii.     Fraudulent Promises Regarding the "Take-Out" Loan . . . . . . . . . . . . . . 63

        iii.    Fraud in Attempt to Syndicate the Cliff Hanger Loan . . . . . . . . . . . . . . 65

    P.      Fifth Cause of Action – Money Had and Received by Rabo, and
        Constructive Trust. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

     Q.     Sixth Cause of Action – Civil Conspiracy / Conspiracy to Defraud. . . . . . . . . . 67

     R.     Seventh Cause of Action – Wrongful Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

     S.     Eighth Cause of Action – Equitable Subordination . . . . . . . . . . . . . . . . . . . . . . 70

     T.     Ninth Cause of Action – Attorney's Fees and Costs. . . . . . . . . . . . . . . . . . . . . . 72

IV.    DAMAGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

V.     PUNITIVE DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

VI.    CONDITIONS PRECEDENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

VII.   PREJUDGMENT INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

VIII.  POST-JUDGMENT INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

IX.    RESERVATION OF RIGHT TO AMEND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

X.     REQUEST FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

LONE STAR STATE BANK OF WEST TEXAS ("Lone Star" or "Plaintiff") hereby files this First Amended Complaint (the "Complaint") against RABO AGRIFINANCE, LLC, f/k/a Rabo Agrifinance, Inc. ("Rabo"). Plaintiff respectfully states as follows:

## I.   JURISDICTION AND VENUE

1.     On April 9, 2018 (the "Petition Date"), Waggoner Cattle LLC ("Waggoner Cattle"), Cliff Hanger Cattle, LLC ("Cliff Hanger"), and Circle W of Dimmitt, Inc. ("Circle W") each filed a voluntary petition in the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division, pursuant to Chapter 11 and Section 301 of Title 11 of the United States Code (the "Bankruptcy Code") thus initiating the voluntary cases [Waggoner Cattle Case No. 18-20126-rlj-11; Cliff Hanger Case No. 18-20129-rlj-11; Circle W Case No. 18-20127-rlj-11].[1]

2.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(a) and (b) and 1334. This case contains core claims as defined in 28 U.S.C. §157(b). Regarding any part of this adversary proceeding found to be "non-core," under Bankruptcy Rule 7008, the Plaintiff consents to the entry of final orders and judgments by this Court.

3.     In its February 5, 2019 Memorandum Opinion [Doc. 35], this Court found that it had "related to" jurisdiction subject matter jurisdiction over Lone Star's claims against Rabo, 28 U.S.C. §1334(b), and denied Defendants' motion to abstain.

4.     Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

5.     Lone Star is a Texas financial institution with its principal place of business in Lubbock County, Texas at 6220 Milwaukee Avenue, Lubbock, Texas 79424. Lone Star is a citizen of Texas.

---

[1] All references to the "Bankruptcy Code" are made to 11 U.S.C. §§ 101 *et seq*. Unless otherwise indicated, all section references are references to the Bankruptcy Code.

6.      Rabo is a Delaware limited liability company with its principal place of business at

12443 Olive Boulevard, Suite 50, St. Louis, Missouri  63141. Rabo is registered to do business in

Texas and does business in the Northern District of Texas, with an office in Potter County, Texas

at 5307 W. Interstate 40 W, Amarillo, Texas 79106. The sole member of Rabo, Utrecht-America

Holdings, Inc., is a Delaware corporation. Rabo is therefore a citizen of Delaware and Missouri.

Rabo has been served in this case, and has appeared and filed an answer.

7.      In the subject transactions, Rabo conducted business in Texas with Debtors, Cliff

Hanger, LLC, Waggoner Cattle, LLC, Circle W of Dimmitt, Inc., Bugtussle Cattle, LLC, and

Michael Quint Waggoner ("Quint"), which are residents of Castro County, Texas. Rabo also

conducted business with Lone Star in Lubbock and Potter Counties in the Northern District of

Texas. Lone Star is a resident of Lubbock County, Texas. Both Castro County and Lubbock County

are counties within the Northern District of Texas. The bankruptcy cases of Waggoner Cattle, LLC

("Waggoner Cattle"), Cliff Hanger, LLC ("Cliff Hanger"), Circle W of Dimmitt, Inc. ("Circle W"),

and Bugtussle Cattle, LLC ("Bugtussle") (Case No. 18-20128-rlj-11) are jointly administered in

Case No. 18-20126-rlj-11, by order dated April 20, 2018, and are all pending in the Amarillo

Division of the Northern District of Texas. The bankruptcy case of Michael Quint Waggoner is also

pending in this Court in Case No. 18-20125-rlj-11, but is not jointly administered with the

Waggoner Cattle, Cliff Hanger, Circle W and Bugtussle bankruptcy cases.

8.      This First Amended Complaint is brought in accordance with Federal Rules of

Bankruptcy Procedure 7001, *et seq.*, and seeks relief under section 105 of the Bankruptcy Code, and

declaratory judgment under 28 U.S.C. §2201, including further relief to include attorney's fees.

9.      This Amended Complaint further seeks relief under Texas law for breach of contract,

attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE §38.001, et seq., declaratory judgment

and attorney's fees under TEX. CIV. PRAC. & REM. CODE §37.001 et seq., conversion, fraud,

conspiracy to defraud and equitable subordination of all Rabo's claims.

## II. BACKGROUND

**A.    Loans by Lone Star to Waggoner-Related Entities.**

10.     Before Defendant Rabo began to loan money to Debtor Cliff Hanger in November

of 2014, Lone Star had entered into certain loan documents, promissory notes, security agreements,

and financial agreements as listed below with Debtors Waggoner Cattle and Cliff Hanger, as well

as with Debtors, Bugtussle Cattle, LLC, Circle W of Dimmitt, Inc. and/or Waggoner Trust:

| Note No. | Date | Amount | Borrower |
|---|---|---|---|
| 7100155659 | 07/18/11 | $1,300,000.00 | Bugtussle Cattle, LLC |
| 7100168381 | 04/30/12 | $ 505,000.00 | Bugtussle Cattle, LLC |
| 7100167463 | 10/05/12 | $1,304,000.00 | Bugtussle Cattle, LLC; Waggoner Cattle, LLC; Circle W of Dimmitt, Inc. |
| 7100155644 | 10/31/13 | $7,000,000.00 | Waggoner Cattle, LLC; Circle W of Dimmitt, Inc.; Bugtussle Cattle, LLC |
| 7100187471 | 03/07/14 | $8,000,000.00 | Waggoner Cattle, LLC; Cliff Hanger Cattle, LLC; Circle W of Dimmitt, Inc.; Bugtussle Cattle, LLC |
| 7100216049 | 03/09/16 | $ 92,000.00 | Bugtussle Cattle, LLC |

11.     Pursuant to its loan documents, promissory notes, deeds of trust and security

agreements, Lone Star  obtained a first lien security interest in, and encumbrance on, the following

property and rights of Waggoner Cattle, Cliff Hanger and Circle W:

      a.     cattle and livestock;

      b.     receivables;

      c.     present and future accounts;

      d.     general intangibles;

      e.     all products and proceeds;

      f.     present and future inventory;

      g.     present and future farm products;

      h.     hedge accounts;

i.      equipment; and

j.      contract rights and monies, and proceeds payable thereunder.

12.    These liens were granted to Lone Star in the respective security agreements and deeds of trust, and were thereafter perfected.

13.    Pursuant to its loan documents, promissory notes, security agreements and deeds of trust, Lone Star obtained a first lien security interest in, and encumbrance upon the following property and rights of Waggoner Cattle, Cliff Hanger, Circle W and Bugtussle:

a.      Bugtussle: July 18, 2011 Deed of Trust as to real property in Castro County, Texas, recorded on August 3, 2011 in Castro County in Vol. 335, Pg. 803 of the public records;

b.      Bugtussle: February 29, 2016 Modification of Deed of Trust recorded in Castro County, Texas in Vol. 376, Pg. 20 of the public records;

c.      Waggoner Cattle: R. J. O'Brien & Associates, LLC Security Agreement and Assignment of Accounts to Lone Star dated August 15, 2011;

d.      Bugtussle: April 30, 2012 Deed of Trust as to real property in Castro and Lamb Counties, Texas recorded on May 1, 2012 in Castro County, Texas in Vol. 342, Pg. 145 of the public records, and recorded on May 2, 2012 in Lamb County, Texas in Vol. 686, Pg. 185 of the public records;

e.      Bugtussle: October 5, 2012 Agricultural Security Agreement;

f.      Waggoner Cattle: October 5, 2012 Agricultural Security Agreement;

g.      Circle W: October 5, 2012 Agricultural Security Agreement;

h.      Bugtussle: October 5, 2012 Deed of Trust as to real property in Castro County, Texas, recorded on November 9, 2012 in Castro County, Texas in Vol. 346, Pg. 549 of the public records;

i.      Waggoner Cattle: October 5, 2012 Agricultural Security Agreement;

j.      Bugtussle: October 5, 2012 Agricultural Security Agreement;

k.      Circle W: October 5, 2012 Agricultural Security Agreement;

l.      Waggoner Cattle: Match 7, 2014 Agricultural Security Agreement;

m.     Cliff Hanger: March 7, 2014 Agricultural Security Agreement;

n.      Bugtussle: March 7, 2014 Agricultural Security Agreement;

o.      Circle W: March 7, 2014 Agricultural Security Agreement;

p.   Bugtussle:  March 7, 2014 Deed of Trust as to real property in Castro and Lamb Counties, Texas, recorded on April 15, 2014 in Lamb County, Texas in Vol. 357, Pg. 684 of the public records, and recorded on April 3, 2014 in Castro County, Texas in Vol. 357, Pg. 691 of the public records; and

q.   Bugtussle:  March 9, 2016 Agricultural Security Agreement.

Security interests in the Debtors' properties were granted to Lone Star in the respective security agreements and deeds of trust, and were perfected shortly thereafter.

14.    One of the conditions of the Lone Star loans to Waggoner Entities was that the financial statements of these entities be regularly audited by certified public accountants. Pursuant to Lone Star's requirement, the Waggoner Entities hired Moseley & Riddle to perform these required audits.

**B.    Waggoner Entities Expand Business, and Need Additional Financing, An Overview.**

15.    Because of the expansion of Quint Waggoner's businesses to carry the Holstein calves through commercial feedyards on through slaughter, these Waggoner Entities needed to borrow additional funds in amounts in excess of Lone Star's lending limits. Initially, Cliff Hanger acquired the needed additional loan funds by having the feedyards finance the Cliff Hanger cattle placed in the feedyards, and also finance the feed provided by the feedyards to the Cliff Hanger cattle. Additionally, First Capital Bank provided some of the financing for the Cliff Hanger cattle. In order to more effectively manage the credit needs of the Waggoner Entities, an arrangement was made whereby Rabo would loan money to Cliff Hanger to finance the Cliff Hanger cattle being fed in third party commercial feedyards, such as Barrett & Crofoot, Bar-G, Great Plains, and Dean Cluck Feedyard. It was contemplated that Rabo would eventually finance all the cattle of Cliff Hanger and Waggoner Cattle, but Rabo would start by providing the financing for Cliff Hanger. While Rabo was in the process of replacing Lone Star as the lender to the Waggoner Entities for all

their cattle, in the interim, Lone Star would continue to loan, and did continue to loan, money to

Waggoner Cattle, Circle W and Bugtussle to finance the operations of those businesses.

**C.      2014 Loan by Rabo to Cliff Hanger, and the Intercreditor Agreement.**

16.      Cliff Hanger wanted to borrow money from Rabo to consolidate the lending to

finance the Cliff Hanger cattle and feed in the commercial feedyards, and later to buy the cattle to

fill the Great Plains Feedyard. It was contemplated that, if Rabo took over the financing of all of

Quint Waggoner's cattle, Lone Star might finance the Great Plains Feedyard purchase, and Rabo

would finance the cattle. It was contemplated that Rabo would eventually take out Lone Star and

become the sole cattle lender for Quint Waggoner and all his entities. Lone Star had a prior first lien

on all the Waggoner Entities' collateral.

17.      Because Lone Star had a perfected prior lien and security interest in cattle and other

collateral of Waggoner Cattle and Cliff Hanger, Rabo contacted Lone Star about an Intercreditor

Agreement.

18.      Lone Star was unwilling to subordinate its prior secured status and lien as to any

property or rights of Waggoner Cattle or Cliff Hanger without express assurance by Rabo, and a

contractual obligation of Rabo, that Lone Star's first lien on the cattle of Waggoner Cattle would

not be subordinated to Rabo's lien on Waggoner Cattle's cattle and their proceeds until two

conditions had been met: first, that Waggoner Cattle was paid in full for the cattle Waggoner Cattle

transferred to Cliff Hanger, and second, that the calves of Waggoner Cattle would be physically

transferred from the calf ranch to the respective commercial feedyards. The Intercreditor Agreement

defined the difference on which lender held a lien on which cattle by virtue of the physical location

of those cattle.

19.    Because Rabo wanted a lien upon, and a security interest in, the calves which had been sold by Waggoner Cattle to Cliff Hanger (the cattle on feed in third party feedyards), and Lone Star wanted to preserve its prior liens and security interests in the Waggoner Cattle calves and their proceeds until Waggoner Cattle was paid in full for the cattle, Lone Star and Rabo entered into a November 26, 2014 Intercreditor Agreement. (*See*, *esp.* ¶2(a)). A true and correct copy of the Lone Star-Rabo Intercreditor Agreement is attached hereto as **Exhibit A**.

20.    Rabo and Cliff Hanger entered into a loan agreement, dated October 27, 2014.  Rabo and Lone Star entered into the Intercreditor Agreement on November 26, 2014. Cliff Hanger and Waggoner Cattle also signed the Intercreditor Agreement as parties. Rabo was the author of the original draft of this Agreement. The Rabo loan to Cliff Hanger funded on November 26, 2014. Then, on December 2, 2014, Rabo and Cliff Hanger entered into an amended and restated loan agreement. A copy of the Amended and Restated Loan Agreement is attached as **Exhibit B**. This loan agreement provided that: (1) Rabo would only advance funds for 75% of the value of unhedged cattle, (2) the transfer price for Waggoner Cattle transferred to Cliff Hanger would be based upon the most recent Overland Auction price, (3) Rabo would receive monthly borrowing base reports from Quint, and (4) annual CPA audits, and quarterly CPA compilations of Cliff Hanger financial statements.  Lone Star was never a party to the Rabo - Cliff Hanger loan agreement, and was never bound by its terms. Rabo was a party to, and was bound by, the Intercreditor Agreement with Lone Star. As is typical with cattle lending, Cliff Hanger was to have and maintain a 25% equity margin in the Cliff Hanger cattle for the Rabo loan. Quint Waggoner caused the monthly borrowing base reports of Cliff Hanger to also be delivered to Lone Star. Bart Schilling of Lone Star also requested Cliff Hanger borrowing base reports from Paul Strouhal, and received them. Bart Schilling and Lone Star reviewed and relied upon the Cliff Hanger borrowing base reports delivered to Lone Star.

21.     Under ¶2(a) of the Intercreditor Agreement, Lone Star did not subordinate its liens on the Waggoner Cattle calves shipped to the feedyards, and Rabo did not obtain, a lien or security interest in the calves transferred from Waggoner Cattle to Cliff Hanger, until and unless Waggoner Cattle was paid in full for the transferred calves. And, if Waggoner Cattle was not paid in full for the transferred calves, under the express terms of the Intercreditor Agreement, Lone Star's prior first lien and security interest upon those Waggoner Cattle calves, and upon the proceeds of the Waggoner Cattle calves, remained and had priority over any lien or security interest claim of Rabo. In the absence of full payment to Waggoner Cattle, the Rabo lien would, in any event, be junior to Lone Star's perfected first lien.

22.     Noteworthy as to the Intercreditor Agreement, on page 7 of the Agreement, Cliff Hanger and Waggoner Cattle also signed the Agreement, acknowledged awareness of its terms, consented to the Intercreditor Agreement, and agreed to be bound by the terms of the Intercreditor Agreement. That contract, to which Cliff Hanger and Waggoner Cattle were also parties, provided that:

a.     Lone Star had and kept a first lien on all the personal property, including all cattle which was located at the "calf ranch";

b.     Lone Star's first lien on the Waggoner Cattle calves would remain, and not be subordinated to Rabo, until (1) the cattle were physically moved from the calf ranch to the feedyards, and (2) Waggoner Cattle was paid in full for those calves; and

c.     When the cattle were transferred to the feedyards, and Waggoner Cattle was paid in full, Lone Star's first lien would remain, but be subordinated to Rabo's lien.

23.    On November 26, 2014, Rabo funded the loan to Cliff Hanger by paying $31,362,904.62 to the feedyards holding liens on Cliff Hanger cattle in their feedyards, and paying $3,330,241.88 to First Capital.

**D.    The Parties' Course of Performance of "Payment in Full" to Waggoner Cattle, and Lone Star's Use of the Cliff Hanger Borrowing Bases Submitted to Rabo.**

24.    As was known and acknowledged by both Rabo (RAF0010931, 0010881, 0010490) and by Lone Star (LSSB 008952, 008959, 009112), the interrelationship among the Waggoner Entities, with the split financing arrangement between Rabo and Lone Star, was such that Bugtussle, Circle W and Waggoner Cattle were to operate at essentially a break even, with Cliff Hanger holding the bulk of the equity for the collective Waggoner Entities in its cattle, and with Cliff Hanger sales of fat cattle being the source of equity for fully paying Waggoner Cattle, and for sustaining and paying for capital expenditures for the other Waggoner Entities. Thus, prior to Rabo's initial funding, it was anticipated and agreed among Quint Waggoner and both lenders that the initial transfer price for the Waggoner Cattle calves would only be approximately the cost of the Waggoner Cattle calves, about 75% of their market value.[2] It was also anticipated, understood and agreed by Quint Waggoner and both lenders that, as Cliff Hanger sold its finished cattle to Tyson, some of the equity in those fat cattle would be distributed back to the other Waggoner Entities. This understanding and agreement is demonstrated in the October 7, 2014 email from Paul Strouhal to Quint Waggoner, DeNise Merritt and Russell Pharis. RAF0001178, et seq. In this pre-funding email, Paul Strouhal stated that the issues to be discussed and agreed upon were: (1) the credit limit of the Rabo loan to Cliff Hanger, (2) distributions from Cliff Hanger back to Waggoner Cattle, and (3) transfer pricing from Waggoner Cattle to Cliff Hanger.   In this email, Paul Strouhal clearly

---

[2] The lenders and the Waggoner Entities agreed to use the Overland Livestock Auction quotes as the market price from which the transfer price would be determined.

differentiated between transfer price payments from Cliff Hanger to Waggoner Cattle, and
**distributions** from Cliff Hanger to Waggoner Cattle. Attached to this October 7, 2014 email were
spreadsheets where Paul Strouhal projected the monthly Cliff Hanger **distributions** .... which were
expressly shown to be in addition to the transfer price payments ... to Waggoner Cattle. These two
spreadsheets even had a horizontal column for ".25", the difference between the market value of the
Waggoner Cattle calves transferred to Cliff Hanger and the transfer price which was to be paid on
delivery.

25.    This understanding and agreement among the parties to have Cliff Hanger make
distributions or draws to Waggoner Cattle from fat cattle sales proceeds is also shown in the DeNise
Merritt spreadsheet labeled "Rabobank Note Draws, 2014 - 2015" (RPharis _001083-87). This
spreadsheet, DeNise Merritt kept track of Cliff Hanger draws on the Rabo line of credit which were
distributed back to Waggoner Cattle. This spreadsheet shows that on November 26 and December
1 of 2014, Cliff Hanger paid Waggoner Cattle $1,167,738.25, in order to fully pay Waggoner Cattle
for the calves which Waggoner Cattle had delivered to Cliff Hanger in August, September, October
and November of 2014 with initial payment of only the amount of the feedyard financing rate for
those calves (about 75% of their market value) having previously been paid to Waggoner Cattle.
Because Rabo understood that, under the terms of the Intercreditor Agreement, Cliff Hanger was
to pay Waggoner Cattle in full for the calves which Cliff Hanger received, Rabo did not object to
the $1,167,738.25 in payments to Waggoner Cattle in order to get Waggoner Cattle paid in full for
the calves delivered to Cliff Hanger in August-November of 2014.

26.    The DeNise Merritt "Rabobank Note Draws Spreadsheet" also recorded and
classified many subsequent payments to Waggoner Cattle by Cliff Hanger from Cliff Hanger draws

from the Rabo line of credit. The following payments, denominated as draws from Cliff Hanger,
which were paid to Waggoner Cattle, were made as follows:

| | |
|---|---|
| 01/06/2015 | $250,000 |
| 01/11/2015 | $250,000 |
| 01/20/2015 | $250,000 |
| 01/23/2015 | $100,000 |
| 01/26/2015 | $150,000 |
| 02/03/2015 | $250,000 |
| 03/16/2015 | $250,000 |
| 04/66/2015 | $250,000 |
| 04/14/2015 | $250,000 |
| 04/14/2015 | $250,000 |
| 07/23/2015 | $245,000 |
| 07/23/2015 | $245,000 |
| 08/12/2015 | $243,250 |
| 08/15/2015 | $104,250 |
| 09/18/2015 | $250,000 |

27.    The following additional payments on DeNise Merritt's "Rabobank Note Draws
Spreadsheet" were posted in the Cliff Hanger and Waggoner Cattle "due to/from" accounts in the
general ledgers:[3]

| | |
|---|---|
| 02/19/2015 | $350,000 |
| 04/15/2015 | $100,000 |
| 08/19/2015 | $243,250 |
| 08/27/2015 | $243,250 |
| 09/02/2015 | $417,000 |
| 09/03/2015 | $243,250 |

---

[3] Rabo carefully monitored the "due to/due from" accounts, and often commented on their use, and their misuse, in their internal reports (e.g., RAF0011176, 0010490, 0010997, 0011035).

| | |
|---|---|
| 09/04/2015 | $100,000 |
| 09/08/2015 | $312,750 |
| 09/16/2015 | $100,000 |
| 09/21/2015 | $100,000 |
| 09/25/2015 | $200,000 |

28.     These "draws" and "due to/from" payments from Cliff Hanger to Waggoner Cattle were approximately in the amounts of the 25% difference between the transfer price and the market value of those Waggoner Cattle calves which had been shipped from Waggoner Cattle to the Cliff Hanger feedyards. Bart Schilling was aware of these later payments to Waggoner Cattle which were in excess of the transfer price. Knowing that these Cliff Hanger payments were being paid to Waggoner Cattle, in addition to the transfer price payments which were paid to Waggoner Cattle at about the time the calves were shipped to the feedyards, assured Bart Schilling that, as agreed, Waggoner Cattle was being paid in full by Cliff Hanger, (with the final 25% coming from fat cattle sales proceeds), for the calves [Lone Star's collateral] which Lone Star was allowing Waggoner Cattle to transfer to Cliff Hanger. Rabo was also aware of and monitored these payments to Waggoner Cattle from its loan proceeds, and often reported on these payments in its internal records (e.g., RAF0010966, 0010930, 0010933, 0010490, 0011188). These payments prove the course of performance among Waggoner Cattle, Cliff Hanger, Lone Star and Rabo of how Waggoner Cattle was to be paid in full for its calves, as was required in the Intercreditor Agreement.[4]

29.     It was understood by Quint Waggoner and both lenders that, after the initial 75% transfer price was paid at or near delivery, the full value of the Waggoner Cattle calves would be paid to Waggoner Cattle later, from the net sales proceeds of the finished Cliff Hanger cattle.

---

[4] *See also* RAF001099, where Rabo admitted it covenanted to permit distributions from Cliff Hanger to the other Waggoner Entities.

Because all involved understood that Cliff Hanger would have to distribute money back to Waggoner Cattle in order to keep Waggoner Cattle, Bugtussle and Circle W operating,[5] all involved understood that it was important for Lone Star to be informed of the financial condition of Cliff Hanger; Cliff Hanger was understood to be the ultimate source of capital expenditures, and repayment of Lone Star's loans.[6]

30.     As Lone Star continued to lend to Waggoner Cattle, it was important for Lone Star to know that Waggoner Cattle would be paid in full from the equity in the Cliff Hanger finished cattle as they sold, and therefore it was important to Bart Schilling to know that sufficient equity remained in the Cliff Hanger cattle to allow Waggoner Cattle to be fully paid when those finished Cliff Hanger cattle sold. Lone Star relied upon Cliff Hanger sales proceeds to get its loans to Waggoner Cattle paid. Lone Star relied upon the Cliff Hanger borrowing base certificates for assurance that this equity for repayment existed (*see* LSSB 009112, 008955).

31.     In order to allow Lone Star to monitor the available equity in the Cliff Hanger cattle, the Cliff Hanger borrowing bases were transmitted to Bart Schilling, the Lone Star loan officer in charge of the Waggoner Cattle, Bugtussle and Circle W credit. Quint Waggoner sent to Bart Schilling the following Cliff Hanger borrowing bases which had been submitted to Rabo:

| Month | Date | Via | Document | Bates Range |
|-------|------|-----|----------|-------------|
| October | 11/20/14 | email | October CH BBC | LSSB 012057-58 |
| November | 01/05/15 | email | November CH BBC | LSSB 012059-60 |
| January | 03/04/15 | email | January CH BBC | LSSB 012061-62 |
| February | 03/30/15 | email | February CH BBC | LSSB 012063-64 |
| February | 04/24/15 | email | February CH BBC (again) | LLLB 012065-66 |
| March | 06/01/15 | email | March CH BBC | LSSB 012067-68 |

--------

[5] *See*, e.g., RAF0010999 and RAF0010930.

[6] *See*, e.g., RAF0010930.

32.     As has been acknowledged both in the deposition testimony of Paul Strouhal (pp. 39-40, 195) and Bart Schilling (pp. 125, 129-130), Paul Strouhal also transmitted Cliff Hanger borrowing base certificates directly to Bart Schilling (LSSB 012069-012080, 012081-012083). Paul Strouhal knew that Bart Schilling was relying on the accuracy and truthfulness of the Cliff Hanger borrowing bases which he was receiving, especially of those Cliff Hanger borrowing bases which Lone Star was receiving directly from Rabo. When Bart Schilling received Cliff Hanger borrowing bases from Rabo, he knew that Rabo loan officers and inspectors had examined those borrowing bases, checked the cattle and checked the numbers, making them particularly reliable.

33.     On December 16, 2015, Bart Schilling and Paul Strouhal had a telephone conversation about the Cliff Hanger/Waggoner Cattle credits (LSSB 012069-012080). In response to that telephone call, on December 16, 2015 Paul Strouhal transmitted to Bart Schilling, with his email, the following attached documents: the Consolidated Cliff Hanger borrowing base for September 30, 2015, the Tucker Waggoner borrowing base, the Tyler Waggoner borrowing base, and the Waggoner borrowing base consolidated. The Cliff Hanger  borrowing base transmitted to Bart Schilling by Paul Strouhal had been prepared by Rabo analyst, Mark Perrier. It showed that, as of September 30, 2015, Rabo had $66,783,405 in collateral, $55,267,124 in borrowing base value, and $51,838,215 in loans from Rabo to Cliff Hanger, resulting in $3,428,909 of excess borrowing base, and an equity of  $14,945,190. Bart Schilling relied on these numbers in that Cliff Hanger borrowing base in allowing the Lone Star loans to continue, and in allowing Waggoner Cattle to continue to ship calves to Cliff Hanger, because the Cliff Hanger borrowing bases gave Bart Schilling assurance that Cliff Hanger had sufficient equity in its cattle to fully pay Waggoner Cattle from the equity in the Cliff Hanger cattle as they were sold to Tyson.

34.    Although Lone Star has not yet been able to locate the transmittal, by March 16, 2016, Bart Schilling had also received Cliff Hanger borrowing base as of December 31, 2015 (LSSB 011724). From this Bart Schilling email, it is clear that Lone Star received, reviewed and relied upon the September 30, 2015 and December 31, 2015 Cliff Hanger borrowing base certificates submitted to Rabo in order to agree to renew Lone Star's loans to the Waggoner Entities (LSSB 011792).

35.    On September 15, 2016, Paul Strouhal also emailed to Bart Schilling Cliff Hanger's July 2015 borrowing base (LSSB 012081-012083).

36.    Because Bart Schilling was relying on the equity in the Cliff Hanger cattle to eventually fully pay Waggoner Cattle, including Waggoner Cattle's receivables from Tucker and Tyler Waggoner, when Bart Schilling received the Cliff Hanger borrowing bases, he was primarily interested in the borrowing base excess number, shown on the summary page of the borrowing base certificate (e.g., LSSB 012070). Although Bart Schilling understood how the cost of gain was used in determining the value of cattle in the feedyards, he did not independently check the cost of gain and reported weights of the Cliff Hanger cattle that went into the calculation of the value of the Cliff Hanger borrowing base. Bart Schilling was generally aware that the Rabo loan officers and inspectors were monitoring of the Cliff Hanger credit. Bart Schilling did not have access to the Cliff Hanger closeouts, so he could not see the costs of gain and actual out weights of the individual lots of Cliff Hanger cattle. Especially when the Cliff Hanger borrowing bases he received came from Rabo, Bart Schilling knew that Rabo loan officers, inspectors and credit analysts had reviewed and accepted those numbers. Bart Schilling reasonably relied on these Cliff Hanger borrowing base certificates to have true and accurate values calculated and approved by numerous Rabo officers, inspectors and credit analysts. Bart Schilling did not know that Rabo loan officers were defrauding

him and Lone Star with fraudulent cost of gain and out weight assumptions in calculating these published values.

37.     Although the Cliff Hanger borrowing base certificates had pages which stated the cost of gain assumptions used in calculating the value of the Cliff Hanger cattle (e.g., RAF0003925, 0003937, 0017964), some of those pages were removed from the Cliff Hanger borrowing base documents which Paul Strouhal transmitted to Bart Schilling (see, e.g., LSSB 012069-012080). Because Bart Schilling had no reason to suspect that Rabo was defrauding him and Lone Star by the use of false cost of gain, out weight, and price numbers in the calculations, Bart Schilling did not dig down into the calculations to verify that all the cost, weight and price assumptions were reasonable and accurate. Bart Schilling relied on the summary numbers which Rabo/the Waggoner Entities published to him. In the emails sent directly to Bart Schilling, Paul Strouhal deliberately omitted the pages of the Cliff Hanger borrowing bases from which Bart Schilling could have determined (1) that the out weight numbers used in calculating the value of the Cliff Hanger cattle had been deliberately made to be fraudulently high, and (2) that the cost of gain numbers used to calculate the cost of finishing the Cliff Hanger cattle on feed had been deliberately made low, in order to fraudulently and deliberately overstate the value of the Cliff Hanger cattle by many millions of dollars.

38.     In other instances, after Lone Star received Rabo borrowing base certificates which showed positive borrowing base equity (LSSB 7288-7334, 7031-7080), which were calculated using fraudulently and unrealistically low cost of gain numbers (LSSB 7303, 7045), Rabo would later go back and amend those same borrowing base certificates using a higher (and thus, "less fraudulent") cost of gain number for their own internal analysis (RAF3941-3942, 17162-17199). Of course, using a higher cost of gain would result in a negative borrowing base (RAF3942 [native form] and 17168).

39.     Bart Schilling was successfully deceived by Paul Strouhal and the Rabo borrowing base certificates.

**E.**     **Specific Knowledge and Actions of Rabo**

40.     In September 2014, Rabo was inspecting Quint Waggoner's cattle operations and accounting, evaluating the possibility of making a $35-40 million loan to Cliff Hanger. Rabo's November 20, 2014 pre-funding credit memorandum did a financial analysis of Quint Waggoner's cattle business. This Rabo credit proposal had an arrangement which provided for split financing, with Rabo to finance the Cliff Hanger cattle located in the commercial feedyards, while Lone Star would continue its lending to Waggoner Cattle and the calf ranch operations of Bugtussle and Circle W. Rabo loan officers in September 2014 were noting that Lone Star was not taking as hard a look at the transfer prices and its effect on the Waggoner Cattle borrowing base as were the Rabo bankers (RAF0011387). In its September 23, 2014 internal memorandum (RAF0011395), Paul Strouhal, the Rabo "relationship manager" (i.e., primary loan officer), noted that the transfer price was a discounted ***advance*** on the value of the cattle, and was less than the fair market value of the cattle. By use of the word "advance", Paul Strouhal disclosed his understanding that the transfer price to be paid to Waggoner Cattle at delivery was only a partial payment.

41.     On October 7, 2014, Rabo Loan Officer Paul Strouhal sent an email message to Quint Waggoner, Russell Pharis and DeNise Merritt, in which Paul Strouhal sent spreadsheets projecting the **distributions** from Cliff Hanger to Waggoner Cattle, *in addition to the transfer prices* which were to be paid at delivery (RAF0001178). From this email and attached spreadsheets, it is clear that Rabo, Quint Waggoner and the Waggoner Entities agreed and anticipated that the 25% difference between the Waggoner calves' transfer price and their market value would be paid to Waggoner Cattle from the proceeds of Cliff Hanger sales of its finished cattle. It was always understood that,

in the structure of Quint Waggoner's businesses, Cliff Hanger was the margin-generating entity (RAF0010931), *and distributions or "draws" from Cliff Hanger to the other entities would be necessary* (see RAF0011188 and 0010881). These additional payments, to cause Waggoner Cattle to be paid in full for its calves under the Intercreditor Agreement, were even denominated as "draws" and "price adjustments" by Waggoner Cattle and Cliff Hanger accountants (see, e.g., RPharis_001083-001086). As of April 21, 2015, these approved Cliff Hanger distributions to Waggoner Cattle in 2015 totaled $2 million (RAF0011188-0011189). Rabo even noted that these distributions of equity had been booked as negative accounts payable (RAF0011196). Rabo understood what was being paid and why, even when the payments were irregularly posted in the general ledger. These payments established a course of performance by and among Rabo, Cliff Hanger, Waggoner Cattle and Lone Star, which established how Waggoner Cattle was to be paid in full for the calves it transferred to Cliff Hanger.

42.      In the October 24, 2014 pre-funding collateral inspection report (RAF0011670), Rabo AgriFinance collateral inspector, Michelle Stockett, noted that the pro forma valuation of the cattle was done using the Rabo AgriFinance cost-to-finish model and the packer contract price assigned to each lot. Rabo inspector, Michelle Stockett, noted that this valuation used for a cost-of-gain number $.80 per pound for all the cattle, and an average daily gain of 2.8 pounds, with an estimated shipment weight of 1,325 pounds. In the course of this inspection, Michelle Stockett examined the Cliff Hanger July and August 2014 closeouts. Those Cliff Hanger close outs revealed that Cliff Hanger's actual costs of gain averaged $89.45 per hundredweight, with an average gain of 2.76 pounds per day, and an average shipment weight of only 1,291 pounds per head. Michelle Stockett further discussed with three feedyard managers about the anticipated closeout cost going forward. The feedyard managers indicated to Michelle Stockett $.80 per pound, with one saying $.80-$.85

per pound. Inspector Michelle Stockett noted that if an $.85 cost gain was used rather than $.80, the total cattle valuation for the 33,387 head would drop by approximately $967,000. She further noted that if a $.90 cost of gain cost was used, the cattle valuation would drop by approximately $1.9 million. In other words, for the 33,387 cattle that Cliff Hanger then had on feed a month before the Rabo loan funded, numerous Rabo personnel knew and understood that understating the cost of gain by ten cents per pound overstated the value of the cattle on the Cliff Hanger borrowing base by approximately $2 million, or about $57.00 per head. Before Rabo funded the loan to Cliff Hanger on November 26, 2014, all the Rabo personnel involved knew the magnitude of cattle value determinations which could be made by understating the cost of gain.

43.    Even before funding the loan to Cliff Hanger, Rabo always knew that Quint Waggoner was funding capital improvements to the Bugtussle calf ranch facility from use of working capital (e.g., RAF0011403, 0010749-50, 0010881-82, 0011050, 0010491).

44.    Due to Rabo AgriFinance's extensive knowledge of and experience in the actual and ongoing cost of feedyard gains, and its own independent inspection of Cliff Hanger's cattle, its direct and current knowledge of the actual Cliff Hanger cattle performance as stated in the July and August 2014 Cliff Hanger closeouts, and as a result of Michelle Stockett's interviews with three feedyard managers in charge of feeding the Cliff Hanger cattle, Rabo had actual knowledge that the cost of gain for the Cliff Hanger cattle would be $.80-$.90 per pound, with only a hope that the cost of gain would in the future drop into the 70s, (apparently based upon a hoped-for future drop in the cost of corn) (RAF0011673). Of course, the price of corn did not materially drop after October of 2014. By the time the Rabo loan funded, all the Rabo personnel involved knew that calculating the value of the cattle with a cost of gain that was less than actual would create an overvaluation of the Cliff Hanger cattle. Because of their specific knowledge of the actual cost of gain for the Cliff

Hanger cattle, throughout the life of the Cliff Hanger credit with Rabo, all Rabo personnel involved

could look at the cost of gain used in a Cliff Hanger borrowing base and quickly know that the

reported value of the Cliff Hanger cattle was materially overstated.

45.     With the approval of the Rabo AgriFinance Regional Credit Officer Jo Deckard, and

with the recommended approval by local Rabo credit committee, the Rabo loan to Cliff Hanger was

approved (RAF0010747-0010753). This loan funded on November 26, 2014 with Rabo paying off

the cattle financing loans Cliff Hanger had from Bar G, Dean Cluck Feedyard, and Barrett &

Crofoot.

46.     In conformance with the agreement and understanding of all parties that, after

receiving the initial 75% of market value transfer price as an advance, Waggoner Cattle would later

be paid in full with the distributions of Cliff Hanger equity from the proceeds of Cliff Hanger cattle

sales to Tyson. On November 26, 2014, by check no. 1001, Cliff Hanger paid Waggoner Cattle

$150,000 as a partial additional payment to the August 2014 transfer price which Cliff Hanger had

paid Waggoner Cattle. On December 1, 2014, Cliff Hanger issued check nos. 1002 - 1005 to

Waggoner Cattle, which made up for the difference between the transfer price paid at delivery to

the feedyards and the market value of the Waggoner Cattle calves transferred to Cliff Hanger in

August, September, October and November of 2014. In all, these checks totaled $1,167,738.25, and

brought the price Cliff Hanger paid for the Waggoner Cattle calves to market value (see "Running

Balance" spreadsheet, **Exhibit C**, attached). With these Cliff Hanger checks totaling $1,167,738.25,

Cliff Hanger paid the full price for the Waggoner Cattle calves which had been transferred to Cliff

Hanger between August and November of 2014. Rabo knew, understood and allowed these

payments to get Waggoner Cattle paid in full for the August-November 2014 shipments.

47.     The January 12, 2015 Rabo credit report (RAF0011261) noted year-to-date sales as of November 30, 2014 of $533,000 in net income, with November 2014 alone generating $250,000 in net income. Cliff Hanger's working capital was determined to be $15.4 million, and the borrowing base excess position was reported to have grown from $6.9 million as of October 31, 2014 to $8.1 million as of November 30 of 2014.

48.     In the February 9, 2015 Rabo credit report (RAF0010928), it was reported that Cliff Hanger had distributed $250,000 to Waggoner Cattle in January 2015 without prior Rabo AgriFinance approval. Cliff Hanger made another distribution to Waggoner Cattle in February 2015, which was approved by Rabo AgriFinance prior to its distribution. As was noted by Paul Strouhal and T.L. Wilson of Rabo (RAF0010930), the primary purpose of these two distributions was to pay down the Waggoner Cattle revolving line of credit with Lone Star Bank. This was in conformance with the Intercreditor Agreement's requirement that *before* Lone Star's first lien on the transferred cattle was subordinated to Rabo's lien, ***Waggoner Cattle had to be paid in full for the transferred cattle*** (Intercreditor Agreement, ¶ 2(a)). This Rabo report also noted that Quint Waggoner's sons, Tucker and Tyler, owned small percentages of the cattle in the feedyards from time to time.

**F.      Rabo Headquarters in Utrecht, Netherlands, Gives Notice That it Has "Reached the Limit of its Appetite" on Cliff Hanger. Any Additional Funds Will Have to Come from Some Other Lender.**

49.     In February 2015, the packer which had contracted to purchase all the Cliff Hanger cattle, Tyson, made a request of Cliff Hanger to defer all contracted deliveries for another 30 days (RAF0011188). Tyson requested this deferral of deliveries in order to increase the weight and improve the finish of the Cliff Hanger cattle before they were slaughtered (RAF001928). However, in order for Cliff Hanger to leave all its cattle on feed for 30 days longer than had been contracted would require an additional $5 million in funding. To accommodate Tyson's request to Cliff Hanger,

Cliff Hanger made the request to Rabo AgriFinance to increase its loan to Cliff Hanger from $35 million to $40 million. On February 19, 2015, the Rabo decision to loan the extra $5 million to Cliff Hanger was finally approved by Rabo's AD KRM at its headquarters in Utrecht, Netherlands. In accordance with the recommendations by AD KRM, the Chairman of the Board of Directors approved this additional $5 million loan, but noted that Rabo's "risk appetite" on the loan to Cliff Hanger had been reached with the additional $5 million loan. The decision by Chairman of the Board of Directors was confirmed in writing by Martin van Vaals and Robert Kuipers (RAF00110934-00110935; 0023206-0023207).

### i.      Rabo's Efforts to Syndicate the Troubled Cliff Hanger Loan Begins.

50.      With the notification from the Rabo Board of Directors that Rabo's "risk appetite" with Cliff Hanger had been reached (RAF0023206-0023207)  (and, therefore, Rabo would not further increase the amount of its loan to Cliff Hanger), on February 19, 2015, Curtis Schreiber, head of Loan Syndications for Rabo Bank, NA and Rabo AgriFinance, Inc. began working on a syndication strategy in order to sell part of this loan to other banks, thereby reducing Rabo AgriFinance's risk exposure on the Cliff Hanger loan (RAF0023205-0023206).

51.      In its April 21, 2015 credit report, Rabo noted that Cliff Hanger had requested an additional $250,000 be distributed from Cliff Hanger to Waggoner Cattle, as of April 14, 2015 (RAF0011188). This request was approved by Regional Credit Officer Jo Deckard. This April 14, 2015 $250,000 approved distribution brought the total Cliff Hanger distributions to Waggoner Cattle for year-to-date 2015 to $2 million, though that was $750,000 higher than what the Rabo Relationship Management previously understood and reported to their superiors at credit. These distributions were the distributions from Cliff Hanger to Waggoner Cattle, testified to by Quint Waggoner on May 31, 2018 as being payments for cattle (Depo Ex. 11, pp. 48-50, 77, 79-82, §341

testimony), and which DeNise Merritt was posting on her "Rabo Note Draws Spreadsheet" (RPharis_001083) as "draws". These "extra" payments for cattle were payments made in order to pay the full market value of the Waggoner Cattle calves which had been transferred to Cliff Hanger with the initial transfer price, or "advance", being only 75% of their market value. The April 21, 2015 Rabo credit memo did note that the January and March distributions from Cliff Hanger to Waggoner Cattle were made without credit approval, though Rabo required that the March distribution be paid back and proper approval sought. The April 21, 2015 credit report further noted that even though Cliff Hanger had distributed $2 million to Waggoner Cattle in year-to-date 2015 distributions, Cliff Hanger remained in compliance with the $12 million total net worth covenant. The Rabo Relationship Management Team recommended approval of a one time waiver of the $750,000 in distributions that occurred in January 2015 without Rabo approval. Rabo approved the waiver. Rabo was allowing Waggoner Cattle to be paid in full from proceeds of Cliff Hanger fat cattle sales, as had been agreed in the Intercreditor Agreement.

**G.**     **Rabo Becomes Increasingly Aware of the Many and Increasingly Serious Problems with the Loans to the Waggoner Entities**.

52.     In attachment C to the April 21, 2015 Rabo credit report (RAF0011196), it was noted that $1.5 million of these Cliff Hanger distributions to Waggoner Cattle were incorrectly posted or recorded as negative accounts payable (RAF0011196). Rabo was thereby on actual notice that the Cliff Hanger and Waggoner Cattle accountants were incorrectly posting inter-company transactions. Rabo loan officers were actually aware that Cliff Hanger was incorrectly posting some of the payments for cattle, from Cliff Hanger "draws" of capital, or "distributions", as short term loans.

53.     In June of 2015, Quint Waggoner and Rabo agreed that Rabo should finance all the cattle of Cliff Hanger and Waggoner Cattle, and the split financing arraignment with Lone Star should be ended (RAF0010881). Rabo was motivated to end the split financing arrangement largely

because it had realized that all the inter-company transactions made it difficult for either lender to

keep accurate track of its collateral, because the split financing structure of this credit hurt the ability

to sell off part of this credit into a syndication, because Rabo had become aware that the Waggoner

Entities' record keeping was poor, and because Quint Waggoner was largely ungovernable.

54.     By September 9, 2015, Rabo Senior Financial Analyst, Mark Perrier, was helping

Amy Logsdon, Rabo Credit Analyst, on a Cliff Hanger loan renewal. Mark Perrier noted that there

was a strong possibility that a syndication partner would be needed for the Cliff Hanger loan

(RAF0024005). Mark Perrier was stating that there was a Rabo desire to get rid of the Intercreditor

Agreement and the split financing on cattle, and bring all of the related Waggoner companies'

financing needs for cattle under Rabo AgriFinance. However, because the Rabo Utrecht

headquarters had determined in February of 2015 that it had already "reached its appetite" for this

credit at $40 million, Senior Financial Analyst, Mark Perrier, noted that the additional $12-$15

million needed to end the split financing and take out Lone Star's cattle loan would have to be

funded from syndication partners, as Rabo itself was unwilling to risk any additional funds on the

Cliff Hanger credit (RAF0024005). So, the Rabo officers knew that they had to somehow

"transform" the Cliff Hanger credit into something which appeared marketable in a syndication.

55.     On September 28, 2015, Rabo inspector, Michelle Stockett, conducted another

inspection of Cliff Hanger (RAF0011209 - 0011216). Prior to this inspection, it was determined that

it was necessary to determine how much Tucker and Tyler owed Cliff Hanger, and determine why

the August 2015 borrowing base had dropped from almost $4 million to approximately $1 million.

The August borrowing base was late, and was only submitted to Michelle Stockett on the morning

of the inspection. And, suspiciously, the borrowing base given to Michelle Stockett to conduct the

inspection was not even the borrowing base which Cliff Hanger actually submitted to Rabo.

Michelle Stockett knew that the cost of gain numbers used on this borrowing base were unrealistically low, and she knew that those low cost of gain numbers were causing the borrowing base to materially overstate the value of Cliff Hanger's cattle. With the known overstatement in the value of the Cliff Hanger cattle resulting from the known use of the falsely low cost of gain numbers (using 78¢ or 80¢ per pound), the Cliff Hanger cattle were overvalued on the "accepted" borrowing base by approximately $1.5 million, meaning that Rabo and Quint Waggoner both knew that, in reality, there was a deficit in the borrowing base. But, Rabo loan officers knew that if the official borrowing base stated the truth, that there was actually a deficit in the Cliff Hanger borrowing base, then the Cliff Hanger credit could not be sold into a syndication. Since the direction from above was to get the Cliff Hanger credit sold into a syndication, the Rabo personnel knew that they had to falsify the cost of gain, out weight and price assumptions in order to falsely make the borrowing base positive, in order to make syndication possible.

56.     Rabo continued to supply these falsified Cliff Hanger borrowing bases to Bart Schilling, with the intent to induce Lone Star to continue allowing its collateral to be transferred to Cliff Hanger for less than the value of those calves. Rabo also accepted the knowingly falsified borrowing bases to facilitate defrauding prospective syndicate partners into acquiring some of this loss, in order to reduce Rabo's likely loss on this credit.

57.     In its October 20, 2015 credit report (RAF0010590), Rabo again noted that there was a need to change the structure of the loan and remove the split financing structure with Lone Star. In addition to simplifying the loan structure and eliminating the split financing arrangement with Lone Star, as well as the need to add Tucker and Tyler Waggoner as co-borrowers, this October 20, 2015 Rabo credit report noted that there was a decrease of approximately $3 million from the prior month's borrowing base (RAF001059). This Rabo credit report further noted that Waggoner Cattle

and Circle W were financing Tucker and Tyler Waggoner's calf ranch cattle, and that the related

Waggoner companies were financing $3 million of Tucker and Tyler's cattle. The credit report also

noted that Bugtussle purchased an adjacent 312 acre farm in August 2015 for approximately

$700,000. Rabo knew that the origin of those funds was Rabo's loans to Cliff Hanger. The report

went on to note that Bugtussle was adding calf ranch improvements. Rabo was fully aware that Rabo

loan funds were being used for Bugtussle capital expenditures.

58.     On November 2, 2015, Rabo Regional Vice President Bill Clune, told Senior

Financial Analyst Mark Perrier, that Mark needed to address the Cliff Hanger borrowing base issues,

and explain in detail how the borrowing base problems could be cured before further efforts were

made to syndicate this credit with its increasing problems (RAF0024040). Regional Vice President

Bill Clune, noted that the borrowing base problems needed to be fixed first, before additional funds

were sought. Disclosure of the existing truth about the Cliff Hanger credit made it unmarketable in

a syndication.

59.     On November 9, 2015, Rabo Managing Director and Senior Vice President of Rabo's

Plains Territory, Van Dewey, noted his unfavorable impression of the Cliff Hanger credit

(RAF0024092). Van Dewey noted that, even if this credit was converted into a more favorable

structure, and even if Cliff Hanger could comfortably margin a large line of credit, he was not in

favor of ever expanding Rabo's risk beyond $40 million. Senior Vice President Van Dewey stated

to Matt Wilson, copying Regional Vice President Bill Clune, that he was very concerned about this

credit. Van Dewey also noted that, in addition to the $39.6 million owed to Rabo, and the $11.5

million owed to Lone Star, over the previous two months, Cliff Hanger had started financing (rather

than paying) the feed bills which were accruing with the feedyards on the Cliff Hanger cattle. As

of November 11 of 2015, in two or so months, those unpaid feed bills had grown to at least $4

million. This was a very serious problem for Rabo, as the feedyards thereby had agister's lien-secured debts against the Cliff Hanger cattle for those sums, and those agister's liens primed Rabo's lien.  However, Vice President Van Dewey, despite having noted his unfavorable impression of the Cliff Hanger loan and his concerns about it, did mention Bank of the West as a potential syndicate partner. Senior Vice President Van Dewey, and Rabo wished to sell off part of this bad credit in order to reduce the size of Rabo's probable losses on this credit, which losses were increasingly becoming more likely. Van Dewey's desire was to shift a portion of the looming Rabo loss onto one or more syndication partners. Of course, by this point in time, if the truth about the known facts of the Cliff Hanger credit were disclosed to a proposed syndication partner, no proposed syndication partner would buy any part of the credit. Van Dewey noted that he did not believe that Rabo could persuade any other bank to join in the participation until Rabo was able to get the credit better structured, reduce the leverage, and get the working capital back to a reasonable level (RAF0024092). In the hope that Rabo could shift some of the looming loss onto some other lender, Rabo then proceeded to try to put some "window dressing" on this credit and make this Cliff Hanger credit "look better" in a syndication offering, to increase its "saleability".

60.     On November 12, 2015, the Rabo credit report noted a borrowing base deficit of $446,000 as of September 30, 2015, and requested a waiver (RAF0010879). (However, the "filed" borrowing base for September 30, 2015, as emailed from Paul Strouhal to Bart Schilling on December 16, 2015, after the Rabo credit report was issued, was manipulated to show $3,428,909 (LSSB 12069-12080).) Thus, by this point in time, many Rabo loan officers were actually aware that the borrowing base reports were falsified and, as was later claimed by DeNise Merritt, those Rabo loan officers were complicit in creating those false borrowing base reports. The November 12, 2015 Credit Report went on to note that the audit for FYE 2015 reported an increase in the related party

accounts receivable (mostly Tucker w/Tyler) of $3,170,00.00, which was $920,000.00 over the approved amount. As of September 30, 2015, the related party receivable had increased by $3,700,000.00 on FYE 2015.The report noted that to regain its "4-Good" rating, the Cliff Hanger credit needed to show a $+2 million borrowing rate excess, and elimination of the split financing with Lone Star. The report also noted that Cliff Hanger had started to finance  its feed bills with the feedyards, rather than pay the feed bills. These feed bills not only represented a sudden large increase in Cliff Hanger liabilities, these unpaid feed bills constituted an agister's lien against Cliff Hanger's cattle that primed Rabo's lien. This also meant that the feedyards were allowing Cliff Hanger to take equity out of its cattle inventory, financing the feed costs by allowing the creation of an agister's lien against the remaining cattle. Despite these increasing serious warnings, Rabo wanted to sell off part of the troubled credit to a syndication partner. A 45-day extension was requested in order to try to get in one or more syndication partners. The November 2, 2015 Credit Report also stated that Cliff Hanger had loaned $700,000.00 to Bugtussle so it could buy an adjoining farm, with the money originating from a loan from Rabo, even though Rabo did not then receive a security interest in that farm (RAF0010881). The Rabo Executive Board expressed its displeasure with the Cliff Hanger credit, but nevertheless urged the local Rabo lenders to get a syndication partner in to lower Rabo's exposure.

61.     On November 20, 2015 , Brian Newcomer, Executive Vice President of Business Development, notified Van Dewey and Curtis Schreiber that the Cliff Hanger "deal" had been approved subject to Rabo being able to put together a syndication.  Apparently, the "deal" was to raise additional funds from syndication partners to refinance the Cliff Hanger credit and pay off Lone Star's cattle loans, so that the syndication partners would have a lien on all cattle, from the day olds at the calf ranch through the finished cattle in the feedyards. It also appears that one of the goals

in the planned syndication was to reduce Rabo's total exposure on the Cliff Hanger's credit by having syndication partners purchase part of Rabo's existing loan to Cliff Hanger (RAF0024132).

62.    On December 7-9, 2015, Michelle Stockett and  David Umbarger of the Rabo AgriFinance Agricultural Field and Collateral Inspection Department conducted another collateral inspection. This inspection report noted that Tucker and Tyler Waggoner had been added as borrowers, and that Rabo was working to finance the entire Waggoner relationship along with a syndicated partner. Michelle Stockett noted that the current structure of the Cliff Hanger credit was weak. Michelle Stockett also noted that a new borrowing base reporting template was being developed to improve overall reporting. This report noted that there were 58,336 head in total inventory, with 31,686 attributable to Cliff Hanger in the feedyards, 14,219 at the Waggoner Cattle calf ranch, and 12,431 owned by Tucker and Tyler. In this report, Michelle Stockett noted that Cliff Hanger management stated that the overall cost of gain to raise a calf from day old to finish would be approximately $.86. That number was the truth. However, despite this knowledge of the actual cost, the Rabo inspectors used $.80, apparently to create a "better looking" result for a prospective syndication partner, and to be comparable to the September 30, 2015 calculation. This six cent understatement in the cost of gain created a material misstatement in the value of the cattle ... and all the Rabo personnel involved knew it.

63.    During this December 7-9, 2015 inspection, the Rabo inspectors learned that feedyards which had the Cliff Hanger cattle had not been holding out the final feed bills on the cattle which had shipped since August. Additionally, the inspectors learned that Cliff Hanger's feed bills which had accrued since August 2015 had not been paid. Apparently, Cliff Hanger management had not told Rabo of this new, multimillion dollar liability. This meant that between August and December of 2015 there had been a large increase in Cliff Hanger's indebtedness to the feedyards,

which debt would be secured by an agister's lien in front of Rabo's lien. This report noted the Cliff Hanger owed the feedyards $9,194,000, and that Tucker and Tyler owed the feedyards an additional $4,782,000. Yet, Rabo's efforts to syndicate continued.

64.     In Rabo's December 15, 2015 Request for Loan Documents, it was noted that, although Rabo was financing the millions of dollars of cattle "held" by Tucker and Tyler, Rabo had no liens against these cattle. The Amarillo Rabo loan officers anticipated that Rabo management would require $12-15 million of the Cliff Hanger loan to be sold to other banks through a syndication, so, despite Rabo's knowledge of the many serious problems with the Cliff Hanger credit, the Rabo Syndications group was engaged to proceed to attempt to process a syndication (RAF0024790). On December 23, 2015, Paul Strouhal decided that Rabo needed to find new syndication partners "ASAP" (RAF 0024624). Obviously, Rabo personnel were under pressure from Rabo management to "do whatever it takes" to get the Cliff Hanger loan sold to new syndicate partners. That could not get done with full disclosure of the known facts about the Cliff Hanger credit.

65.     On December 12, 2015, Rabo Regional Vice President Bill Clune, emailed Rabo Managing Director and Senior Vice President Van Dewey, the he (Bill Clune) considered the structure of the lending to the Waggoner Entities "a cluster", meaning, "a cluster ****". Bill Clune noted the difficulty in tracking and monitoring the credit, the fact that the accounting was not current, and that the size of the credit was too large for the available equity. Bill Clune also questioned the ability of the Waggoner Entities to transition from a business plan of taking Holsteins through the feedyards with forward contracting when the Holsteins were placed in the feedyards, to a business plan of taking pee wee beef calves to finish with some sort of hedging price protection

(RAF0624657). Yet, Bill Clune understood the management directive: do what it takes to get this credit sold down to syndicate partners.

66.     In his February 2, 2015 email to Paul Strouhal and Amy Hodgson (RAF0025076), Luke McCarthy, Vice President of Loan Syndications for Rabo Bank, N.A. and Rabo AgriFinance, set out their plan to get the Cliff Hanger credit syndicated. Paul Strouhal was to contact UMB Bank, TLMA National Finance Credit Corp., Lone Star, and First Capital, to try to promote (or induce) them into buying $10-20 million of the syndication. In order to get the credit where it would be even presentable to potential syndicate partners, the loan could not be sold with existing loan covenants being violated. Since the Rabo officers realized that there was no way that the Cliff Hanger credit could be brought into loan covenant compliance in the foreseeable future, they would have to "water down" and rewrite the covenants to whatever was required to make the covenants attainable. Amy Hodgson was to go over the December 31, 2015 financial statements when they were completed, and then prepare loan covenants which could be met by those financials. Since Cliff Hanger could not meet the existing loan covenants, and a credit with existing loan covenant violations was not marketable into a syndication, in order to get this credit sold in a syndication, Rabo had decided to rewrite the covenants to whatever terms were necessary for Cliff Hanger to be in compliance. In accordance with Rabo's plan on how to get the Cliff Hanger credit sold into a syndication (to reduce the size of Rabo's anticipated loss on this credit), Paul Strouhal called Shean Inglis at UMB Bank, and induced Mr. Inglis to take a look (RAF0025120). Pursuant to the Rabo plan, Vice President Luke McCarthy, called Intrust Bank, and induced their interest in a syndication. *Id*. As of February 11, 2016, Rabo had not yet received the December 31, 2015 financial statements, but as soon as they were received, Amy Hodgson was to write some loan covenants which could be met with the December 31, 2015 reported numbers. Because a credit with existing loan covenant violations (of

which Cliff Hanger had many long-standing and serious violations) was unmarketable, Rabo

decided to "cure" the loan covenant marketability problem by "writing down" the covenants to

whatever the Waggoner Entities' financial records could "pass".

67.    On April 18, 2016, Paul Strouhal and Amy Hodgson wrote an internal memo to

Executive Vice President Curt Hudnett, and to Managing Director and Senior Vice President Van

Dewey, regarding the Cliff Hanger credit, and efforts to get Rabo's exposure on this credit reduced

with a syndication (RAF0016809 - 0016880). Strouhal and Hodgson were seeking Senior

Management feedback on how to deal with the many loan covenant violations and requests for

extensions of the maturity date, while trying to get the credit syndicated. Strouhal and Hodgson

noted the following problems with the credit which Rabo was trying to syndicate:

    a.    Even after adding Tucker and Tyler as borrowers, and obtaining a lien on

their cattle, Cliff Hanger's borrowing base and collateral margins were "tight". The

borrowing base of February 29, 2016 was only $208,000 (even though the loan covenant

required $15 million of Tangible Net Worth, and a positive borrowing base) (RAF0000497,

Ex. B, p. 6).

    b.    If Waggoner Cattle was added into a consolidated borrowing base, the

combined "excess" would be a negative $3.4 million. Strouhal and Hodgson attributed this

negative position to:

        (1)    $1.6 million in year-to-date inter-company transfers to Bugtussle for
               capital expenditures;

        (2)    tightening cattle margins (the live cattle market had then dropped by
               $33/cwt from November 26, 2014);

        (3)    likely imbedded losses in the existing cattle inventory; and

        (4)    growth of inventory exceeding what the Waggoner Entities' balance
               sheets (i.e., equity) could support.

c.      Cliff Hanger's cash flow and Rabo's loan had always been used to support

the operations of Waggoner Cattle, Circle W and Bugtussle, and to finance Tucker and

Tyler.

d.      The internally-prepared financials did not differentiate between accounts

receivable (i.e., inter-company loans) and "draws" or distributions of equity out of Cliff

Hanger and back to Waggoner Cattle, Bugtussle and Circle W (RAF0016869).

e.      The loan covenants were in serious default, and the ability of the Waggoner

Entities to come into compliance in the foreseeable future was not expected.

f.      Quint Waggoner had defied the loan agreements' requirement of advance

approval of millions of dollars of Cliff Hanger distributions. Quint Waggoner was just not

coachable or controllable.

68.     The recommendation of Strouhal and Hodgson to senior management, Executive

Vice President Curt Hudnett and Senior Vice President Van Dewey, was to (a) syndicate the loan,

(b) have Rabo take over all cattle financing for the Waggoner Entities with the money raised from

a syndication, and pay off Lone Star's cattle loans, (c) get Lone Star to provide the Waggoner

Entities a $5.5 million term loan on the real estate, which would inject $3 million into working

capital, (d) reduce cattle inventory immediately and sell off 3,518 head of beef cattle then on

pasture, and others, until 4,000-5,000 head had been sold, (e) extend maturity to December 1, 2016

to continue to try to sell the syndication, and (f) just eliminate the total net worth and distribution

covenants, since they simply could not be met (RAF0016869 - 0016880).

69.     On the next day, April 19, 2016, Rabo presented the syndication agreement/proposal

to Quint Waggoner and the Waggoner Entities (RAF0016865 - 0016867).

70.     On April 20, 2016, Paul Strouhal sought the advice of Senior Vice President Van Dewey, and Executive Vice President Curt Hudnett, on how to submit the Cliff Hanger financials to RACC with all the many covenant violations and tight liquidity, while moving forward with an attempt to syndicate this troubled credit (RAF0025260). Obviously, those Rabo loan officers who were trying to sell the Cliff Hanger credit into a syndication would have to be "very economical with the truth" if they were to have any hope of getting a sale.

71.     On April 21, 2016, while Rabo was trying to syndicate the Rabo credit, and induce other banks to buy some of Rabo's exposure, Managing Director and Senior Vice President Van Dewey, exchanged emails with Executive Vice President and Chief Commercial Officer Curt Hudnett, where both admitted that they were each scared of the Cliff Hanger credit, and that they needed to get the borrower, Quint Waggoner, "well under control" (RAF0025259). Of course, the reason they wanted to sell of some of the Rabo exposure on the Cliff Hanger credit is because they were scared of it.

72.     On April 29, 2016, a Request for Loan Documents was submitted, where the maturity date of the loan was being extended in the hope of allowing some time to sell this troubled credit into a syndication, and to "dumb down" the loan covenants by eliminating the loan covenant requiring a minimum of $12.6 million in tangible net worth, since that requirement simply could not be met. Rabo was eliminating or lowering the loan covenants so that the Cliff Hanger credit could be marketed in a syndication with no existing loan covenant violations. In effect, in an effort to sell some of its likely loss on this credit, Rabo was "dumbing down" or "lowering the bar" on loan covenants in an attempt to pass off a "passing grade" for a very troubled credit.

73.     In the May 10-13, 2016 Collateral Review Report by Michelle Stockett to Paul Strouhal, Kasi Jansten, Amy Hodgson, Vice President Bill Clune, Vice President Van Dewey,

Regional Credit Officer Jo Deckard and Vice President Charlie Pointer (RAF00011227 - 0011236), Michelle Stockett reported the following problems with the Cliff Hanger credit and collateral:

      a.      Though there was a split financing credit structure, there was no clear title distinction between the Waggoner Cattle calves and the Cliff Hanger cattle;

      b.      Incredibly, despite the fact that by then Rabo had a lien on Tucker and Tyler's cattle, proceeds of the sales of Tucker and Tyler's cattle were being paid to Tucker and Tyler's personal accounts, rather than to one or the other of the lenders;

      c.      Michelle Stockett could not verify the documentation, noting that the "information risk" on the Cliff Hanger credit was very high;

      d.      On the borrowing base, the projected out weight of the cattle had been unjustifiably increased by 75 pounds, from 1,350# to 1,425#. Inspector, Michelle Stockett, listed the out weights of 31 lots of Holsteins which had closed out between January 2 and May 10, 2016. The average out weight was 1,266 pounds. They all knew the borrowing base grossly overstated the value of the collateral with exaggerated weights. They all knew that the borrowing bases were fraudulent, based on false weights;

      e.      Cliff Hanger did not have in place adequate employees needed to properly keep the accounting records on a $42 million loan;

      f.      Cliff Hanger was not following the Credit Agreement's terms on transfer pricing;

      g.      The Cliff Hanger checks written to Waggoner Cattle had no description of what was being paid for. In March of 2016 alone, Cliff Hanger had written $2,045,000 in checks to Waggoner Cattle, but the inspector could only find $906,000 of cattle which had been transferred to Cliff Hanger;

h.      The Cliff Hanger cattle in the feedyards were losing money because of poor performance, but this poor performance was not being allowed for in valuing the collateral, which increased the overstatement of the value of the cattle. They all knew that these borrowing bases were fraudulent by overstating performance;

i.      The Cliff Hanger cattle shipped to the packer from Barrett & Crofoot were being shipped too light, and not fully finished. The Barrett & Crofoot feedyard manager attributed this to Quint Waggoner placing those calves in the feedyard at too light a weight, which was resulting in the sales price being docked by $3 per cwt, or approximately $37.00 per head. They all knew these borrowing bases were fraudulent by overstating the prices being received after grading;

j.      Michelle Stockett did not receive all the information she requested, and because the accounting staff was located in Dimmitt, Abilene and Austin, getting information was difficult;

k.      The components of the borrowing base did not reconcile with the accounting detail, general ledger and financial statements. And, those records were only partially provided to Michelle Stockett. These facts strongly inferred that the borrowing bases had been materially falsified;

l.      There was significant tension in Michelle Stockett's communications with DeNise Merritt;

m.      The actual cost of gain numbers in the feedyard close outs were materially higher than the cost of gain numbers being used on the borrowing base. Of the 31 lots of Holstein cattle closeouts which were examined by Michelle Stockett, the average cost of gain was $93.99/cwt , while the borrowing base which Rabo allowed and accepted used a

$.72 cost of gain and an average daily gain of 3 pounds per day, while the actual average daily gain was only 2.47 pounds per day. If an $.85 cost of gain for Holsteins and an $.80 cost of gain for beef cattle had been used, there would have been a $3,128,726 reduction in the stated value of the Cliff Hanger cattle. HOWEVER, even though Michelle Stockett told these Rabo loan officers — in writing — that the Cliff Hanger borrowing base was overstated by more than $3 million *just on the understated cost of gain*, Rabo management continued to use — and publish, the knowingly falsified borrowing base;

n.     Because cattle were being shipped to the packer from so many lots,[7] it took lots more than a month to close out. Lots were not being paid for until lots closed out, so it often took more than a month for Cliff Hanger to collect the money from a given lot from the time of first sales out of a given lot. And, these transactions were not properly accounted for;

o.     Tucker's and Tyler's receivables from the packer could not be verified. The Abilene staff, Quint Waggoner and DeNise Merritt each gave different answers to what was going on with Tucker and Tyler's packer receivables. The feedyards were paying Tucker and Tyler, but the stories and accounting records were unclear and contradictory over what happened to that money. All those packer proceeds should have been remitted to Cliff Hanger to pay down the Rabo loan (RAF0011234).

74.     By August 11, 2016, Rabo Regional Manager Gretchen White, was involved in email discussions with Paul Strouhal and Jo Deckard about bringing in a Rabo special assets manager to

---

[7] Because the Cliff Hanger cattle were placed on feed too light, and contracted for delivery too soon, before they were heavy enough and finished enough to meet quality specs, the feedyards were going through the many lots trying to find the heaviest cattle they could from every lot, in order to make the shipments of cattle to the packer as heavy as possible.

assist in handling the troubled Cliff Hanger credit, *while still trying to sell this Special Assets Level Credit into syndication* (RAF0017651). Amazing.

75.     On September 12, 2016, a month after Special Assets help was requested, Gretchen White was emailing Jeanne Scharf, Paul Strouhal and Ben Carpenter that Rabo was still seeking to get a capital infusion from Lone Star, and sell off to syndication partners part of the Cliff Hanger credit, in order to reduce Rabo's exposure on this very troubled credit. Gretchen White and Paul Strouhal had been discussing how to create borrowing bases that "looked better" so Rabo could attempt to syndicate the Cliff Hanger loans. This "tight" borrowing base problem was "solved" by instructing and knowingly using fraudulently low cost of gain numbers, fraudulently high "current weights", and fraudulently high "sales price" numbers for the Cliff Hanger cattle when sold. Rabo instructed, and knowingly approved, the use of "contract prices" in the cost to finish calculations within the borrowing bases, even though they all knew that Tyson was actually discounting from the contract price for many of the cattle, because most of the Cliff Hanger cattle were not adequately finished, and many did not grade out properly (RAF0018033).

76.     On September 19, 2016, more than a month after Special Assets help was requested, Paul Strouhal and Ben Carpenter wrote an email to Jeanne Scharf, Jo Deckard and Gretchen White regarding how to keep the Cliff Hanger credit's "head above water" while trying to reduce Rabo's probable loss on this credit by selling the credit into a syndication. RACC had instructed the Rabo loan officers to try to get Rabo's $42 million exposure down to $20 million (RAF0018035). Paul Strouhal and Ben Carpenter noted the improbability of getting a syndication partner into the Cliff Hanger credit with the current borrowing base certificate. Strouhal and Carpenter also stated that the existing structure of the credit was unmarketable. Incredibly, efforts to sell the troubled Cliff

Hanger credit into a syndication continued. The four prospective syndication partners which Rabo had identified to solicit were Bank of the West, Intrust, Bank of America and Agri-Access.

77.     In the October 24-27, 2016 Collateral Review Report, Michelle Stockett reported to Paul Strouhal, Kasi Janssen, Ben Carpenter, Gretchen White, Mark Perrier, Senior Vice President Van Dewey, Regional Credit Officer Jo Deckard and Special Assets Manager Roger Becker, the following problems with the Cliff Hanger credit:

a.      In the borrowing base reports, there were *still* significant differences between the submitted cost of gain numbers and actual cost of gain numbers, meaning that the borrowing bases published to Bart Schilling continued to contain fraudulently high cattle values, and *all the Rabo personnel knew it*, even at the Senior Vice President level. It was obvious to the inspector that the cost of gain numbers used in the borrowing base were being falsely and deliberately lowered for the purpose of hiding the truth: a negative borrowing base;

b.      Quint Waggoner was loaning money from Cliff Hanger to his other entities, noting $1,053,250 in Cliff Hanger loans to Circle W in August of 2016 alone. Michelle Stockett could not verify why the Cliff Hanger money was transferred to Circle W when the accounts payable/receivable records were examined;[8]

c.      The business model was not profitable;

d.      Cliff Hanger continued to fail to produce timely and accurate borrowing base reports;

e.      The borrowing base report needed to be adjusted down by $3,189,000;

---

[8] In his May 24, 2019 deposition, Quint Waggoner's cousin, Russell Pharis, CPA, acknowledged that Quint Waggoner was moving money among the Waggoner Entities as needed, without regard to which lender had a lien on what (RPharis, pp. 100-106).

f.      In marking to market the corn commodity swaps, there was a $751,000 loss;

g.      For the August borrowing base, out weights for all cattle used 1,425 pounds. This weight was knowingly materially overstated, *and they all knew it*;

h.      For the August borrowing base, the cost of gain used was $.62 for Holsteins and $.60 for beef cattle. These numbers were grossly less than actual, causing the value of the cattle to be grossly overstated by millions of dollars, *and they all knew it*;

i.      **Even though** in her report, Michelle Stockett carefully, clearly and specifically stated the actual out weights, the actual cost of gain and the actual average daily gain to the many Rabo loan officers and vice presidents, *the Rabo loan officers nonetheless directed that cost of gain numbers which were materially lower than actual would continue to be used*. The Rabo loan officers wished to have Waggoner Cattle continue to transfer calves to Cliff Hanger for no payment, or for less than their fair market value, in order for Rabo to assert a lien on Lone Star's collateral.[9] In order for Rabo to continue to successfully convert Lone Star's collateral, Bart Schilling had to continue to receive and rely upon the Cliff Hanger falsified borrowing bases. In order for Cliff Hanger to continue to obtain Waggoner Cattle calves for no payment, or for payments of less than market value:

(1)      Rabo continued to instruct, use and publish Cliff Hanger borrowing base reports which had falsely inflated values of the cattle;

(2)      Rabo needed to induce potential syndicate partners to buy into the Cliff Hanger loan to reduce Rabo's ultimate, and now inevitable, loss on the Cliff Hanger credit; and

---

[9] Rabo Regional Credit Officer Jo Deckard admitted that was Rabo's intent in her November 8 (RAF0018591) and November 9 (RAF0026085), 2016 emails to Jeanne Scharf and Roger Becker.

(3)     Rabo and Cliff Hanger had to avoid the creation of a truthful

borrowing base, which would show a negative borrowing base value, because the

submission of a truthful borrowing base -- showing negative numbers -- would result

in an immediate shut down of the credit, which would forever prevent any

syndication, and stop the transfer of Lone Star's collateral to Cliff Hanger for no

payment, or less than market value payments.

78.     On November 7, 2016, DeNise Merritt, CPA submitted to Paul Strouhal a

consolidated borrowing base report (RAF0003876-0003877). DeNise Merritt had just received

Moseley & Riddle's FYE 2016 audit adjustments, which combined Tucker and Tyler with Cliff

Hanger. This draft borrowing base report showed a negative $2,652,150 (RAF0003877). On the

morning of November 8, 2016, Paul Strouhal called DeNise Merritt to say that he (Paul) had made

adjustments to that borrowing base and, after Paul's adjustments, it then showed $87,000 positive.

Paul Strouhal instructed DeNise Merritt to send that altered borrowing base back to Paul Strouhal

in an email, saying that Quint Waggoner would send a signature page. DeNise Merritt refused to

transmit the falsified borrowing base as Paul Strouhal had instructed. DeNise Merritt stated in

writing, "I told him [Paul Strouhal] I was not going to lose my [CPA] license over this." (LSSB

007712). Paul Strouhal falsified this borrowing base by inserting cost of gain numbers of $.60 for

beef cattle and $.62 for Holsteins, when all the Rabo loan officers and inspector, Michelle Stockett,

knew those numbers were unrealistically low, and all the Rabo loan officers and inspector knew

those falsely low cost of gain numbers created a materially falsified over valuation of the Cliff

Hanger cattle. Quint Waggoner confirmed this event in his deposition and testified that, throughout

the relationship, Rabo directed the cost of gain numbers which were to be used in the submitted

borrowing bases (pp. 155-157).

79.     This falsified borrowing base of Cliff Hanger was being instructed and published by Rabo, with knowledge of many Rabo loan officers and vice presidents, and the Rabo collateral inspector, Michelle Stockett, because Rabo was knowingly and deliberately converting Lone Star's collateral, and Rabo needed to continue to deceive Bart Schilling in order to convert Lone Star's collateral. As Rabo Regional Credit Officer Jo Deckard emailed to Jeanne Scharf at 5:08 p.m. on November 8, 2016:

> "Paul will walk me the steps to get all the cattle under RAF and regain our equity that was leaked out ...." (RAF0018591).

— and —

Jo Deckard emailed to Jeanne Scharf and Roger Becker at 3:04 p.m. on November 9, 2016:

> "... If in fact, as the most recent BB comments noted, RAF does capture all the cattle under our RLOC (revolving line of credit), RAF will regain the "leaked" equity. I will watch and see. ..." (RAF0026086)

80.     On November 9, 2016, auditor, Rita Moseley, CPA, emailed to Paul Strouhal draft consolidated financial statements for Waggoner Cattle, which showed that the Waggoner Entities were out of compliance with loan covenants. Of course, Rabo had long known that fact. Rita Moseley inquired whether Rabo would waive those loan covenant violations (RAF003891). Paul Strouhal responded to Rita Moseley that he would seek Rabo approval to waive those loan covenant violations (RAF0003899). On November 11, 2016, Paul Strouhal notified Rita Moseley by email that Rabo AgriFinance was working on a waiver plan (RAF0003909).

81.     On November 21, 2016, Paul Strouhal sent an email to Rita Moseley where he stated that the "forbearance plan" for Cliff Hanger was:

    a.     for Lone Star to refinance a portion of the Waggoner Cattle debt into a term real estate loan, and to finance the purchase of the Great Plains feedyard;

     b.     Cliff Hanger would use its loan availability on the Rabo loan to pay off Lone Star's cattle note;

     c.     Rabo would acquire a first lien on all the cattle of Waggoner Cattle and Cliff Hanger;

     d.     maturity of the Rabo loan to Cliff Hanger would be extended to January 15, 2017; and

     e.     a forbearance letter from Rabo should be forthcoming.

82.     These statements by Paul Strouhal were knowingly false. The many internal Rabo reports and emails show that Rabo at Utrecht had long ago stated that Rabo had reached its "appetite" at $40 million, and any additional funding would have to come from a syndication. By November 9, 2016, Paul Strouhal knew a syndication was impossible. By November 21, 2016, Paul Strouhal knew Rabo would not loan any more of its own money to take out the Lone Star cattle loan, or to finance the Great Plains Feedyard purchase (RAF0003943).

83.     Though Waggoner Cattle ceased delivering cattle to Cliff Hanger on November 9, 2016, and Rabo terminated the lending arrangement with Cliff Hanger and refused to allow the purchase of the Great Plains Feedyard to close on November 30, 2016 (thereby causing Bugtussle to forfeit its $500,000 escrow deposit), Lone Star was not notified of any particular problem with the Waggoner Entities' financial matters until December 29, 2016. The Lone Star borrowing base for December 31, 2016 inexplicably had millions of dollars of receivables "disappear," and reflected huge reductions in total cattle inventory. In December of 2016, Lone Star's borrowing base value inexplicably went from $12,410,661.45 to $2,227,506.00. In that same period, the value of the receivables on Lone Star's borrowing base went from $7,461,045.00 to $265,000.00. Moseley & Riddle, CPAs were questioned by Lone Star about "what happened?". They were unable or

unwilling to explain beyond stating that adjusting entries were made. Quint Waggoner also blamed errors by his accountants as the cause of the problem, particularly in regard to the stated receivables from his sons, Tucker Waggoner and Tyler Waggoner. Quint Waggoner blamed Moseley & Riddle for not previously noting and bringing to his attention the errors and misstatements in the Waggoner Entities' financial statements, accounting records, and borrowing base certificates.

84.    It is now very obvious that a great deal of the information and representations in the borrowing base reports, the audit reports, the compilations, and in the accounting records of the Waggoner Entities, all of which was reasonably relied upon by Lone Star, were grossly incorrect, and Rabo participated with the Waggoner Entities in publishing false financial information regarding Cliff Hanger. Accordingly, all statutes of limitations in this case should be tolled so as to not to begin to accrue until Lone Star actually discovered the underlying claims and causes of action.

85.    Quint Waggoner and the Waggoner Entities conspired with Rabo and many of its officers to submit falsified borrowing base certificates to Lone Star. The objects of this conspiracy were: (1) to induce Lone Star to continue to allow Waggoner Cattle calves to be transferred to Cliff Hanger for no payment, or for less than full payment, so Rabo could reduce its losses on the Cliff Hanger credit by converting Lone Star's collateral, (2) to make it possible for Rabo to defraud syndicate partners into buying an interest in the Cliff Hanger credit, in order to reduce Rabo's ultimate loss on this credit, (3) to avoid an immediate shut down of the Cliff Hanger credit which would occur automatically if a negative borrowing base was submitted, and (4) especially for Quint Waggoner, to keep the Cliff Hanger business alive so Quint Waggoner/Bugtussle could close on the purchase of the Great Plains Feedyard.

H.    **False Assurances by Rabo to Lone Star.**

86.    In May of 2016, Bart Schilling met in Amarillo with Rabo representatives to discus

Bugtussle buying the Great Plains Feedyard. Rabo was in favor of this purchase, but wished to

postpone the closing to the fall of 2016. It is now known that the reason for the delay was Rabo's

desire to try to sell off part of its looming loan loss to a syndication, because Rabo Utrecht had

determined that Rabo would not put any more money into this credit. Rabo representatives,

however, told Bart Schilling that Rabo would take out Lone Star's cattle loan. Bart Schilling

believed that falsehood, to Lone Star's detriment.

87.    Several times in the fall of 2016, even in November of 2016, Bart Schilling asked

Paul Strouhal if the purchase of the Great Plains Feedyard was going to go through, and if Rabo was

going to take out Lone Star's cattle loan. Though Paul Strouhal knew neither were true, Paul

Strouhal assured Bart Schilling that both were going to occur. Believing Paul Strouhal, Bart

Schilling took no action to stop the transfer of Waggoner Cattle calves to Cliff Hanger, instead

believing that in a few days, the feedyard purchase would close, and Lone Star's cattle loan would

be paid off by Rabo.

I.    **Lone Star Forbearance Agreement.**

88.    After Rabo shut down the Cliff Hanger credit in late November of 2016, Waggoner

Cattle's loans to Lone Star became past due and in default. Lone Star and Waggoner Cattle entered

into a Forbearance Agreement, effective June 1, 2017. Under the terms of the Forbearance

Agreement, Lone Star ratified its perfected security interests in:

       a.     cattle and farm products;

       b.     equipment;

       c.     receivables;

       d.     inventory;

e.      accounts;

f.      hedge accounts;

g.      real estate;

h.      life insurance;

i.      general intangibles;

j.      an aircraft;

k.      all Waggoner Cattle's claims, causes of action, and all choses in action, including all claims which Waggoner Cattle has against Rabo and Cliff Hanger; and

l.      proceeds.

**J.      Contrary to the Terms of the Intercreditor Agreement, Waggoner Cattle Calves Were Transferred to Cliff Hanger Without Full Payment.**

89.      Beginning on or about November 25, 2014 and through 2017, Cliff Hanger obtained possession of cattle of Waggoner Cattle without paying the full price of the cattle to Waggoner Cattle. Approximately $10.8 million of Waggoner Cattle calves were transferred to Cliff Hanger with no payment at all, more Waggoner Cattle calves were transferred to Cliff Hanger for less than their market value, and approximately $3 million of Waggoner Cattle calves were transferred to Cliff Hanger via offsets involving Tucker Waggoner and Tyler Waggoner receivables. (See "Running Balance" spreadsheet, attached as **Exhibit C**.)

90.      Accordingly, many millions of dollars' worth of Waggoner Cattle calves were transferred to Cliff Hanger without Waggoner Cattle receiving: (1) full payment, (2) market value, (3) the amount owed, or (4) a reasonably equivalent value, in exchange for the transfers.

91.      Pursuant to the express terms of the Intercreditor Agreement, Rabo knew that Cliff Hanger had to pay Waggoner Cattle in full for the cattle sold to Cliff Hanger by Waggoner Cattle, or else Lone Star's perfected lien on those cattle and proceeds would not be released or subordinated, and the transferred cattle and their proceeds would not become collateral of Rabo.

When Cliff Hanger did not pay for the cattle, or did not pay full value for the Waggoner Cattle calves, Rabo's security interest in the transferred cattle never attached and, at all times pertinent, Lone Star's prior perfected first lien status and lien as to the transferred cattle and their proceeds remained, and was not subordinated to any lien claim of Rabo. In the alternative, when Cliff Hanger did not pay, or did not pay in full, for the Waggoner Cattle calves, Rabo's lien remained junior to Lone Star's perfected and unsubordinated first lien against the transferred cattle and their proceeds. When Cliff Hanger did not pay Waggoner Cattle for the cattle, or did not pay full value for the transferred cattle, and then transferred proceeds from the re-sale of the same cattle to Rabo when the cattle finished, Lone Star's perfected first lien as to those cattle and their proceeds remained. The cattle were transferred to Cliff Hanger in breach of the Intercreditor Agreement, and both Cliff Hanger and Rabo are transferees of the cattle and proceeds of the cattle that were transferred by fraud.

92.    At the time the calves of Waggoner Cattle were transferred to Cliff Hanger for less than full price, or, in other cases, for no payment whatsoever, Lone Star had a prior perfected, unsubordinated security interest in those cattle and proceeds pursuant to its Agricultural Security Agreements with Waggoner Cattle and Cliff Hanger. Lone Star's prior security interest was totally disregarded, all to the detriment of Lone Star.

93.    As set out in its October 27, 2014 Credit Agreement with Cliff Hanger, Rabo directed that the amount of the Rabo loan advances to Cliff Hanger, which Cliff Hanger used to pay Waggoner Cattle for the transferred cattle would be only 75% of the average price of such calves at the Overland Auction (*see* Paragraph 6.11 of the December 20, Credit Agreement, **Exhibit B**), but the Parties contemplated and agreed that the 25% balance of the market value of the Waggoner Cattle calves would be paid to Waggoner Cattle by Cliff Hanger as "draws" or "distributions" from

the proceeds of Cliff Hanger fat cattle sales. Rabo had actual awareness that as Cliff Hanger was transferring money to Waggoner Cattle to pay for the balance of the market value of the transferred Waggoner Cattle calves, in excess of the 75% "transfer price", as was required in the Intercreditor Agreement in order for Lone Star to subordinate its first lien to Rabo, and it knew that Cliff Hanger was not paying Waggoner Cattle the market price, or a reasonable equivalent price.

94.     The perfected security interests and agricultural liens of Lone Star in the transferred cattle and their proceeds remained even though Cliff Hanger received and later sold the cattle, and remitted all the sales proceeds to Rabo. When Rabo accepted and retained the proceeds from the sale of those cattle from Cliff Hanger, Rabo breached the Intercreditor Agreement, it wrongfully asserted a lien upon the Waggoner Cattle calves which had been shipped to Cliff Hanger for no value or insufficient value, and the proceeds of such cattle, and it disregarded Lone Star's prior and existing perfected security interest and lien as to such cattle and their proceeds, thereby (1) converting the proceeds of Lone Star's collateral, and (2) breaching the Intercreditor Agreement.

95.     To the extent Rabo may claim it has, or had, a lien or could claim as collateral, calves or proceeds of calves that Cliff Hanger obtained from Waggoner Cattle but for which Cliff Hanger did not pay anything, or did not pay full value, Lone Star objects to the Rabo lien under 11 U.S.C. §506. Pursuant to the November 26, 2014 Intercreditor Agreement, Rabo did not obtain a lien or secured status as to cattle in the possession of Cliff Hanger for which Cliff Hanger did not pay Waggoner Cattle full value, and Lone Star's prior security interest and lien remained as to all such cattle and in the proceeds of the sale of those cattle. In the alternative, any lien which Rabo had on the Cliff Hanger cattle was junior and subordinated to Lone Star's perfected first lien.

K.    **Obligations of Rabo.**

96.    Under the Intercreditor Agreement, Rabo and Debtors Waggoner Cattle and Cliff Hanger knew Rabo would not obtain a security interest or lien in the cattle or in the proceeds of the calves transferred from Waggoner Cattle to Cliff Hanger, unless and until Waggoner Cattle was paid in full for the calves.

97.    The Intercreditor Agreement obligated Rabo to assure that Waggoner Cattle was paid in full before Rabo claimed a security interest or lien as to the transferred cattle and their proceeds, and before Rabo accepted any proceeds from the sale of calves transferred from Waggoner Cattle to Cliff Hanger.

98.    Contrary to its contractual obligations to Lone Star, and in order to perpetuate a fraud or constructive fraud upon Lone Star, Rabo directed the Debtors to transfer the Waggoner Cattle calves to Cliff Hanger without paying full price to Waggoner Cattle, and then Rabo received all the proceeds of those same calves when they were later sold by Cliff Hanger, even though Rabo had no security interest or lien, or, alternatively, only held a junior or subordinated security interest or lien, on such cattle and their proceeds.

99.    The transfers of Waggoner Cattle calves, in which Lone Star had a prior perfected security interest and lien, to Cliff Hanger were done by Waggoner Cattle and Cliff Hanger, with the proceeds of those transferred cattle paid to Rabo, with actual intent to hinder, delay or defraud Lone Star, to whom Waggoner Cattle and Cliff Hanger were indebted on secured debts.

100.    As a result of the actions of Waggoner Cattle, Cliff Hanger, and Rabo, Lone Star did not receive the proceeds from the transfer and sale of Lone Star's collateral, the Waggoner Cattle calves.

101.    Because Rabo knew Cliff Hanger was required to pay Waggoner Cattle full value for the Waggoner Cattle calves and instructed Cliff Hanger not to do so, Lone Star's prior perfected security interest in the cattle remained, and Rabo (with no security interest, or, alternatively, with only a junior or subordinated security interest and lien, in partially-paid for calves, or in Waggoner Cattle's calves for which nothing had been paid by Cliff Hanger), is a transferee of those transfers when Rabo accepted and retained proceeds of the re-sold cattle with unreleased liens attached. Further, Rabo failed to act in good faith, and in fact acted with actual malice. It knew that the full price had not been paid for the Waggoner Cattle calves, and, therefore, knew that it had no lien, or alternatively, only a junior or subordinated lien, on the calves and their proceeds. Rabo nevertheless fraudulently accepted and retained all the proceeds of the sale of such calves. Rabo knew it had not advanced sufficient funds of Cliff Hanger to Waggoner Cattle for Cliff Hanger to pay the full price for the Waggoner Cattle calves, a required condition precedent to Lone Star's perfected first lien being subordinated to Rabo's lien.

102.    Rabo received the proceeds of the resale of the calves even though Waggoner Cattle had not been paid in full by Cliff Hanger for those calves. Rabo never acquired a security interest in the calves due to the non-payment of full value to Waggoner Cattle, or, alternatively, Rabo only had a junior or subordinated lien. And, the prior perfected lien of Lone Star as to the calves was never satisfied, in breach of the Intercreditor Agreement.

### III.  CAUSES OF ACTION

**L.    <u>First Cause of Action - Declaratory Judgment.</u>**

103.    Lone Star realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

104.    On November 26, 2014, Lone Star and Rabo agreed and executed the Intercreditor Agreement. The Intercreditor Agreement is a subordination agreement. Interpreting and construing the Intercreditor Agreement is a core claim.

105.    The Intercreditor Agreement is related to the subject matter of this bankruptcy case because Lone Star is a secured creditor of Debtors Waggoner Cattle, Circle W and Cliff Hanger, and Rabo is a creditor of Cliff Hanger. The Intercreditor Agreement pertains to lien priority as to cattle transfers and cattle sale proceeds, as well as certain receivables.

106.    Pursuant to the Intercreditor Agreement, paragraph 2, Rabo agreed that "upon delivery of the collateral to the Cliff Hanger Feedyards **and receipt of payment in full by Waggoner** [Cattle] (emphasis added), **thereafter** all Collateral located in the Cliff Hanger Feedyards shall be owned by and in possession of Cliff Hanger and shall be Cliff Hanger Collateral."  The parties thereby agreed that a condition precedent for Rabo's lien to attach to the transferred calves, and for Lone Star's lien to be subordinated, was for Waggoner Cattle to be paid in full for the full value of the transferred Waggoner Cattle calves.

107.    Rabo further contracted therein that "Any [Rabo] security interest in, or lien or encumbrance on, or claim to Waggoner Collateral including proceeds thereof or rights relating thereto shall be junior in priority to the security interest in, lien, encumbrance on, claims or rights of Lone Star to the Waggoner Collateral."

108.    When some of the calves were transferred from Waggoner Cattle to Cliff Hanger, Cliff Hanger did not fully pay Waggoner Cattle, for other transferred calves Cliff Hanger did not pay Waggoner Cattle at all, and as to most of the calves after January of 2016, Waggoner Cattle did not receive "payment in full".

109.    Therefore, pursuant to the terms of the Intercreditor Agreement, the calves transferred from Waggoner Cattle to Cliff Hanger never became "Cliff Hanger Collateral." In any event, any Rabo lien upon the Waggoner Cattle calves transferred to Cliff Hanger for no consideration, or for inadequate consideration, and as to the proceeds of such cattle, was junior and subordinate to Lone Star's lien.

110.    Rabo agreed that Lone Star's prior security interest in, and lien upon Waggoner Collateral (the calves) would remain in place as to calves transferred for which Waggoner Cattle did not receive payment in full. Further, Rabo agreed that Lone Star's lien has priority and Rabo's lien shall be junior in priority to Lone Star's security interest in, lien, encumbrance on, and claims and rights to said collateral.

111.    Therefore, Lone Star seeks declaratory judgment as follows:

a.      As to the calves transferred by Waggoner Cattle to Cliff Hanger for which Waggoner Cattle was not paid in full, or for which Waggoner Cattle was not paid at all, the calves never became Cliff Hanger Collateral.

b.      As to the cattle transferred by Waggoner Cattle to Cliff Hanger, which never became Cliff Hanger Collateral, the Lone Star security interest in, lien, encumbrance on, and claims and rights to said calves, and all proceeds thereof, takes priority over any claim, lien or security interest of Rabo in the calves and/or calf proceeds in the possession of Rabo and/or paid to it by Cliff Hanger, Waggoner Cattle, or by any buyer of the calves.

c.      As to the calves transferred by Waggoner Cattle to Cliff Hanger for which Waggoner Cattle was not paid at all, or not paid in full, Lone Star's perfected first lien was never subordinated to any lien of Rabo.

112.    Further, as set out in ¶¶ 25-30, 51-52, 67(d), 73(g) and 93 above, and ¶¶ 116-117 and 167-170 below, Cliff Hanger transferred from Rabo loans $8,779,488.25 to Waggoner Cattle, with both Cliff Hanger and Waggoner Cattle posting these transfers in their "due to/due from" accounts as loans from Cliff Hanger to Waggoner Cattle. In his May 31, 2018 §341 testimony, Quint Waggoner testified that all of these transfers were intended to be payments by Cliff Hanger to

Waggoner Cattle for Waggoner Cattle calves transferred to Cliff Hanger (page 48, line 21 - page 82, line 9). In regard to the transfer of the $9,771,891.22 of Cliff Hanger money to Waggoner Cattle, Lone Star prays for a declaratory judgment of this Court, declaring and determining that these transfers of money from Cliff Hanger to Waggoner Cattle were payments for Waggoner Cattle's cattle, as Quint Waggoner testified on May 31, 2018, and that they were not loans, as was reflected on the general ledger and borrowing base certificates of both Cliff Hanger and Waggoner Cattle.

113.    Effective June 30, 2016, Cliff Hanger offset the receivable from Tucker for $1,190,716.90 and the receivable from Tyler for $1,964,483.22, for a total of $3,155,200.12, and made that same amount due as a receivable from Cliff Hanger. The description was "to purchase the cattle from Tucker and Tyler in Waggoner Cattle."

114.    There were a few adjusting transactions posted to the Cliff Hanger Receivable in Waggoner's books. Payments were posted against the new Cliff Hanger AR in Waggoner Cattle for $55,000 on July 12, 2016 (check 1091 from Tyler Waggoner's LSSB acct) and for $125,000 on July 20, 2016 (check 1141 from Tucker Waggoner's account.) However, the same amount of $125,000 was paid from Waggoner Cattle to Cliff Hanger on July 22, 2016 and credited to "Note Payable Cliffhanger." There were also invoices to Cliff Hanger between July 27, 2016 and November 30, 2016. There were ten invoices issued to Cliff Hanger during this period for shipping charges, and two invoices for $11,034.00 (invoice 1394) and for $10,642 (invoice 1398) that appeared to be for baby (day-old) calves.

115.    Effective as of December 30, 2016, a second adjusting journal entry was made to offset the remaining balance of the Cliff Hanger account receivable in Waggoner Cattle's books for $3,004,041.21, with a portion of the credit balance in the "Due\from Cliffhanger Cattle" general ledger account. The description for the journal entry is "To offset Due to CH with A/R CH."

116.     Similar to the books of Waggoner Cattle, there were offsets made related to the Accounts Receivable with Cliff Hanger in Circle W's books, effective June 30, 2016. The journal entry description was "To purchase Tucker and Tyler cattle."  Tucker's account at Circle W was credited for $2,201,187.33, and Tyler's account was credited for $1,451,408.77. The total amount of $3,652,596.10 was charged to the account of Cliff Hanger. Cliff Hanger made payments to Circle W from June 27, 2016 through December 16, 2016 for a total of $4,586,332.13, including two checks that were written to Waggoner Cattle but deposited into Circle W's account (for $170,000 and for $116,855.) Prior to June 27, 2016 there were two deposits totaling $107,000 shown to be from Cliff Hanger, but do not appear to have been paid from the Cliff Hanger/Rabo bank account. Cliff Hanger was also billed for "Holstein Feed Billing" beginning June 30, 2015 and continuing through 2016.

117.     These transactions allowed for the transfer of the Waggoner Cattle calves previously recorded as Waggoner Cattle sales to Tucker and Tyler to now be shown as being acquired by Cliff Hanger, but without Cliff Hanger paying anything for those calves. Instead, the $3,155,200.12 "offset" was a reduction in the booked "due to/due from loans" from Cliff Hanger to Waggoner Cattle, which Quint Waggoner has testified were actually payments to Waggoner Cattle for calves. According to Quint Waggoner's testimony, there was no actual Cliff Hanger receivable from Waggoner Cattle to offset, so that by this "offset", Cliff Hanger acquired $3,004,041.21 in cattle without paying anything for them.

118.     Quint Waggoner was the equitable owner of Cliff Hanger, Waggoner Cattle, Bugtussle and Circle W. These Waggoner Entities often transferred money among themselves, and often paid payables to third parties for one another as loans.

119.    Under the Intercreditor Agreement, the holder of the lien was defined by the location of the collateral, not by the entity which issued the check to the third party seller. Beginning in approximately June of 2015, because Waggoner Cattle was maxed out on its loan from Lone Star, Cliff Hanger began loaning money to Waggoner Cattle by paying third party sellers of pee wee beef calves. Those pee wee beef calves were placed in the Waggoner Calf Ranch, and thereby became Waggoner Collateral. Between June 1, 2015 and November 30, 2016, Cliff Hanger loaned $10,554,191.82 to Waggoner Cattle by paying third party sellers of pee wee beef calves for beef calves which were shipped to the Waggoner Calf Ranch, thereby becoming Waggoner Collateral, upon which Lone Star held a perfected first lien. These beef calves were later shipped to Cliff Hanger, but no consideration was paid to Waggoner Cattle or to Lone Star for them. The value of these Waggoner Cattle beef calves when shipped to Cliff Hanger was approximately $14,282,218.

**M.      Second Cause of Action - Breach of Intercreditor Agreement.**

120.    Lone Star realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

121.    On November 26, 2014, Lone Star and Rabo entered into the Intercreditor Agreement ("Agreement").

122.    Pursuant to Recital A of the Agreement, Rabo knew that Lone Star had loan documents, promissory notes, security agreements or other financial agreements dated March 7, 2014 with Waggoner Cattle, Cliff Hanger, Bugtussle Cattle, LLC, Circle W of Dimmitt, Inc., and Waggoner Trust. Lone Star's liens were perfected, and of public knowledge. Further, Rabo knew those loans financed Waggoner Cattle's cattle operations.

123.    Pursuant to Recital C of the Agreement, Rabo knew the indebtedness to Lone Star was secured by security interests and a lien on the calves at the Waggoner Calf Ranch, and that such was Waggoner Collateral.

124.    Pursuant to Paragraph 2(a) of the Agreement, Rabo knew that cattle transferred from Waggoner Cattle to Cliff Hanger without payment in full by Cliff Hanger to Waggoner Cattle would not become Cliff Hanger Collateral for its loan from Rabo, or in the alternative, would not become subordinated to any lien held by Rabo, and would remain Waggoner Collateral to secure Lone Star's loans to the Debtors.

125.    Through the course of performance of the Intercreditor Agreement between November of 2014 and May 18, 2016, Lone Star, Rabo, Cliff Hanger and Waggoner Cattle demonstrated their intent and agreement that, after the payment of the initial 75% transfer price from Rabo loan advances upon delivery of the Waggoner Cattle calves to Cliff Hanger and the feedyards, the 25% balance of the market value of those calves would be paid by Cliff Hanger to Waggoner Cattle from proceeds of the sale of the finished Cliff Hanger fat cattle.

126.    Pursuant to Paragraph 2(b) of the Agreement, Rabo knew that any Rabo security interest in, or lien or encumbrance on, or claim to Waggoner Collateral, including proceeds thereof, or rights relating thereto, was junior in priority to the security interest in, lien, and encumbrance on, claims or rights of Lone Star to the Waggoner Collateral, until such time as (1) the Waggoner Cattle calves were physically delivered to a feedyard, and (2) Waggoner Cattle was fully paid for such cattle. As of January 31, 2016, Cliff Hanger had fully paid Waggoner Cattle for the delivered calves. However, the balance owed to Waggoner Cattled by Cliff Hanger was thereafter:

      a.      February 28, 2016    $    377,308.03

      b.      March 31, 2016    $ 3,600,958.03

      c.      April 30, 2016    $ 4,703,713.03

| | | |
|---|---|---|
| d. | May 18, 2016 | $ 6,030,831.03 |
| e. | May 31, 2016 | $ 5,306,435.03 |
| f. | June 30, 2016 | $ 5,832,984.03 |
| g. | July 31, 2016 | $ 7,019,272.03 |
| h. | August 31, 2016 | $ 8,906,357.03 |
| i. | September 30, 2016 | $11,606,226.03 |
| j. | October 31, 2016 | $13,214,747.03 |
| k. | November 30, 2016 | $13,585,649.03 |

(*See* **Exhibit C**, "Running Balance Spreadsheet".)

127.    At all times pertinent, Lone Star performed its obligations under the Intercreditor Agreement.

128.    In contrast, Rabo breached the Intercreditor Agreement when Rabo participated with Waggoner Cattle and/or Cliff Hanger in transferring Waggoner Collateral to Cliff Hanger without Waggoner Cattle being paid, or not being paid full value for the collateral, and then having Cliff Hanger resell the cattle (Lone Star's collateral) with Rabo receiving the proceeds of the resale of such cattle, all without paying any of the proceeds to the priority perfected lienholder, Lone Star.

129.    The breach of contract by Rabo proximately caused actual damages to Lone Star. But for the wrongful transfer of the cattle from Waggoner Cattle to Cliff Hanger for less than full value and then resale of the cattle with Rabo receiving the cattle proceeds, Lone Star would have been paid the cattle proceeds to reduce the prior and superior secured debt lien owed by the Debtors to Lone Star.

130.    Lone Star suffered actual damages in the amount of the transfers of cattle proceeds from Waggoner Cattle's cattle to Rabo. In the alternative, Lone Star suffered actual damages in the amount of the difference between the actual value of the Waggoner Cattle calves transferred to Cliff Hanger, and the amount Cliff Hanger paid Waggoner Cattle for those cattle.

131.    Lone Star seeks to recover prejudgment interest on all the transfers of its collateral, or transfers of the proceeds of its collateral. In the alternative, Lone Star seeks recovery of the unpaid interest it accrued on its loans to the Waggoner Entities after the dates those proceeds were paid to Rabo.

N.      **Third Cause of Action - Conversion of Proceeds of Lone Star Collateral.**

132.    Lone Star realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

133.    Pursuant to less than full payments, or no payments whatsoever, for the transfers of Waggoner Cattle calves to Cliff Hanger, Rabo acquired no security interest, or in the alternative, only acquired a junior or subordinated security interest in, or lien or encumbrance on the cattle in the possession of Cliff Hanger. Then, when the cattle were sold by Cliff Hanger, Rabo had no security interest in the proceeds of those cattle, or only, at best, a junior or subordinated security interest in, or lien or encumbrance on the proceeds of the cattle.

134.    Despite the lack of a security interest, or in the alternative despite only holding a junior or subordinate security interest in, lien or encumbrance on the cattle, and while knowing that Lone Star had the prior and continuing primary security interest in, lien and encumbrance on the cattle, Rabo accepted proceeds from the sale of the cattle in 2015, 2016, and 2017 and wholly excluded Lone Star from the proceeds of its collateral, thereby converting Lone Star's collateral and the proceeds of Lone Star's collateral.

135.    Lone Star had a legal interest, its prior and primary security interest in, and lien and encumbrance on, the Waggoner Cattle calves, and the proceeds of those calves.

136.    Rabo assumed and exercised dominion and control over the proceeds of the transferred cattle in an unlawful and unauthorized manner, to the exclusion of and inconsistent with

Lone Star's rights and Lone Star's prior and primary lien. Rabo acted with malice, and a specific deliberate intent to convert Lone Star's collateral.

137.   At the time Rabo obtained the proceeds of the transferred Waggoner Cattle calves, it knew it did not have a primary lien on the proceeds because Cliff Hanger did not pay full value for the cattle, or in some instances, did not pay anything for the Waggoner Cattle calves.

138.   And, pursuant to the Intercreditor Agreement, Rabo knew Lone Star's prior and primary lien applied to the Waggoner Cattle calves, and their proceeds.

139.   Rabo refused Lone Star's demand for the return to Lone Star of the proceeds of the sale of the calves, its collateral.

140.   The conversion by Rabo of cattle proceeds on which Lone Star has a prior, primary, and superior continuing security interest and lien proximately caused damages to Lone Star in an amount in excess of the jurisdictional limits of the Court, and in the amount of the proceeds transferred to Rabo.

141.   In addition to recovery of damages in the value of the converted property on the dates of conversion, Lone Star seeks pre-judgment interest from the date of each conversion.

**O.**   **Fourth Cause of Action - Fraud.**

142.   Lone Star realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

**i.**   **Fraud in Cliff Hanger Borrowing Base Certificates.**

143.   When Rabo and Quint Waggoner transmitted the fraudulent Cliff Hanger borrowing base certificates to Bart Schilling, Paul Strouhal, Amy Hodgson, and many others at Rabo knew they were false, and made those fraudulent value representations with the intent that Lone Star rely on them.

144.    Further, Rabo made the false representations with the intent that Bart Schilling and Lone Star would act upon them, and to induce Bart Schilling and Lone Star to allow Lone Star's collateral, the Waggoner Cattle calves, to be transferred to the possession of Cliff Hanger.

145.    Lone Star signed the Intercreditor Agreement and continued to loan funds to Waggoner Cattle, and allowed the Waggoner Cattle calves to continue to be transferred to Cliff Hanger, in reliance on the representations made by Rabo, and in reliance on the borrowing bases submitted by Quint Waggoner to Rabo and to Lone Star, and in reliance upon the Cliff Hanger borrowing bases submitted by Paul Strouhal of Rabo to Bart Schilling (LSSB 008955, 009111).

146.    Rabo's false representations and fraudulent borrowing base certificates, and Lone Star's repeated reliance on the representations, were the proximate cause of actual damages to Lone Star. As a result of Rabo's false representations, calves were transferred by Waggoner Cattle to Cliff Hanger for less than full value, or for no consideration, Cliff Hanger then resold the cattle, and Rabo accepted and kept all the proceeds of these cattle sales, even though Rabo had no security interest or lien as to the Waggoner Collateral or proceeds of such collateral pledged previously to Lone Star, or in the alternative, Rabo only held a junior or subordinated lien in such cattle and proceeds.

147.    Lone Star seeks its actual damages, and appropriate interest, resulting from the described conduct of Rabo, Cliff Hanger, Circle W and Waggoner Cattle.

**ii.    Fraudulent Promises Regarding the "Take-Out" Loan.**

148.    Rabo, Lone Star and Quint Waggoner had long discussed the plan to have Rabo pay off the Lone Star cattle financing loan to Waggoner Cattle, and for Rabo to be the only cattle lender to both Waggoner Cattle and Cliff Hanger. With Quint Waggoner's decision to purchase Great Plains Feedyard, to concentrate all of his cattle feeding into one facility which could be specialized toward Holsteins, this plan included the purchase of the Great Plains Feedyard, the conversion of

Lone Star's lending arrangement with the Waggoner Entities to that of a lender for the real estate and fixtures only. In furtherance of this plan, Quint Waggoner made $500,000 in escrow deposits toward the purchase of the Great Plains Feedyard.

149.    By 2016, the Waggoner Cattle loans from Lone Star were not being paid down as had been planned. Bart Schilling sought assurances from Rabo that Rabo would still provide the "take-out" loan to completely pay off Lone Star's cattle loans to Waggoner Cattle. In May 2016, Bart Schilling met with Rabo representatives in Amarillo, Texas to discuss the Great Plains Feedyard purchase and Rabo's "take-out" loan. Bart Schilling was assured by the Rabo representatives that the Great Plains Feedyard purchase would go through, that Rabo would pay off the Lone Star's cattle loan, and that Rabo would take over all cattle lending for Quint Waggoner's businesses. Bart Schilling believed Rabo's promises and assurances, to the detriment of Lone Star.

150.    The truth was that Rabo representatives in Utrecht, Netherlands had decided in February 2015 that Rabo would never increase its lending to Quint Waggoner's businesses. All the Rabo loan officers and vice presidents involved were aware of that fact. All the Rabo loan officers and vice presidents were also aware that the only way Rabo would be involved in any increased lending, including any "take-out" loan, or any financing of or regarding the purchase of the Great Plains Feedyard, was completely contingent upon raising additional loan funds from syndication partners. The ability to create a syndicate was always a requirement before Rabo would make a "take-out" loan, take over all the lending for cattle, or otherwise increase its lending to Quint Waggoner's businesses. However, the fact that any increase in lending by Rabo was conditioned on a syndication, and the ability to syndicate the troubled Cliff Hanger loan was always very questionable, was never disclosed to Bart Schilling or Lone Star.

151.    Rabo representatives continued to mislead, string along, and lead on Bart Schilling and Lone Star into believing that the Rabo "take-out" loan was coming, in order to induce Bart Schilling and Lone Star to continue to allow Waggoner Cattle's calves to be shipped to Cliff Hanger for less than their market price, or for no payment whatsoever. By these false and misleading statements regarding Rabo's intent to fund a "take-out" loan, Rabo successfully defrauded Lone Star, and induced Lone Star to allow more and more of its collateral, the Waggoner Cattle calves, to be transferred to Cliff Hanger for less than their market value, or for no payment whatsoever.

### iii.    Fraud in Attempt to Syndicate the Cliff Hanger Loan.

152.    In February 2015, Rabo officers in Utrecht, Netherlands determined that they had reached the "limit of their appetite" for loaning money to Quint Waggoner's businesses. Any additional funding for Quint Waggoner's businesses would only be made through the syndication of the Cliff Hanger loans and the money of other lenders. Also, it was clear that early in 2015, Rabo had determined that the Cliff Hanger loan was undesirable and risky. Rabo wanted to reduce its exposure on the Cliff Hanger loan, and believed that the best way to reduce Rabo's risk on the Cliff Hanger credit was to sell it off to other lenders in a syndication.

153.    Once marching orders for a syndication were given, the Rabo loan officers began to look for ways to "dress up" the credit, to make it more presentable, and therefore more marketable in a syndication. The Rabo loan officers all realized that the split financing arrangement was very undesirable in a syndication, and that feature of the Cliff Hanger credit would make the credit quite difficult to sell into a syndication. The Rabo loan officers knew that, in order to reduce Rabo's risk on this credit through a syndication, Rabo would have to raise sufficient money to take over all of Quint Waggoner's cattle lending.

154.    Other problems in making the Cliff Hanger credit marketable were the loan covenant violations, and the unfavorable information contained in the Cliff Hanger borrowing base certificates. Rabo loan officers began to find, and execute, ways to "dress up" the borrowing base certificates. Rabo loan officers struggled with ways to get the Cliff Hanger loan covenants into compliance. A large loan is virtually impossible to sell into the syndication when it currently has loan covenant violations. Soon the Rabo loan officers realized there simply was no way to bring the Cliff Hanger loan back into compliance with the loan covenants. Thus, the Rabo loan officers determined that they had to "dumb down" the loan covenants to something that could be attained, in the hope that they could successfully market the Cliff Hanger credit in a syndication.

155.    In order to keep the possibility of a syndication alive, the Rabo loan officers began to instruct and require the Cliff Hanger borrowing base certificates to use falsified information on Cliff Hanger's cost of gain, the projected out weight of the cattle, and the price to be received for those cattle. All these fake numbers caused the value of the Cliff Hanger cattle to be materially overstated. The loan officers knew that if truthful information was placed in the Cliff Hanger borrowing base certificates: (1) the Cliff Hanger credit would automatically be shut down when the negative borrowing base was filed, (2) Lone Star would stop the transfer of its collateral to Cliff Hanger for less than their market value, or for no payment at all, and (3) the possibility of selling the Cliff Hanger credit into syndication would be forever gone, thereby causing the entire Cliff Hanger loan loss to be borne by Rabo. Rather than allowing the negative consequences of the truth to be realized, the Rabo loan officers perpetrated frauds on Lone Star and were attempting to perpetrate frauds on prospective syndication partners.

156.    In order to carry out the fraud against prospective syndication partners, it was necessary for Rabo to instruct, create and publish fraudulent Cliff Hanger borrowing base

certificates; which Rabo knew were being relied on by Lone Star, and would be relied on by any syndication partner who could be induced to buy a syndication interest. The damage to Lone Star was a known consequence of Rabo's attempt to defraud prospective syndication partners.

**P.**   **Fifth Cause of Action - Money Had and Received by Rabo, and Constructive Trust.**

157.   Lone Star realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

158.   Rabo holds money that in equity and good conscience belongs to, or should be paid to, Lone Star, which Lone Star seeks to recover by this suit.

159.   Rabo has been and will be unjustly enriched by its receipt of the proceeds of Lone Star's collateral which Rabo misappropriated, accepted and/or withheld from Lone Star.

160.   The Court should impose a constructive trust upon the proceeds of Lone Star's collateral which was taken by Rabo.

161.   Lone Star seeks recovery of the money which constitute the proceeds of Lone Star's collateral that Rabo received and kept.

**Q.**   **Sixth Cause of Action - Civil Conspiracy / Conspiracy to Defraud.**

162.   Lone Star realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

163.   Quint Waggoner, on behalf of himself, Waggoner Cattle, Cliff Hanger, and Circle W, and accountants of the Waggoner Entities, with Paul Strouhal and others of Rabo, agreed to engage in, and actually did engage in, an actual civil conspiracy, the objects of which, in general terms, were to conceal and hide from Lone Star and prospective syndicate partners the financial condition of Debtors and to fraudulently transfer collateral of Lone Star, the Waggoner Cattle calves and their proceeds, and loan funds of Lone Star and their proceeds to Cliff Hanger, and then for Cliff

Hanger to transfer those proceeds to Rabo.  All such actions were taken by Rabo to defraud Lone Star and prospective syndicate partners. These actions were also taken in order to induce Lone Star to take no action to preserve its collateral, and take no steps to stop the transfer of its collateral from Waggoner Cattle to Cliff Hanger for less than its value, or for no value whatsoever, and to reduce Rabo's losses on the Cliff Hanger credit by selling part of the credit to other lenders in a syndication.

164.    Lone Star alleges that the co-conspirators' acts were committed with a calculated, malicious and deceitful intent as demonstrated by the secretive manner in which they acted. In the alternative, such conduct, at a minimum, was the result of reckless disregard for Lone Star's rights. One or more persons carried out acts to further the goals of the conspiracy: to convert Lone Star's loan funds and collateral, and to fraudulently transfer the collateral of Lone Star and those proceeds to Rabo, and to create falsified financial information on Cliff Hanger so that part of the Cliff Hanger credit could be sold into a syndication, thereby lowering Rabo's inevitable loss on the Cliff Hanger loan.

165.    The conduct of Rabo and its conspirators, as alleged herein, directly and proximately caused and produced actual damages to Lone Star for which Lone Star seeks judgment against Rabo. Rabo is liable for all the acts of the other conspirators in carrying out the objects of the conspiracy.

**R.    Seventh Cause of Action - Wrongful Offset.**

166.    Lone Star realleges and incorporates by reference all preceding paragraphs of this First Amended Complaint as if fully set forth herein.

167.    Between December 1, 2014 and June 30, 2016, Cliff Hanger transferred $8,779,488.25 to Waggoner Cattle, and posted on the due to/due from accounts in the general ledger of both Cliff Hanger and Waggoner Cattle that those transfers were loans, or profit distributions, to Waggoner Cattle.  $1,283,962.86 in various credits to Waggoner Cattle's $8,779,488.25 payable to

Cliff Hanger were posted to the general ledgers. As of June 30, 2016, due to miscellaneous credits to Cliff Hanger's booked receivable from Waggoner Cattle, the general ledgers of both Cliff Hanger and Waggoner Cattle showed that Cliff Hanger had outstanding loans of $7,495,525.39 to Waggoner Cattle. That meant that even at the "below market" and "below Overland Auction" prices, no less than $7,495,525.39 of Waggoner Cattle collateral had been transferred to Cliff Hanger with no payment to Waggoner Cattle, since this amount was not booked as sales, but into the "due/from CH" account (even though Waggoner Cattle counted all posts as cattle posts in some other statements). (In addition, several million dollars of other Waggoner Cattle calves had previously been transferred to Cliff Hanger for only approximately 75% of its actual market value.)

168.    After May 18, 2016, Waggoner Cattle continued to ship cattle to Cliff Hanger.  From records examined to date, it appears that between July 1, 2016 and December 31, 2016, Waggoner Cattle transferred another 16,342 head of Waggoner Cattle calves to Cliff Hanger. It appears that these cattle were worth approximately $9,725,073.00, but Cliff Hanger only paid Waggoner Cattle approximately $751,375.00 for them. Thus, as of December 31, 2016, Waggoner Cattle had transferred $16,469,223.39 (including beef calves) of its cattle, for which Cliff Hanger paid nothing. ($7,495,525.39 + $8,973,698.00).

169.    Effective no later than December 31, 2016, Cliff Hanger offset $3,004,041.21 of its payable to Waggoner Cattle for delivered cattle against the $6,297,168.50 receivable of Cliff Hanger from Waggoner Cattle. However, there was no receivable, as the transfers of money so booked as a "due to/due from loan" were, according to the testimony of Quint Waggoner, actually payments for Waggoner Cattle calves.

170.    If the $8,779,488.25 in transfers from Cliff Hanger to Waggoner Cattle were loans, as they were booked on the general ledgers of both Cliff Hanger and Waggoner Cattle, then if the

credits were appropriate, Cliff Hanger received *at least* $7,495,525.39 of Waggoner Cattle calves

for which it never paid Waggoner Cattle, (in addition to the $8,973,698.00 unpaid deliveries after

May 18, 2016. In addition to the millions of dollars' worth of underpriced cattle which Waggoner

Cattle transferred to Cliff Hanger). However, if the $8,973,698.00 in transfers from Cliff Hanger to

Waggoner Cattle, which were booked as loans by both Cliff Hanger and Waggoner Cattle, were

actually intended to be payments for Waggoner Cattle calves, as Quint Waggoner testified, then

there was no Cliff Hanger receivable from Waggoner Cattle against which Cliff Hanger could offset

Waggoner Cattle for the Waggoner Cattle calves deliveries between November 25, 2014 and June

30, 2016. If that is the case, then by virtue of the offset, Cliff Hanger and Rabo converted 1)

$3,004,041.21 of Waggoner Cattle's receivable from Cliff Hanger, 2) $3,004,041.21 of underpriced

Waggoner Cattle calves, and 3) $3,004,041.21 of proceeds of those Waggoner Cattle calves …

which was Lone Star's collateral. This wrongful offset was part of the conversion of Lone Star's

collateral, and part of Rabo's breach of the Intercreditor Agreement.

S.    **Eighth Cause of Action - Equitable Subordination.**

171.    Lone Star realleges and incorporates by reference all preceding paragraphs of this

First Amended Complaint as if fully set forth herein.

172.    Rabo has engaged in inequitable conduct, including conduct described in this

Amended Complaint, which has resulted in injury to Lone Star, and to the Estates of Waggoner

Cattle and Circle W, as well as Estate creditors. The result of such inequitable conduct has been the

conferring of an unfair advantage to Rabo. This inequitable conduct has resulted in harm to the

Estates of Waggoner Cattle and Circle W and their entire creditor bodies.  Accordingly, pursuant

to §§ 510(c)(1) and 105(a) of the Bankruptcy Code, all claims asserted by, on behalf of, or for the

benefit of Rabo against Debtors should be equitably subordinated to the allowed claims of legitimate

creditors for distribution purposes because the claims of Rabo arise from improper conduct in the

form of Fraud, Fraudulent Borrowing Bases, attempts to defraud prospective syndication partners,

Fraudulent Transfers, and receipt and conversion of cattle proceeds on which Rabo held no lien or

security interest, or, alternatively held only a junior or subordinated lien, and done in violation of

an Intercreditor Agreement.

173.    Rabo created and delivered to Lone Star borrowing bases which it knew materially

overstated the value of the Cliff Hanger cattle, and falsely represented non-existent equity. Rabo

directly participated in creating these materially false and fraudulent borrowing bases by directing

that Quint Waggoner, DeNise Merrit and Russell Pharis use and publish (1) fraudulently low cost

of gain numbers, (2) fraudulently high current cattle weights, (3) fraudulently high projected

slaughter weights, and (4) prices which did not reflect the quality price discounts which Debtors and

Rabo knew were being assessed by Tyson on the Cliff Hanger cattle then being slaughtered.

174.    Rabo agreed, directed and participated in the creation and distribution of these false

borrowing bases for the following reasons:

a.      In order to defraud prospective loan syndication or loan participation

members to purchase syndication or loan participation interests in the Cliff Hanger loan, so

that Rabo's inevitable losses on this loan would be partially shared by the other syndication

or loan participation owners; and

b.      In order to induce Lone Star to not stop the transfer of its collateral,

particularly the Waggoner Cattle calves, to Cliff Hanger for no payment, or for less than full

payment, where Rabo would claim 100% of the proceeds of these cattle, despite Lone Star's

first lien. In the words of Rabo Regional Credit Officer Jo Decker:

"... If in fact, as the most recent BB (borrowing base) comments
noted, RAF (Rabo AgriFinance) does capture all the cattle under our

RLOC (revolving line of credit), RAF will regain (from Lone Star and Waggoner Cattle, LLC) some of the (Cliff Hanger) "leaked" equity. I will watch and see."

(RAF0026086 - 3:04 p.m. November 9, 2016 email to Rabo Special Assets Officers Jeanne Scharf and Roger Becker);

– and –

"... While the BB (borrowing base) was received today, I believe it to be falsely positive with low COG's (cost of gain numbers) used. That will be part of our discussion. Paul will walk me through the steps to get all the cattle under RAF and regain our equity that was leaked out so I can get a timeline in my head."

(RAF0018591 - 5:08 p.m. November 8, 2015 email to Rabo Special Assets Manager Jeanne Scharf).

**T.**   **Ninth Cause of Action - Attorney's Fees and Costs.**

175.   As a result of the conduct described above by Rabo, Lone Star was required to engage the services of the undersigned attorneys, and has agreed to pay the attorneys a reasonable fee.

176.   Pursuant to TEX. CIV. PRAC. & REM. CODE §37.009, Lone Star is entitled to a judgment against Rabo for costs and reasonable attorney's fees as are equitable and just.  Pursuant to 28 U.S.C. §2202, Lone Star is entitled to a judgment against Rabo for further relief, including costs and reasonable attorney's fees.

177.   Pursuant to TEX. BUS. & COM. CODE §38.001 et seq., Lone Star is entitled to recover its reasonable attorney's fees in addition to its damages.

## IV. DAMAGES

178.   As a result of Rabo not allowing Cliff Hanger to fully pay for the Waggoner Cattle calves after January of 2016, Cliff Hanger did not pay for, or did not fully pay for, Waggoner Cattle calves. The total underpayment to Waggoner Cattle was $13,585, 649.03. Lone Star's first lien on all Waggoner Cattle calves shipped to Cliff Hanger after January of 2016 remained perfected,

primary and unsubordinated. In regard to all Waggoner Cattle calves shipped after January of 2016, (1) Rabo converted all the proceeds of those cattle, upon which Lone Star had a first lien, and (2) Rabo breached the Intercreditor Agreement.

179.    Had Cliff Hanger not underpaid Waggoner Cattle and allowed Rabo to convert all the proceeds of the calves on which Lone Star held a perfected, unsubordinated first lien, Lone Star would have been over-secured, and paid in full on all its loans to Waggoner Cattle, Cliff Hanger, Bugtussle and Circle W, and would have been able to recover from the Waggoner Entities any associated attorney's fees it might have incurred in dealing with defaults of the Waggoner Entities. Had Rabo not breached the Intercreditor Agreement, and converted the proceeds of Lone Star's collateral, Lone Star would have recovered all its attorney's fees in the Waggoner Entities' bankruptcies from its collateral. Had Rabo not breached the Intercreditor Agreement, and converted the proceeds of Long Star's collateral, Lone Star would have been paid in full from its collateral, and would not have incurred any attorney's fees in the Waggoner Entities' bankruptcies, in the Castro County receivership case, in the *Lone Star v. Moseley & Riddle* adversary proceeding, or in this adversary proceeding. Lone Star seeks the recovery of these attorney's fees as damages proximately caused by Rabo's wrongful conduct.

## V.  PUNITIVE DAMAGES

180.    Plaintiff realleges and incorporates by reference all the allegations set out above, particularly paragraphs 30-39, 42-44, 50-87, 132-156 and 162-165.

181.    The conduct of Rabo in directing the creation and publication to Lone Star of falsified and fraudulent Cliff Hanger borrowing base certificates was done with the specific and malicious intent to defraud Lone Star. The decision to create and publish to Lone Star fraudulent Cliff Hanger borrowing base certificates was made, approved and ratified by many Rabo officers, including

several vice presidents. The fraud perpetrated upon Lone Star by Rabo with the fraudulent Cliff
Hanger borrowing base certificates was done by the numerous Rabo actors with the actual intent to
benefit Rabo, by allowing Rabo to breach the Intercreditor Agreement and convert millions of
dollars of Lone Star's collateral. Rabo actually benefitted by these frauds, and has ratified these
frauds by claiming and keeping the fruits of the frauds.

182.    In addition to its actual damages, Lone Star also seeks to recover punitive damages
against Rabo in an amount necessary to make Lone Star whole, including any attorney's fees, expert
witness fees, and all other costs and losses which it has incurred as a result of Rabo's fraud, but
which are not otherwise to be recovered as part of the damages awarded in this case.

## VI.  CONDITIONS PRECEDENT

183.    Lone Star has fully satisfied and complied with all required notices, demands and
conditions precedent to asserting its rights for recovery of all damages and attorney's fees as stated
herein and to its right to all relief sought from Rabo.

## VII.  PREJUDGMENT INTEREST

184.    As a result of the actions and conduct of Rabo, as hereinabove described, Lone Star
has been damaged and is entitled to recover prejudgment interest. Lone Star seeks prejudgment
interest at the maximum lawful rate.

## VIII.  POST-JUDGMENT INTEREST

185.    Lone Star is entitled to interest on any judgment against Rabo received in this action
at the rate provided by law from the date of judgment until paid.

## IX.  RESERVATION OF RIGHT TO AMEND

186.    Lone Star reserves the right to further amend this pleading as additional information,
defenses and/or claims are discovered or developed.

## X.  REQUEST FOR RELIEF

WHEREFORE, Lone Star respectfully requests that this Court enter judgment in its favor

and against Rabo as follows:

(1)    Damages from Rabo for breach of the Intercreditor Agreement, with appropriate prejudgment interest;

(2)    Declaratory relief as requested in paragraphs 103-119;

(3)    Declaratory relief determining that at all times, in regard to all cattle of Waggoner Cattle for which it was not fully paid, Rabo was an unsecured creditor of Cliff Hanger;

(4)    An order of this Court determining that all claims of Rabo in this proceeding and the bankruptcy cases of the Waggoner Debtors be subordinated to all other creditors in the Debtors' bankruptcy cases;

(5)    Damages from Rabo for conversions of Lone Star's collateral and prejudgment interest from the date(s) of the respective conversions of Lone Star's collateral;

(6)    That the Court impose a constructive trust upon the proceeds of Lone Star's converted collateral;

(7)    Damages from Rabo for fraud, fraud in the inducement and accounting documents, fraud as to the representation of feedyard financing as an inducement for Lone Star to sign the Intercreditor Agreement, money had and received, and conspiracy;

(8)    Ordering an Accounting of Cattle Transfers and Sales by Waggoner Cattle and Cliff Hanger and Distribution of Proceeds to Transferee Rabo;

(9)    Awarding Lone Star its attorney's fees and costs of suit from Rabo;

(10)   Prejudgment Interest from Rabo;

(11)   Post-judgment Interest from Rabo;

(12)   Awarding punitive damages against Rabo in an amount sufficient to make Lone Star completely whole; and

(13)   Awarding Lone Star all such other and further relief, at law or in equity, to which it may be justly entitled.

Dated this 10th day of July, 2019.

> Respectfully submitted,
>
> LOVELL LOVELL  ISERN & FARABOUGH, LLP
> John H. Lovell, SBN 12609300
> john@lovell-law.net
> Joe L. Lovell, SBN 12609100
> joe@lovell-law.net
> 112 Southwest 8th Avenue, Suite 1000
> Amarillo, Texas 79101-2314
> Telephone: (806) 373-1515
> Facsimile:  (806) 379-7176
>
> By:_____/s/ John H. Lovell_____
>      John H. Lovell

### CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing was sent via ecf on this the 10th day of July, 2019, to the following listed parties in interest:

Michael Johnson                                    *Via ecf service: mjohnson@rqn.com*
RAY QUINNEY & NEBEKER, P.C.
36 South State, Suite 1400
Salt Lake City, UT 84111
and

Thomas C. Riney                                    *Via ecf service: triney@rineymayfield.com*
W. Heath Hendricks                                 *Via ecf service: hhendricks@rineymayfield.com*
RINEY & MAYFIELD, LLP
320 S. Polk Street, Suite 600
Amarillo, TX 79101
   *Attorneys for Rabo Agrifinance, LLC*

Max R. Tarbox                                      *Via ecf service: max@tarboxlaw.com*
TARBOX LAW, P.C.
2301 Broadway
Lubbock, TX  79401
   *Attorney for Waggoner Cattle, LLC, Cliff Hanger Cattle, LLC,*
   *Circle W of Dimmitt, Inc., and Bugtussle Cattle, LLC*

R. Byrn Bass, Jr.                                  *Via ecf service: bbass@bbasslaw.com*
Compass Bank Building
4716 4th Street, Suite 100
Lubbock, TX  79416-4953
   *Attorney for Michael Quint Waggoner*

Brad Odell                                         *Via ecf service: bodell@mhba.com*
MULLIN HOARD & BROWN, LLP
P.O. Box 2585
Lubbock, TX 79401-3111
   *Attorney for Lone Star State Bank*

All creditors and parties in interest registered with the U. S. Bankruptcy Court to receive electronic notices in this case.

      */s/ John H. Lovell*
      John H. Lovell